**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| DEUTSCHE BANK SECURITIES INC., | Case No.:  19cv10823 |
| *Plaintiff*, | **COMPLAINT** |
| v. | |
| KINGATE GLOBAL FUND LTD. and KINGATE EURO FUND LTD., | |
| *Defendants*. | |

Plaintiff Deutsche Bank Securities Inc. ("DBSI"), by and through its undersigned attorneys, White & Case LLP, as and for its Complaint herein against Kingate Global Fund Ltd. ("Kingate Global") and Kingate Euro Fund Ltd. ("Kingate Euro" and, collectively with Kingate Global, the "Kingate Funds" and together with DBSI, the "Parties"), states as follows:

<u>**INTRODUCTION**</u>

1.      This is an action to recover damages resulting from the Kingate Funds' breach of a "firm, irrevocable and binding agreement" to sell DBSI the Kingate Funds' bankruptcy claims (the "Claims") in the approximate amount of $1.6 billion against the estate of Bernard L. Madoff Investment Securities LLC ("BLMIS") (the "Madoff Estate").  In 2011, the Kingate Funds and DBSI entered into a binding trade confirmation (the "Agreement") — a written agreement pursuant to which the Kingate Funds agreed to sell the Claims to DBSI, at the price of 66 cents on the dollar, subject to the negotiation of a Purchase and Sale Agreement ("PSA") in good faith.  The Agreement contains all material terms as it specifies the identity, type, purchase price, and quantity of the Claims being sold.

2.     The Agreement required the Kingate Funds to convey "Allowed"[1] Claims against the Madoff Estate, meaning that the Claims would not be subject to subordination, disallowance, avoidance, or any other type of legal or equitable challenge by the trustee of the Madoff Estate, Irving Picard (the "Madoff Trustee").  At the time the Parties executed the Agreement, the Kingate Funds did not yet have Allowed Claims against the Madoff Estate to sell to DBSI.  The Madoff Trustee had filed a lawsuit against the Kingate Funds seeking to, among other things, subordinate, disallow, and avoid the Kingate Funds' Claims in the Madoff Estate (the "Trustee Adversary Proceeding").  Thus, the Kingate Funds would not have Claims in the form that could be transferred to DBSI until they resolved the Trustee Lawsuit.

3.     The Trustee Adversary Proceeding has now been resolved.  On June 26, 2019, the Kingate Funds entered into a settlement agreement that would resolve their lawsuit with the Madoff Trustee (the "Settlement Agreement"); therefore, the Claims are on the verge of becoming Allowed.  The Settlement Agreement provides that the Madoff Trustee will dismiss with prejudice the Trustee Adversary Proceeding seeking to subordinate, disallow, and avoid the Kingate Funds' Claims and that, on the closing date of the Settlement Agreement, the Kingate Funds' Claims will be Allowed on a final and irrevocable basis.  On July 17, 2019, the Madoff Trustee filed a motion requesting that the bankruptcy court overseeing the administration of the Madoff Estate approve the Settlement Agreement, which approval was granted on August 6, 2019.  The courts overseeing the Kingate Funds' liquidation in the British Virgin Islands (the "BVI") and Bermuda have also

---

[1] "Allowed" is defined in the Agreement to mean "a valid, enforceable, liquidated, non-contingent, undisputed, unavoidable, and unsubordinated claim that is not subject to any actual or potential avoidance, reduction, set-off, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise, and whether pursuant to section 510(c) of the United States Bankruptcy Code or otherwise) counterclaim, cross-claim, defenses, disallowance, (whether under sections 502(b), (d), or (e) of the United States Bankruptcy Code or otherwise), impairment, objection, or any other challenges under any applicable law, whether foreign or domestic.

approved the Settlement Agreement.  Thus, when the Settlement Agreement closes, the Kingate

Funds' Claims against the Madoff Estate will become Allowed and can be transferred to DBSI in

accordance with the Agreement.

4.      The  Kingate  Funds  have  failed  to  comply  with  their  obligations  under  the

Agreement.  In May 2019, after years of keeping DBSI apprised of the status of its litigation with

the Madoff Trustee and discussing the transfer of the Claims, and with the Claims ripe for transfer

to DBSI, the Kingate Funds refused to transfer the Claims to DBSI or negotiate a final PSA in

good faith, incorrectly stating that the Agreement is not "binding."  The reason is simple.  As the

value of the Kingate Funds' Claims has materially increased since 2011, the Kingate Funds now

have sellers' remorse and want to avoid their obligations under the "firm, irrevocable and binding"

Agreement to sell the Allowed Claims to DBSI for 66 cents on the dollar.

5.      On the closing date of the Settlement Agreement, the Kingate Funds will receive a

total combined "Allowed" Customer Claim (as defined below) of $1,659,748,094.52 against the

Madoff Estate.  At that time, the Kingate Funds will possess the bundle of rights that they agreed

to transfer to DBSI in the Agreement.  The Kingate Funds breached the Agreement by refusing to

transfer the Claims (once they become Allowed) to DBSI or negotiate a final PSA regarding the

Claims in good faith, and DBSI is entitled to an award of damages based on the full value of the

Claims, including the $1,659,748,094.52 in Customer Claims, less the agreed upon purchase price,

plus all applicable interest, costs, and fees.  Alternatively, DBSI is entitled to a declaration that the

Agreement is binding and enforceable, and that the Kingate Funds are in breach of their obligation

to transfer the Claims to DBSI in accordance with the Agreement.

## PARTIES

6.      Plaintiff DBSI is a Delaware corporation with its principal place of business in New

York, New York.  DBSI is an indirect wholly-owned subsidiary of Deutsche Bank AG.

7.     Defendant Kingate Global is an investment fund incorporated in the BVI, whose primary activity prior to its liquidation entailed raising funds through subscription of its shares for investment with BLMIS.

8.     Defendant Kingate Euro is an investment fund incorporated in the BVI, whose primary activity prior to its liquidation entailed raising funds through subscriptions of its shares for investment with BLMIS.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a).  DBSI is a Delaware corporation.  Kingate Global and Kingate Euro are companies incorporated in the BVI. The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

10.     Venue in this Court is proper under 28 U.S.C. § 1391.  The Agreement was negotiated in the Southern District of New York.  Additionally, the Agreement provides that "[a]ny controversies arising between [the Kingate Funds] and [DBSI] under this Confirmation Letter and in connection with, or in relation to, the transaction contemplated herein will be determined in the federal or state courts located in the State of New York and the borough of Manhattan."  Further, on December 21, 2011, the Kingate Funds commenced an action in the United States District Court for the Southern District of New York alleging that DBSI breached the Agreement.  In addition, on October 18, 2019, the Bankruptcy Court overseeing the Kingate Funds Chapter 15 proceedings entered an Order Granting Recognition of Foreign Main Proceedings allowing DBSI to commence litigation relating to the Agreement against the Kingate Funds in the United States District Court for the Southern District of New York.  This Court has personal jurisdiction over the Kingate Funds for the same reasons.

## BACKGROUND

### The Kingate Funds and the Revelation of the Madoff Fraud

11.     For years leading up to the December 2008 collapse of BLMIS, the two Kingate Funds were customers of BLMIS and acted as so-called Madoff "feeder funds," investing approximately $1.6 billion of their customers' assets into BLMIS's accounts.  As the world now knows, in December 2008 Bernard Madoff publicly confessed that BLMIS was a massive fraud. Madoff's confession revealed the largest Ponzi scheme in history.  The Claims arise out of the Kingate Funds' investments in BLMIS prior to the public revelation of the Madoff fraud.

12.     Immediately following Madoff's confession, BLMIS was placed into a liquidation proceeding under the Securities Investor Protection Act (the "SIPA Proceeding").  The SIPA Proceeding is being conducted much like a bankruptcy, and administrative matters essential to the proceeding are pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  The Madoff Trustee supervises the administration and liquidation of BLMIS in the SIPA Proceeding.

13.     On April 17, 2009, the Madoff Trustee commenced the Trustee Adversary Proceeding in the Bankruptcy Court against the Kingate Funds and their former principals for their alleged conduct in connection with the Madoff fraud.  *See Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC v. Kingate Global Fund, Ltd. et al.*, Adv. Pro. No. 09-1161 (BRL) (Bankr. S.D.N.Y.).  The Madoff Trustee alleged that the Kingate Funds' former principals received hundreds of millions of dollars in fees while on actual notice of BLMIS's fraudulent activity.  The Madoff Trustee sought to avoid and claw back almost $1 billion from the Kingate Funds based on the theory that redemptions made by the Kingate Funds from BLMIS constituted unlawful preferential and fraudulent transfers under various sections of the U.S. Bankruptcy Code and the New York Debtor and Creditor Law.  The Madoff Trustee sought,

among other remedies, the return of the nearly $1 billion the Kingate Funds redeemed from BLMIS and to disallow and equitably subordinate the Kingate Funds' Customer Claims (as defined below) against the Madoff Estate.

14.     Each of the Kingate Funds had two claims relating to BLMIS — the "Customer Claim" and the "Remission Claim." The Customer Claim related to claims held by the Kingate Funds in the assets recovered by the Madoff Trustee on behalf of the Madoff Estate. For the Kingate Funds' Customer Claims to become Allowed claims, the Trustee Adversary Proceeding had to be resolved. The Remission Claim related to claims the Kingate Funds had to any forfeiture fund, including the forfeiture fund established by the United States Department of Justice, which was designed to distribute certain designated funds to victims of the Madoff fraud.

15.     The Kingate Funds invested almost all of the capital provided to them by investors with BLMIS. The revelation that Madoff had operated a Ponzi scheme caused the Kingate Funds to enter liquidation proceedings. On May 6, 2009, each of the Kingate Funds applied to the Commercial Division of the High Court of Justice, BVI (the "BVI Court"), which appointed William Tacon and Richard Fogerty as Joint Provisional Liquidators (together, with any successors, the "Liquidators"). As a result, the Kingate Funds are now in liquidation, subject to a formal Winding Up By Court process under the direction of the BVI Court.

**The Kingate Funds Agreement to Sell the Claims to DBSI**

16.     In or about April 2011, the Kingate Funds solicited bids for the sale of their Claims against the Madoff Estate.

17.     DBSI submitted a formal bid letter to acquire the Kingate Funds' Claims relating to the Madoff Estate. DBSI's bid letter included certain proposed terms and conditions that would be incorporated in any PSA with the Kingate Funds as well as any settlement agreement between

the Kingate Funds and the Madoff Trustee.  Importantly, the bid letter specified that as a condition precedent to any transaction, any settlement agreement with the Madoff Trustee would need to provide that the Claims would be "treated for all purposes as Allowed."  The bid letter defined "Allowed" to mean:

> allowed as a valid, enforceable, liquidated, non-contingent, undisputed, unavoidable, and unsubordinated claim that is not subject to any actual or potential avoidance, reduction, set-off, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise, and whether pursuant to Section 510(c) of the United States Bankruptcy Code or otherwise), counterclaim, cross-claim, defenses, disallowance (whether under sections 502(b), (d), or (e) of the United States Bankruptcy Code or otherwise), impairment, objection, or any other challenges under any applicable law, whether foreign or domestic.

Thus, from the very beginning, starting with DBSI's bid letter, DBSI and the Kingate Funds contemplated that the transfer of the Kingate Funds' Claims would occur only after they were Allowed.  Because the Trustee Adversary Proceeding sought to subordinate, disallow, and avoid the Kingate Funds' Claims in the Madoff Estate, DBSI's acquisition of the Claims was conditioned on the successful resolution of the lawsuit.

18.      After DBSI submitted its initial bid letter, the Kingate Funds selected another bidder to purchase the Kingate Funds' Claims.  The Kingate Funds could not reach a final agreement with this third party, however, and the bid fell through.  Thereafter, the Kingate Funds reengaged with DBSI.  In light of their inability to document the previously contemplated transaction, the Kingate Funds insisted that DBSI execute a written trade confirmation to document the express terms of the deal.

19.      On August 16, 2011, DBSI's counsel sent the Kingate Funds' counsel an initial draft of the PSA for the Claims, which included an express representation by the Kingate Funds that the "Claims" would be "Allowed against the Debtor in the amounts set forth in the Settlement Agreement [with the Madoff Trustee] . . . ."  The initial draft of the PSA defined "Allowed" in the

same way as DBSI's May 25, 2011 bid letter and specified that the accuracy of this representation (and others) was a condition precedent to closing. While DBSI was willing to accept the credit risk associated with a recovery on the Allowed Claims, DBSI was not willing to accept the risk that the Claims themselves would be subordinated, disallowed, or avoided as contemplated in the Trustee Adversary Proceeding.

20.     On August 23, 2011, counsel for the Kingate Funds sent a revised draft of the PSA to DBSI's counsel. Acknowledging the deal terms, the Kingate Funds did not change any of the language in the draft PSA regarding the Kingate Funds' representation that, as of the time of closing, the Claims would be Allowed — nor did the Kingate Funds change the language stating that the accuracy of this representation was a condition precedent to closing. In the August 23, 2011 draft sent by counsel for the Kingate Funds, the representation read:

> The Claims are Allowed against the Debtor in the amounts set forth in the Settlement Agreement (the "Settlement Amount") in accordance with the Net Investment Method and the Last Statement Method, inclusive of any and all Funding Obligations.

The definition of "Allowed" also remained unchanged.[2]

21.     The next day, on August 24, 2011, the Parties executed the Agreement pursuant to which the Kingate Funds agreed to sell to DBSI its Claims in the Madoff Estate. The Agreement expressly states that it is a "firm, irrevocable and binding agreement (the 'Transaction') to sell the Claims . . . at the Purchase Rate . . . to [DBSI]." The Kingate Funds sold Claims in the total amount of $1,624,748,095 — $938,862,953 from Kingate Global and $685,885,142 from Kingate Euro — with a purchase price of 66% of the claim amount, *i.e.*, $1,072,333,743. Consistent with the draft PSA that the Kingate Funds' counsel had circulated just one day earlier, the Agreement

---

[2] On August 25, 2011, DBSI revised the language in the draft PSA regarding this representation from the Kingate Funds to provide: "the Customer Claim is Allowed against the Debtor" instead of "the Claims are Allowed against the Debtor." This revision was accepted and incorporated into later drafts of the PSA.

provides that each of the Kingate Funds is committed to sell, *inter alia*, "all right, title and interest, whether legal, equitable, or otherwise, in the Allowed" Customer Claim.  A true and correct copy of the Agreement is attached as Exhibit A.

22.     Thus, the Parties agreed that the transaction contemplated in the Agreement required the Kingate Funds to transfer Allowed Customer Claims.  This intention is stated explicitly in the Agreement, the bid letter, and in drafts of the PSA exchanged between DBSI and the Kingate Funds, both before and after the Agreement was executed, including the draft PSA the Kingate Funds' counsel sent DBSI the day before the Agreement was signed.

23.     In clear and unambiguous terms, the Agreement specifies the exact Claims that each Kingate Fund agreed to sell to DBSI:

> The "Global Claim" is comprised of:  (A) all right, title and interest, whether legal, equitable or otherwise, in the Allowed "claim" (as defined in 11 U.S.C. § 101(5)) of a "customer" for "net equity" (as such terms are defined in 15 U.S.C. § 78lll) of Global against the Debtor in the Case; (B) all right, title and interest, whether legal, equitable or otherwise, in all rights to any recoveries of Global arising from or related to any forfeiture fund established pursuant to 28 C.F.R. Part 9 or otherwise (including, but not limited to, any such funds recovered pursuant to a settlement in (i) *United States of America v. $7,206,157,717 On Deposit at JPMorgan Chase, N.A. in the Account Numbers Set Forth on Schedule A*, No. 10-CV-9398 (S.D.N.Y.) (TPG)) and (ii) *United States of America v. $625,000,000 On Deposit at JPMorgan Chase, N.A. in the Account Numbers Set Forth on Schedule A*, No. 10-CV-916 (S.D.N.Y.) (TPG) (RLE)) or any other restitution, remission or mitigation processes or funds, or from any other fund operated or administered by (or on behalf of) any entity, governmental or otherwise, (including the US Department of Justice) foreign or domestic (collectively, the "Forfeiture Funds") and (C) subject to the third sentence in this "Claims" section, any and all other claims, causes of action or other rights related to, or in connection with, the foregoing subclauses (A) and (B).
>
> The "Euro Claim" is comprised of:  (A) all right, title and interest, whether legal, equitable or otherwise in the Allowed "claim" of a "customer" for "net equity" of Euro against the Debtor in the Case; (B) all right, title and interest, whether legal, equitable or otherwise, in all rights to any recoveries of Euro arising from or related to the Forfeiture Funds and (C) subject to the third sentence in this "Claims" section, any and all other claims, causes of actions or other rights related to, or in connection with, the foregoing subclauses (A) and (B).

For the avoidance of doubt, the Claims shall not include any of Seller's third-party litigation claims, which may be transferred to the Trustee in Seller's sole discretion.[3]

24.     The Agreement further provides that "[t]he Transaction is subject to execution of a Purchase and Sale Agreement (governed by New York law) in a form that is reasonably and mutually agreed between Seller and Buyer and which Seller and Buyer shall negotiate in good faith."  Although the Agreement contemplates execution of a PSA, it contains all essential terms for the sale of the Kingate Funds' Allowed Claims.  The Agreement specifies the asset sold (the Kingate Funds' Claims) and the price for the asset.  However, as the Agreement requires the Kingate Funds to transfer Allowed Claims, which the Kingate Funds did not at that time possess, the Agreement has been subject to a condition precedent.

25.      Although DBSI's obligation to purchase the Claims was subject to a condition precedent, DBSI's contemporaneous actions reflect its understanding that the Agreement was binding.  DBSI entered into participation agreements with various third parties that would transfer, among other things, DBSI's right to receive recoveries on the Claims to those third parties.

26.     The Agreement does not contain an expiration date.

**2011 Negotiations of the PSA Following Execution of the Agreement**

27.     After executing the Agreement, DBSI continued to engage in good faith negotiations with the Kingate Funds towards consummation of the transaction.  However, the transaction could not close until the Trustee Adversary Proceeding was resolved and the Customer Claims were Allowed.

28.     In September 2011, DBSI, the Kingate Funds, and the Madoff Trustee engaged in negotiations in an effort to resolve the Trustee Adversary Proceeding against the Kingate Funds,

---

[3] The term "Seller" refers to each of the Kingate Funds.

so that the Kingate Funds' Claims would be allowed against the Madoff Estate. Throughout the discussions with the Kingate Funds, DBSI reasonably sought the right to review and consent to any settlement agreement between the Kingate Funds and the Madoff Trustee. DBSI also requested reasonable accommodations be included in the draft settlement agreement between the Madoff Trustee and the Kingate Funds, including provisions that DBSI would be a third-party beneficiary of the contemplated settlement agreement (given that it had agreed to purchase all Claims that would be Allowed thereunder) and that the Remission Claim relating to the DOJ's Forfeiture Fund would be Allowed.[4]

29.     Throughout the remainder of 2011, DBSI's counsel participated in numerous conversations with the Kingate Funds' counsel regarding the transaction, and advised the Kingate Funds' counsel that DBSI stood ready to purchase the Claims at the agreed-upon price under an appropriate PSA and upon the resolution of the Trustee Adversary Proceeding to allow the Claims.

**The Kingate Funds' Litigation Against DBSI**

30.     Even though the Kingate Funds could not convey Allowed Claims to DBSI because the Trustee Adversary Proceeding remained pending, and though DBSI remained in discussions with the Kingate Funds, on December 21, 2011 the Kingate Funds filed a complaint in the United States District Court for the Southern District of New York in an effort to force DBSI to close the transaction. *See Kingate Global Fund Ltd. v. Deutsche Bank Securities Inc.*, No. 11-cv-9364 (S.D.N.Y. 2011) (Batts, J.). Specifically, the Kingate Funds sought declaratory relief that the Agreement constituted a "firm, irrevocable and binding" commitment by DBSI to purchase the Kingate Funds' Claims. The Kingate Funds alleged that they "sold their Claims to [DBSI]," contending that the Agreement "plainly states" the transaction is a "done deal." When the Kingate

---

[4] Mr. Picard, the Madoff Trustee, was also the Special Master of the Forfeiture Fund at the time.

Funds' counsel delivered a courtesy copy of the Complaint, they advised that "we are of course open to settlement discussions" and that the filing of the Complaint was "not intended to cut off discussions" between the Kingate Funds and DBSI, including the discussions DBSI initiated with the Kingate Funds in the prior week.

31.     On January 11, 2012, DBSI filed its answer and counterclaim, which sought a declaratory judgment that the Agreement, standing alone, did not bind DBSI to purchase the Claims when the Claims were not yet Allowed, and that DBSI had negotiated with the Kingate Funds to resolve the condition precedent in good faith in satisfaction of its obligations under the Agreement.  As DBSI alleged in the Counterclaims, "[a]ny sale of the Kingate Funds' claims is predicated on the Funds' successful settlement of the lawsuit brought by the Madoff Trustee . . . [because] . . . the settlement with the Madoff Trustee is the event that will create the bundle of rights the Kingate Funds seek to sell."

32.     Following the exchange of pleadings, DBSI and the Kingate Funds continued to negotiate with each other and the Madoff Trustee toward a resolution that would provide the Kingate Funds with Allowed Claims, thus satisfying the condition precedent for consummating the transaction.

33.     At a status conference before Judge Batts on April 12, 2012, DBSI advised the Court that it was prepared to proceed with the transaction, subject to obtaining reasonable assurances that DBSI would be able to recover on the Claims.  The Court encouraged the Parties to continue their negotiations with the Madoff Trustee and suggested that the Parties agree to a discovery stay while the Parties were seeking to negotiate a resolution.  In accordance with the Court's suggestion, the Parties agreed to stay the lawsuit to continue their negotiations.

34.     On May 1, 2012, DBSI's counsel wrote a letter advising the Kingate Funds' counsel that "DBSI remains desirous to close the proposed transaction on reasonable terms."   DBSI's counsel cautioned the Kingate Funds against pursuing any proposed settlement with the Madoff Trustee in which "the Kingate Funds would no longer sell their claims to DBSI."   DBSI's counsel made clear:  "[a]ny decision by the Kingate Funds not to sell their claims to DBSI would not only violate the express provisions of the Confirmation Letter, but would run afoul of the very grounds on which Judge Batts agreed to defer the commencement of discovery — namely, to enable the Kingate Funds to consult with the Madoff Trustee in an effort to resolve the remaining issues preventing the parties from proceeding with their contemplated transaction."   Thus, DBSI emphasized that the Agreement was binding and the Kingate Funds were obligated to consummate the transaction with DBSI.

35.     On May 4, 2012, the Kingate Funds' counsel responded by asserting that "DBSI is bound by the Confirmation Letter to purchase the Claims."   The Parties thereafter continued negotiating.

36.     Less than a month later, the Kingate Funds told the Court that the Parties were working toward a resolution of outstanding issues that would allow them to finalize the PSA.  On June 1, 2012, the Kingate Funds' counsel wrote a letter to Judge Batts on behalf of the Kingate Funds and DBSI requesting an additional two-month stay of discovery.  The letter stated that, "[p]ursuant to the Court's recommendations at the [April 12, 2012] conference, on April 16, 2012, the parties submitted a discovery schedule proposal . . . that included a one-month delay to the start of discovery to facilitate a possible solution to the litigation.  No solution has thus far emerged, and the one-month delay expired on May 16, 2012.  Under the parties' proposed discovery schedule, discovery is to now commence.  The parties, however, are hopeful that an additional

delay to the start of discovery will lead to a resolution of the litigation."  The Court agreed to extend the requested stay of discovery on the same day.

37.    On July 10, 2012, the Kingate Funds' counsel wrote a letter to DBSI's counsel seeking to discontinue the lawsuit the Kingate Funds had commenced against DBSI.  The Kingate Funds made this proposal in order to "clear[] the underbrush of this litigation," which it suggested would facilitate the Parties' negotiations of definitive documentation.  The Kingate Funds also acknowledged the Parties' "productive discussions . . . for completing the sale of the Kingate Funds' Madoff-related claims to DBSI."

38.    On July 17, 2012, DBSI's counsel responded that it was premature to dismiss the pending litigation while the Parties were having productive negotiations over closing the trade. DBSI's counsel reminded the Kingate Funds' counsel that "the existing Confirmation Letter binds the Kingate Funds to sell their claims to DBSI on the terms set forth therein."

39.    On or about August 21, 2012, a joint meeting was held among representatives of DBSI, the Kingate Funds, and the Madoff Trustee, as they continued their efforts to reach a resolution that would provide the Kingate Funds with Allowed Claims that could be transferred to DBSI.

40.    Thereafter, in late 2012 and in early 2013, DBSI and the Kingate Funds exchanged draft PSAs, as well as drafts of the proposed settlement agreement between the Madoff Trustee and the Kingate Funds, as they endeavored to finalize the transaction.  DBSI reiterated its desire "to move this forward as quickly as possible" and "strived to accommodate the various concerns raised by the Trustee . . . by keeping [DBSI's] comments [on the settlement agreement] to a minimum."  Those negotiations were not successful, however, because of ongoing uncertainty over the Kingate Funds' right to recover on the Remission Claim and the pending litigation

between the Madoff Trustee and the Kingate Funds, which was still preventing the Kingate Funds' Claims from becoming Allowed.  The Parties continued their negotiations.

41.     On November 22, 2013, the Kingate Funds' counsel renewed their request that DBSI agree to a stipulation dismissing the pending litigation.  The Kingate Funds' counsel noted its view regarding the DOJ's recently announced guidelines, which provided that Madoff feeder funds, such as the Kingate Funds, would not receive a distribution from the DOJ's Forfeiture Fund.

42.     DBSI responded on December 6, 2013.  DBSI did not take the position that the Kingate Funds' inability to deliver an Allowed Remission Claim rendered the Agreement a nullity. To the contrary, DBSI's counsel made clear that the Agreement remained "in full force and effect" and that "[a]ny impairment of the Kingate Funds' interest in the Madoff Victim Fund, however, would not excuse the Kingate Funds' contractual obligations under the Confirm."  The Kingate Funds did not challenge DBSI's assertion.

43.     To the extent that delivery by the Kingate Funds of an Allowed Remission Claim has been a condition precedent to the performance of the Agreement, DBSI is the beneficiary of that condition precedent and has waived that condition.

44.     DBSI agreed to the Kingate Funds' request that the Parties stipulate to the dismissal of the action without prejudice, but the Parties would continue to negotiate toward the transaction contemplated in the Agreement.   DBSI stated:   "We understand that, from your client's perspective, a dismissal without prejudice of this action will remove a potential impediment to the successful negotiation of definitive documentation regarding the sale of the Claims.  Frankly, we do not understand why a dismissal is required by your client as a condition precedent to further negotiations when, as you know, the liquidators are obligated to negotiate in good faith whether or not there is a dismissal . . . ."  Ultimately, however, the Parties recognized that it made sense to

postpone expensive litigation over the terms of the Agreement pending the resolution of the litigation between the Kingate Funds and the Madoff Trustee because absent a resolution there would be no Allowed Claims to transfer, a condition precedent in the Agreement.

45.     The Parties agreed to meet in New York with the Madoff Trustee eleven days later, on December 17, 2013, to continue working toward consummation of the transaction.

46.     On January 2, 2014, the Court entered an order of voluntary dismissal of the pending action without prejudice.  The Parties did not terminate the existing Agreement or the transaction agreed to thereunder.

**Continuing Negotiations Following Voluntary Dismissal of the Kingate Funds' Action**

47.     Following the voluntary dismissal of the action through at least the end of 2018, DBSI and the Kingate Funds stayed in regular contact regarding the status of the Trustee Adversary Proceeding, which was the primary impediment to consummation of the transaction.

48.     DBSI made repeated and ongoing efforts to engage with the Kingate Funds on the potential resolution of the Trustee Adversary Proceeding, which would provide the Kingate Funds with Allowed Claims that could be transferred to DBSI.  The Kingate Funds and the Madoff Trustee, however, were not able to reach a settlement in this five-year period as they actively litigated the Trustee Adversary Proceeding.  As a consequence, DBSI and the Kingate Funds could not consummate the transaction contemplated in the Agreement during that time period.  Relevant developments in the 2014 to 2018 period are summarized below.

49.     On July 18, 2014, the Kingate Funds filed a motion to dismiss the Madoff Trustee's Fourth Amended Complaint in the Trustee Adversary Proceeding.

50.     On or about November 20, 2014, DBSI met with the Liquidators to discuss the Trustee Adversary Proceeding.

51.     On or about December 17, 2014, a hearing was held on the Kingate Funds' motion to dismiss the Madoff Trustee's complaint.  Afterwards, DBSI discussed with the Kingate Funds' counsel their expectations for how the Trustee Adversary Proceeding would proceed.

52.     On or about February 5, 2015, DBSI's counsel and the Kingate Funds' counsel discussed the likely timing of a potential settlement with the Madoff Trustee.

53.     On August 11, 2015, the Kingate Funds' motion to dismiss the Trustee Adversary Proceeding was granted in part and denied in part, allowing the Madoff Trustee to pursue ten of the twelve counts alleged.  The court held that the Madoff Trustee had plausibly alleged the Kingate Funds and their former principals had actual knowledge of Madoff's fraud.  As a consequence, the Kingate Funds' Claims against the Madoff Estate remained subject to subordination, disallowance, and avoidance and were not Allowed in a form that the Kingate Funds could convey to DBSI.

54.     On the day the Bankruptcy Court ruled on the Kingate Funds' motion to dismiss the Trustee Adversary Proceeding, DBSI reached out to lead counsel for the Madoff Trustee regarding the ruling.  DBSI wrote to the Madoff Trustee's counsel:  "Hopefully this will serve as a catalyst for all of us to get back in a room to resolve this."  The same day, the Madoff Trustee's counsel responded, "[a]s you know we are always open to a positive discussion."

55.     The next day, after receiving confirmation that the Madoff Trustee was open to settlement discussions, DBSI reached out to the Liquidators and raised the possibility of mediation with the Madoff Trustee.  Far from disavowing the obligation to sell the Claims under the Agreement, the Liquidators agreed to consider the proposal.

56.     DBSI and the Liquidators engaged in at least two phone calls in October 2015 leading up to an in-person meeting on or about November 18, 2015.  At no point during any of

these calls or the November 2015 meeting did the Liquidators disavow their obligation to convey the Claims to DBSI in accordance with the terms of the Agreement.

57.     Throughout this period, the Madoff Trustee and the Kingate Funds continued to actively litigate the Trustee Adversary Proceeding. Between December 2015 and June 2016, the Madoff Trustee and the Kingate Funds engaged in, and briefed, multiple discovery disputes. An oral argument before the Bankruptcy Court was held on these disputes in June 2016, and a discovery arbitrator was appointed in October 2016. On several occasions during this time period, counsel for DBSI reached out to counsel for Kingate to discuss developments in the Trustee Adversary Proceeding.

58.     On or about July 21, 2016, DBSI and counsel for the Kingate Funds again discussed potential settlement of the Trustee Adversary Proceeding against the Kingate Funds. During this discussion, DBSI again noted its continuing expectation of purchasing any Allowed Claims under the Agreement. Again, the Kingate Funds' counsel did not disavow their ongoing obligations under the Agreement.

59.     Thereafter, DBSI and counsel for the Kingate Funds or the Liquidators, engaged in multiple follow-up discussions and emails to discuss the status of the litigation between the Kingate Funds and the Madoff Trustee, including on or about December 2, 2016, June 23, 2017, September 11, 2017, January 31, 2018, February 12, 2018, March 1, 2018, June 28, 2018, and September 26, 2018. In none of these conversations did the Kingate Funds' counsel or the Liquidators disavow their obligations under the Agreement. To the contrary, in June 2018, DBSI and the Liquidators participated in a call to discuss the transaction contemplated in the Agreement. Throughout this period, as DBSI and the Kingate Funds engaged in these communications, the litigation between the Kingate Funds and the Madoff Trustee continued.

60.     On or about June 27, 2018, DBSI learned that there likely would be a mediation aimed at resolving the Trustee Adversary Proceeding.  DBSI's counsel inquired whether it could participate in the mediation, a request that counsel for the Kingate Funds agreed to consider. Consistent with the view that the Kingate Funds had ongoing obligations under the Agreement, counsel for the Kingate Funds advised DBSI, in substance, that he was sure the mediation would work for everyone — a statement with the clear implication that a successful mediation would also inure to the benefit of DBSI.  DBSI engaged in follow-up discussions with one of the Liquidators on or about September 26, 2018, during which DBSI was told in words or substance that the Liquidators would like to wrap up mediation with the Madoff Trustee at the same time that they resolved DBSI's claims related to the Agreement.

61.     Counsel for the Kingate Funds continued to update DBSI regarding the status of the anticipated mediation through at least November 2018.

62.     The above-described meetings and communications reflect that the Kingate Funds and DBSI understood the Agreement remained in effect, and treated it as such, for years following the Kingate Funds' lawsuit against DBSI.

63.     Throughout this entire period, from 2011 through at least as late as 2018, the Kingate Funds acted as if they would consummate the transaction with DBSI in accordance with the terms of the Agreement once the Kingate Funds resolved the Trustee Adversary Proceeding.

**The Kingate Funds Attempt to Walk Away from the Agreement in 2019**

64.     In or about May 2019, after having been strung along by the Kingate Funds for years, DBSI learned that the Kingate Funds intended to enter into mediation in the near future without involving DBSI in the process.

65.     DBSI's counsel promptly contacted counsel for the Kingate Funds and offered assistance with the mediation to facilitate resolution of the dispute between the Kingate Funds and the Madoff Trustee so that the Kingate Funds' Claims could be transferred to DBSI once the Claims were Allowed as required by the Agreement.

66.     On May 16, 2019, in a startling about-face from their almost eight years of interactions since the Agreement was executed, the Kingate Funds' counsel informed DBSI's counsel that the Kingate Funds no longer considered the Agreement "binding."  In support of this position, the Kingate Funds' counsel cited the lapse of time since the execution of the Agreement and that DBSI had not entered into a PSA in 2011 (in the absence of assurances that the Kingate Funds' disputes with the Madoff Trustee would be resolved in a manner that would provide the Kingate Funds with Allowed Claims, as required).

67.     In a letter dated June 4, 2019, DBSI's counsel disputed the Kingate Funds' new position, stating:

> In December 2011, Kingate commenced an action against DB [DBSI] seeking declaratory relief that the Trade Confirm was "firm, irrevocable, and binding."  To our knowledge, until your May 16, 2019 letter, Kingate has never asserted that it was relieved of its obligations under the Trade Confirm because DB failed to perform thereunder. . . .  As DB advised Judge Batts in 2012, and as has been its position ever since, DB has been prepared to close on the Trade Confirm pending the execution of a reasonably and mutually agreed PSA.  The principal roadblock to that negotiation has been Kingate's inability, to date, to reach a satisfactory resolution of its disputes with the BLMIS Trustee, including as to the Purchased Claims.  As you will recall, Judge Batts stayed discovery of the case to allow Kingate to pursue settlement discussions with the BLMIS Trustee.  As those discussions continued, Kingate and DB agreed to dismiss the action before Judge Batts without prejudice, and both sides reserved their respective rights under the Trade Confirm.  Since that time, DB has continued to communicate to Kingate its intention to consummate the proposed transaction.

68.     Upon information and belief, the Kingate Funds did not negotiate in good faith with DBSI to close the transaction because the Kingate Funds intended to deprive DBSI of the fruits of the Agreement.

**The Kingate Funds Settle the Trustee Adversary Proceeding**

69.     On or about June 2019, despite DBSI's multiple requests that the Kingate Funds keep DBSI apprised of the status of negotiations with the Madoff Trustee (as the Kingate Funds had done from 2011 through at least the end of 2018), the Kingate Funds cut off communications with DBSI regarding a potential settlement of the Trustee Adversary Proceeding.  The Kingate Funds' failure to negotiate with DBSI, after years of solely focusing on resolving the litigation with the Madoff Trustee to fulfill their contractual obligations, was a repudiation of the Agreement and a breach of the Kingate Funds' independent obligation under the Agreement to negotiate in good faith.

70.     On or about June 26, 2019, the Kingate Funds entered into the Settlement Agreement with the Madoff Trustee.  On July 17, 2019, the Madoff Trustee filed a motion with the Bankruptcy Court seeking approval of the proposed Settlement Agreement with the Kingate Funds.  The proposed Settlement Agreement resolves the Trustee Adversary Proceeding and provides the Kingate Funds with Allowed Claims.  The Kingate Funds are expressly permitted to sell and transfer their Claims under the Settlement Agreement.

71.     On August 6, 2019, the Bankruptcy Court entered an order approving the Settlement Agreement.  The courts in the BVI and Bermuda that are overseeing the liquidation of the Kingate Funds also approved the Settlement Agreement.  Accordingly, the condition precedent in the Agreement has been (or is about to be) satisfied and the Parties must close the sale.

72.     On September 5, 2019, the Kingate Funds filed a Verified Petition In Support of Application of Kingate Global Fund, LTD. and Kingate Euro Fund, LTD. for Recognition of Foreign Main Proceedings Pursuant to Section 1517 of the U.S. Bankruptcy Code and Seeking Related Relief (the "Verified Petition") in Case No. 19-12853 (SMB) (Jointly Administered) [ECF

No. 2].  The Verified Petition alleged that the Kingate Funds sought recognition of the BVI insolvency proceedings after more than a decade because they were concerned that DBSI would pursue a claim against the Kingate Funds for breach of the Agreement.

73.   On October 1, 2019, DBSI filed a Limited Objection to the Petition for Recognition of the BVI Proceedings in Case No. 19-12853 [ECF No. 21], as DBSI objected to certain relief requested by the Kingate Funds.  The Parties resolved DBSI's limited objection and agreed to settle a Recognition Order that, among other things, preserves DBSI's ability to pursue claims against the Kingate Funds arising under the Agreement in the United States District Court for the Southern District of New York.

74.   The Kingate Funds' decision to disavow their obligations under the Agreement in May 2019 deprives DBSI of the opportunity to conclude a definitive PSA with the Kingate Funds. Had the Kingate Funds negotiated in good faith with DBSI in May 2019, as is their independent obligation under the Agreement, the Parties would have resolved any outstanding disputes with respect to the PSA and finalized the documentation for the transaction before or contemporaneously with the Settlement Agreement.

75.   Moreover, the Kingate Funds filed the Verified Petition seeking relief under Chapter 15 of the U.S. Bankruptcy Code in bad faith as the Verified Petition is designed to provide the Kingate Funds with a tactical advantage in their two-party dispute with DBSI.  Indeed, the Kingate Funds never disclosed to DBSI their intention to file the Verified Petition.  Had the Kingate Funds disclosed that they intended to delay negotiations with DBSI so that they could first seek relief under Chapter 15 of the U.S. Bankruptcy Code, DBSI would have demanded that the Kingate Funds immediately perform their obligations under the Agreement.

76.     In sum, after years of discussions and negotiations, the Kingate Funds rejected DBSI's offer to participate in the mediation with the Madoff Trustee and have stated that they do not believe the Agreement is "binding".  The Kingate Funds have adopted this position just before entering into the Settlement Agreement with the Madoff Trustee — a settlement that satisfies the condition precedent in the Agreement and provides the Kingate Funds with the bundle of rights the Kingate Funds have agreed to sell to DBSI.

## JURY DEMAND

77.     DBSI hereby demands a trial by jury on all claims triable by jury.

## FIRST CAUSE OF ACTION
### (Breach of Contract/Damages)

78.     DBSI repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

79.     The Agreement is a "firm, irrevocable and binding" contract that contains all essential terms.

80.     The Agreement specifies the identity and type of claims that the Kingate Funds sold to DBSI and that DBSI purchased from the Kingate Funds.  Specifically, the Agreement provides that the Kingate Funds are to convey the "Global Claim" and the "Euro Claim" to DBSI.

81.     The Agreement specifies the amount of the Claims that the Kingate Funds sold to DBSI and that DBSI purchased from the Kingate Funds.  Specifically, the Agreement provides that the Global Claim Amount is $938,862,952 and the Euro Claim Amount is $685,885,142.

82.     The Agreement specifies the purchase price for the Claims.  The Agreement provides that the purchase price for the Claims is 66% of the Kingate Global Claim Amount and the Kingate Euro Claim Amount.

83.     DBSI has fully performed or stood ready to perform its obligations under the Agreement.

84.     The Kingate Funds refuse to consummate the transfer of their Allowed Claims to DBSI, as required under the Agreement.

85.     The Kingate Funds' breach of the Agreement has damaged DBSI, by, among other things, depriving DBSI of the value of the Claims up to and including the full Global Claim Amount and Euro Claim Amount, plus interest.  DBSI is entitled to damages in an amount that will be determined at trial.

**SECOND CAUSE OF ACTION**
**(Breach of Contract/Damages)**

86.     DBSI repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

87.     The Agreement is a "firm, irrevocable and binding" enforceable contract that, in addition to requiring the Kingate Funds to consummate the transfer of their Allowed Claims to DBSI, independently requires the Kingate Funds to "negotiate in good faith" towards "execution of a Purchase and Sale Agreement (governed by New York law) in a form that is reasonably and mutually agreed between" DBSI and the Kingate Funds.

88.     DBSI has fully performed or stood ready to perform all of its obligations under the Agreement.

89.     The Agreement obligates the Kingate Funds to transfer Allowed Claims.  As the Trustee Adversary Proceeding sought to, among other things, avoid, subordinate, and disallow the Kingate Funds' Claims, the successful resolution of the Trustee Adversary Proceeding was a condition precedent to consummating the transaction contemplated in the Agreement.

90.     As the Settlement Agreement between the Madoff Trustee and the Kingate Funds was approved by the Bankruptcy Court on August 6, 2019, the conditions precedent to consummating the transaction contemplated in the Agreement have been or are about to be satisfied.

91.     After seeking a legal declaration that the Agreement is binding and engaging in years of negotiations with DBSI to finalize a PSA, in 2019 the Kingate Funds found themselves on the cusp of resolving the Trustee Adversary Proceeding in a fashion that would provide them with Allowed Claims that could be transferred to DBSI.  Rather than negotiate a final PSA in good faith, as the Agreement requires, the Kingate Funds acted in bad faith by refusing to negotiate with DBSI and concealing their intention to file a petition seeking relief under Chapter 15 of the U.S. Bankruptcy Code (the "Chapter 15 Filing").  Had the Kingate Funds advised DBSI that they intended to delay negotiations so that they could make the Chapter 15 Filing, DBSI would have demanded that the Kingate Funds earlier perform their obligations under the Agreement to negotiate in good faith to finalize a PSA.

92.     Had the Kingate Funds negotiated in good faith with DBSI in May 2019 to finalize a PSA, as the prior actions of the Liquidators had led DBSI to reasonably believe, final documentation of the transaction outlined in the Agreement could have been finalized and executed before or at the same time as the Madoff Trustee and the Kingate Funds executed the Settlement Agreement in June 2019.

93.     The Kingate Funds' breach of their independent obligation to negotiate a definitive PSA in good faith has damaged DBSI in an amount that will be determined at trial.

## THIRD CAUSE OF ACTION
### (Breach of Implied Covenant/Damages)

94.     DBSI repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

95.     A covenant of good faith and fair dealing is implied in all contracts under New York law.  The covenant of good faith and fair dealing prevents a party from destroying or injuring the right of another party to receive the fruits of the contract.

96.     The fruits of the Agreement for DBSI include the right to acquire the Claims identified in the Agreement.

97.     Through their bad faith Chapter 15 Filing, the Kingate Funds have sought to deprive DBSI of the fruits of the Agreement.  More than a decade after entering liquidation proceedings in the BVI, the Kingate Funds made the Chapter 15 Filing solely as a means to gain a tactical advantage in the Kingate Funds' dispute with DBSI and to thwart DBSI's rights to acquire the Claims.

98.     The Kingate Funds have breached the covenant of good faith and fair dealing implied in the Agreement.

99.     The Kingate Funds' breach of the covenant of good faith and fair dealing implied in the Agreement has damaged DBSI in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Declaratory Judgment)

100.     DBSI repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

101.    Under 28 U.S.C. § 2201(a), there exists an actual controversy between DBSI and the Kingate Funds, within the jurisdiction of this Court, such that the Court may declare the rights and legal relations of the Parties under the Agreement.

102.    Although the Agreement was executed almost eight years ago, it has no expiration date.  The Agreement remains a binding and enforceable contract pursuant to which the Kingate Funds are obligated to transfer, among other things, their Allowed Customer Claims against the Madoff Estate to DBSI.

103.    The Kingate Funds continued to discuss and negotiate the transfer of the Claims to DBSI from August 2011, when the Agreement was executed, until the Kingate Funds were on the verge of settling the Trustee Adversary Proceeding in a manner that would provide the Kingate Funds with Allowed Customer Claims.

104.    In May 2019, the Kingate Funds asserted that the Agreement is not "binding" and refused to negotiate a PSA in good faith with DBSI.

105.    DBSI is entitled to a declaration that the Agreement is an enforceable, binding contract and that the Kingate Funds are in breach of their obligation to transfer the Claims to DBSI in accordance with the express provisions of the Agreement.

## PRAYER FOR RELIEF

WHEREFORE, DBSI respectfully requests that the Court:

(1)    award DBSI all actual, economic, consequential, and out-of-pocket damages sustained as a result of the Kingate Funds' breach of the Agreement, including, without limitation, the Global Claim Amount and Euro Claim Amount, plus interest, in an amount to be determined at trial;

(2)    award DBSI pre- and post-judgment interest as allowed by law;

(3)    award DBSI reasonable attorneys' fees and costs;

(4)     issue a declaratory judgment, pursuant to 28 U.S.C. § 2201 that the

Agreement constitutes a binding, enforceable contract for the purchase and sale of the

Allowed Claims identified in the Agreement, and that the Kingate Funds are obligated to

consummate the transfer of the Claims to DBSI; and

(5)     grant DBSI such other and further relief as the Court deems just and proper,

together with the costs and disbursements of this action.

Dated:     November 21, 2019
           New York, New York          WHITE & CASE LLP

                                       By: *Andrew W. Hammond*
                                       Glenn M. Kurtz
                                       Andrew W. Hammond
                                       1221 Avenue of the Americas
                                       New York, NY 10020
                                       Telephone: 212-819-8200

                                       *Attorneys for Plaintiff Deutsche Bank Securities*
                                       *Inc.*