UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEUTSCHE BANK SECURITIES INC.,

Plaintiff,

v.

KINGATE GLOBAL FUND LTD. and
KINGATE EURO FUND LTD.,

Defendants.

Case No. 19-cv-10823

**<u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>**

Date:  April 1, 2020

Philippe Z. Selendy
Caitlin Halligan
Andrew R. Dunlap
Lena Konanova
Oscar Shine
Thad Eagles
SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, NY  10104
Tel: 212-390-9000
pselendy@selendygay.com
challigan@selendygay.com
adunlap@selendygay.com
lkonanova@selendygay.com
oshine@selendygay.com
teagles@selendygay.com

*Attorneys for Defendants Kingate Global
Fund Ltd. and Kingate Euro Fund Ltd.*

# **TABLE OF CONTENTS**

**Pages**

PRELIMINARY STATEMENT .................................................................................1

BACKGROUND ..................................................................................................4

    A.    The Kingate Funds' Catch-22 With Their Claims Against The Madoff Estate...............................................................................................................4

    B.    The Parties Attempt To Negotiate A Deal In Which DBSI Pays To Settle The Trustee's Lawsuit To Permit A Recovery On The Funds' Customer Claims ...........................................................................................................6

    C.    DBSI Abandons Negotiations And The Deal ........................................8

    D.    Nearly A Decade Later, The Funds Settle The Trustee's Lawsuit With No Support From DBSI, And DBSI Sues For Windfall Payments ...........................10

ARGUMENT .....................................................................................................11

I.    DBSI'S CLAIMS FAIL BECAUSE THE IMPLIED CONDITION PRECEDENT ON WHICH THEY DEPEND IS CONTRARY TO NEW YORK LAW AND CONTRADICTED BY THE DOCUMENTS ON WHICH DBSI RELIES .................11

    A.    Under New York Law, The Confirmation Letter Cannot Be Read To Condition DBSI's Performance On The Customer Claims Becoming Allowed...........................................................................................................12

        1.    The Letter Does Not Establish A Condition Precedent In "Unmistakable Language," As New York Law Requires ...................................................12

        2.    DBSI's Reading Is Contrary To New York Law, Which Infers A Reasonable Time To Perform When Time Of Performance Is Not Specified—Not A Condition Precedent ...................................................13

    B.    The Incorporated Documents Confirm DBSI's Payment Was Intended to Enable Allowance of the Customer Claims ...........................................................14

II.    THE COURT SHOULD DISMISS DBSI'S CLAIMS WITH PREJUDICE BECAUSE AMENDMENT WOULD BE FUTILE.........................................................15

    A.    If The Confirmation Letter Is A Type II Agreement, The Parties Fulfilled Their Obligation To Negotiate When Impasse Was Reached ...............................16

1.      The Letter Is Best Read As A Type II Agreement, As It Is "Subject To" Negotiation Of A Final Purchase And Sale Agreement ........................... 16

2.      The Funds' Obligation To Negotiate Terminated Upon Impasse ............. 21

B.      Even If The Letter Were A Type I Agreement Requiring Purchase And Sale, DBSI Materially Breached Its Obligations And Cannot Sue The Funds ................................................................................................................22

1.      The Confirmation Letter Is Not Fully Integrated, And The Draft PSAs Show Terms That DBSI Breached, Terminating The Contract ............... 22

2.      Even If The Confirmation Letter Were Fully Integrated, The Court Should Still Look To Extrinsic Evidence To Determine Reasonable Terms Of Performance .............................................................................................. 24

III.    DBSI'S IMPLIED COVENANT CLAIM FAILS FOR ADDITIONAL REASONS .................................................................................................................25

CONCLUSION ...................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Recovery Tr.*,
  634 F.3d 678 (2d Cir. 2011)...................................................................................................25

*Arcadian Phosphates, Inc. v. Arcadian Corp.*,
  884 F.2d 69 (2d Cir. 1989)....................................................................................................17

*ARP Films, Inc. v. Marvel Entm't Grp, Inc.*,
  952 F.2d 643 (2d Cir. 1991)..................................................................................................24

*Awards.com, LLC v. Kinko's, Inc.*,
  925 N.E.2d 926 (N.Y. 2010)..................................................................................................24

*Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*,
  821 F.3d 297 (2d Cir. 2016)..............................................................................................12, 13

*Bear Stearns Inv. Prod., Inc. v. Hitachi Auto. Prod. (USA), Inc.*,
  401 B.R. 598 (S.D.N.Y. 2009)...........................................................................................17, 20

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
  369 F.3d 212 (2d Cir. 2004)..................................................................................................14

*Bonaventura v. Gear Fitness One NY Plaza LLC.*,
  17-cv-2168, 2018 WL 1605078 (S.D.N.Y. Mar. 29, 2018)....................................................4

*Bourne v. Walt Disney Co.*,
  68 F.3d 621 (2d Cir. 1995)....................................................................................................22

*Brown v. Cara*,
  420 F.3d 148 (2d Cir. 2005).............................................................................15, 16, 17, 18

*Bulldog N.Y. LLC v. Pepsico, Inc.*,
  8 F. Supp. 3d 152 (D. Conn. 2014).......................................................................................18

*DirectTV Latin Am., LLC v. RCTV Int'l Corp.*,
  982 N.Y.S.2d 96 (App. Div. 2014)........................................................................................12

*In re Fairfield Sentry Ltd.*,
  768 F.3d 239 (2d Cir. 2014)..................................................................................................21

*Global Network Commc'ns, Inc. v. City of New York*,
  458 F.3d 150 (2d Cir. 2006)....................................................................................................4

*Greenfield v. Philles Records, Inc.*,
   780 N.E.2d 166 (N.Y. 2002).............................................................16

*IDT Corp. v. Tyco Grp., S.A.R.L.*,
   15 N.E.3d 329 (N.Y. 2014)...............................................................21

*Intercont'l Packaging Co. v. China Nat'l Cereals, Oils & Foodstuff Imp. & Exp. Corp.*,
   559 N.Y.S.2d 302 (App. Div. 1990)..................................................23

*Israel v. Chabra*,
   537 F.3d 86 (2d Cir. 2008)................................................................12

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
   274 F.3d 706 (2d Cir. 2001)..............................................................25

*Krys v. Pigott*,
   749 F.3d 117 (2d Cir. 2014)..............................................................16

*L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*,
   90 F. Supp. 2d 277 (S.D.N.Y. 2000).................................................23

*L-7 Designs, Inc. v. Old Navy, LLC*,
   647 F.3d 419 (2d Cir. 2011)................................................................4

*Matusovsky v. Merrill Lynch*,
   186 F. Supp. 2d 397 (S.D.N.Y. 2002).................................................4

*Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*,
   815 F. Supp. 2d 679 (S.D.N.Y. 2011).................................................4

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*,
   861 F. Supp. 2d 344 (S.D.N.Y. 2012)...............................................18

*New Eynon Assocs., L.P. v. Lehman Bros. Holdings Inc.*,
   713 N.Y.S.2d 176 (App. Div. 2000)..................................................24

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*,
   660 N.E.2d 415 (N.Y. 1995)........................................................12, 13

*In re Parmalat Sec. Litig.*,
   421 F. Supp. 2d 703 (S.D.N.Y. 2006)...............................................16

*Savasta v. 470 Newport Assocs.*,
   623 N.E.2d 1171 (N.Y. 1993)............................................................13

*St. John's Univ., N.Y. v. Bolton*,
   757 F. Supp. 2d 144 (E.D.N.Y. 2010)...............................................24

iv

*Starter Corp. v. Converse, Inc.*,
  170 F.3d 286 (2d Cir. 1999)...........................................................................................22

*Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*,
  670 F. Supp. 491 (S.D.N.Y. 1987) ................................................................................17

*Thome v. Alexander & Louisa Calder Found.*,
  890 N.Y.S.2d 16 (App. Div. 2009)................................................................................24

*In re W. T. Grant Co.*,
  1 B.R. 516 (2d Cir. 1979) ..............................................................................................23

*World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*,
  345 F.3d 154 (2d Cir. 2003)...........................................................................................23

*Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*,
  14-cv-7343, 2015 WL 5671724 (S.D.N.Y. Sept. 22, 2015) ...............................18, 20

**Statutes**

11 U.S.C. § 502(d) ...................................................................................................................5

11 U.S.C. § 1520....................................................................................................................10

**Other Authorities**

Restatement (Second) of Contracts § 204 ..............................................................................23

Restatement (Second) of Contracts § 210 ..............................................................................23

Defendants Kingate Global Fund Ltd. and Kingate Euro Fund Ltd. (together, the "Kingate Funds" or the "Funds") respectfully submit this memorandum of law in support of their motion to dismiss the Complaint of Plaintiff Deutsche Bank Securities Inc. ("DBSI").

## PRELIMINARY STATEMENT

In 2009, the Kingate Funds went into liquidation in the British Virgin Islands (the "BVI") as a result of the collapse of Bernie Madoff's fraudulent investment fund, in which the Funds were wholly invested.  With approximately $1.6 billion in potential claims against Madoff's Estate, the Funds sought to settle those claims and distribute the proceeds to their stakeholders, many of whom were investors harmed by Madoff's fraud.  But because the trustee of the Madoff Estate (the "Trustee") had sued to recover certain transfers to the Funds and disallow their claims, the Funds could not recover anything from the Madoff Estate until they first settled the Trustee's lawsuit.

DBSI and the Funds thus negotiated a deal to solve this dilemma whereby DBSI would provide the money to settle the Trustee's lawsuit by purchasing the Funds' claims against the Madoff Estate.  As the deal documents—all incorporated in the Complaint—make clear, DBSI was to pay the vast majority of the purchase price directly to the Trustee to settle the suit against the Funds.  That settlement would permit recovery on the Funds' claims against the Madoff Estate and lead to them being "Allowed," enabling the Funds to transfer the Allowed claims free and clear to DBSI.  The Funds would then distribute the rest of the purchase price to stakeholders.

While the parties signed a preliminary Confirmation Letter (the "Letter") and exchanged several draft Purchase and Sale Agreements (the "PSAs"), they never executed a final agreement. Nor did DBSI *ever* take any steps to make good on the crux of the deal—the payment that would resolve the Trustee's suit, thereby freeing the Funds' own claims for sale.  The Funds instead had to litigate against the Trustee for nearly a decade, at a cost of tens of millions of dollars to the insolvent Funds, finally settling with the Trustee through an extensive mediation process.  That

1

settlement did not require the Funds to sell their claims. As a result, with no help from DBSI, the Funds now have Allowed claims against the Madoff Estate.

DBSI, having walked away from the 2011 negotiations and abandoned any deal to invest in the claims, now concocts spurious contractual interpretations in an effort to win an unearned recovery. In 2011, the Funds had contemplated selling their claims against the Madoff Estate in order to secure the necessary capital to get the claims Allowed and obtain some positive return for stakeholders. DBSI, by its own admission, never provided that capital or any other benefit to the Funds. But today, after the Funds' long litigation and settlement with the Trustee, no-show DBSI steps forward and demands a windfall at the expense of the Funds' stakeholders, to whom these assets should go. DBSI advances the remarkable claim that the Confirmation Letter, signed in the middle of ongoing negotiations between the parties, granted it an exclusive, perpetual, risk-free right to purchase the Funds' claims at the precise moment they became valuable—once they became Allowed and released for sale—even though it paid *not one cent* to fund the settlement with the Trustee. DBSI's Complaint is meritless, littered with inconsistencies, and should be dismissed with prejudice.

*First*, DBSI's claims all rest on a false premise. DBSI contends that the Confirmation Letter signed by the parties in August 2011 was a binding sales contract that conditioned DBSI's obligation to fund the Trustee settlement on the Funds' claims being Allowed and free for sale. The Letter says no such thing, let alone in the unmistakable language New York law requires to impose a condition precedent. Section I.A.1. Indeed, the Letter does not even specify a time of performance. Under settled law, the Letter thus must be read to imply that performance be completed within a reasonable time rather than—as DBSI would have it—implying an open-ended, perpetual condition precedent. Section I.A.2. The draft PSAs exchanged by the parties (which

DBSI invites the Court to consider) confirm that having Allowed claims was *not* a condition prec-edent but exactly the opposite.  Under the PSAs, DBSI's payment was specifically earmarked to fund the very settlement with the Trustee that would permit the Allowance of the Funds' claims, which would in turn enable the Funds to transfer the claims to DBSI free and clear.  Section I.B.

*Second*, because there is no plausible reading of the Letter under which the Funds could have breached any obligation to DBSI, amendment would be futile, and the Court should dismiss all of DBSI's claims with prejudice.  On its face, the Letter is best read as an agreement only to negotiate in good faith (a "Type II" agreement), as it conditions the transaction on execution of a PSA to be negotiated in the future and omits numerous material terms.  Section II.A.1.  DBSI's own allegations show the Funds negotiated in good faith but reached impasse by 2013 and certainly are at impasse now—ending any putative contractual obligations of the Funds and precluding any potential breach of contract claim in an amended complaint.  Section II.A.2.

*Third*, if the Confirmation Letter could be read as a binding sales contract (a "Type I" agreement), that agreement is not fully integrated, so the Court must look to the draft PSAs that DBSI incorporates into its Complaint.  Those documents show that the parties intended DBSI to fund the settlement with the Trustee, which in turn would permit the Allowance of the Funds' claims against the Madoff Estate.  DBSI never paid, materially breaching the contract and termi-nating the Funds' obligations.  Section II.B.1.  Even if the Letter were fully integrated, it does not specify a time of performance, so the Court would have to look to the same draft PSAs to determine a reasonable time and would reach the same conclusion.  Section II.B.2.

*Finally*, DBSI's claim that the Funds breached the Letter's implied covenant of good faith and fair dealing is both estopped and meritless.  DBSI claims that the Funds filed a Chapter 15 petition seeking recognition of their BVI liquidation in bad faith and solely for tactical advantage.

But DBSI brought the exact same objection in the Bankruptcy court and then promptly *withdrew* that objection, agreeing that the petition was proper in a proposed order that was entered by the Bankruptcy Court.  That forecloses and disproves any allegation of bad faith.  Section III.

## BACKGROUND

These facts are drawn from the allegations in Plaintiff's Complaint ("Compl."), documents attached as exhibits thereto or incorporated by reference therein, and filings in other judicial proceedings.[1]  On a motion to dismiss, the Court assumes all plausible allegations to be true, "unless contradicted by more specific allegations or documentary evidence" attached to or incorporated in the Complaint.  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).  "If a plaintiff's allegations are contradicted by such a document, those allegations are insufficient to defeat a motion to dismiss."  *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002).

### A.      The Kingate Funds' Catch-22 With Their Claims Against The Madoff Estate

The Kingate Funds operated managed accounts that invested with Bernard L. Madoff Investment Securities ("BLMIS").  Compl. ¶ 11.  The Funds went into liquidation after Madoff's fraud was exposed and BLMIS collapsed in 2008.  *Id.* ¶¶ 12, 15.  Upon collapse, BLMIS also entered liquidation through a proceeding in the Bankruptcy Court for the Southern District of New York, supervised by the Trustee.  *Id.* ¶ 12.  As significant investors and net losers in BLMIS, having invested far more than they ever withdrew, the Funds had considerable claims against the assets recovered on behalf of the Madoff Estate (the "Customer Claims") and potential claims to recover

---

[1] "To be incorporated by reference, the Complaint must make a clear, definite and substantial reference to the documents."  *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011) (alteration omitted).  A document is "integral" if "the complaint relies heavily upon its terms and effect."  *Bonaventura v. Gear Fitness One NY Plaza LLC*., 17-cv-2168, 2018 WL 1605078, at *2 (S.D.N.Y. Mar. 29, 2018).  The Court may take judicial notice of court filings not for the truth of matters asserted but to establish the fact of the litigation and related filings.  *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

from a separate forfeiture fund (the "Forfeiture Fund") established by the United States Department of Justice (the "DOJ") to distribute additional recoveries to victims of the BLMIS fraud (the "Remission Claims").  *Id.* ¶ 14.

In April 2009, the Trustee sued the Funds in Bankruptcy Court.  *Id.* ¶ 13.  The Trustee sought to recover certain transfers the Funds had made from BLMIS before it collapsed, and, critically, argued that "the [Customer] Claims must be disallowed unless and until Kingate Global and Kingate Euro return the Transfers to the Trustee."  Decl. of Philippe Z. Selendy in Supp. of Defs.' Mot. to Dismiss ("Selendy Decl.") Ex. 1 ¶ 103.  As the Trustee explained in its September 2011 interim report, the complaint sought "disallowance of customer claims under Section 502(d) of the Bankruptcy Code.  Accordingly, *such claims will not be allowed until the avoidance actions are resolved by settlement or otherwise* …."  Selendy Decl. Ex. 2 ¶ 22 (emphasis added); *see also* 11 U.S.C. § 502(d) ("[T]he court shall disallow any claim of any entity from which property is recoverable ... or that is a transferee of a transfer avoidable under ... this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable ....").

Because the Funds could not collect on the Customer Claims before resolving the Trustee's lawsuit, this action created what DBSI later admitted was a "chicken and … egg problem." Selendy Decl. Ex. 3 ("DBSI Counterclaim") ¶ 6.  On the one hand, the Funds could not "sell their claims free and clear to a third party without, among other things, settling the Madoff Trustee lawsuit."  *Id.*  On the other hand, the Funds could not "settle with the Madoff Trustee without first lining up a potential buyer whose purchase price [would] fund any such settlement with the trustee."  *Id.*  That catch-22 gave rise to the failed deal at issue here.

**B.      The Parties Attempt To Negotiate A Deal In Which DBSI Pays To Settle The Trustee's Lawsuit To Permit A Recovery On The Funds' Customer Claims**

In April 2011, DBSI submitted a bid letter to purchase the Funds' Customer and Remission Claims.  Compl. ¶¶ 16, 17.  In that bid letter, DBSI proposed conditioning the deal closing on the "receipt of evidence, to [DBSI's] satisfaction, that, *except with respect to any funding obligations of [DBSI] with respect to the Claims*, all of [the Funds'] obligations under the Settlement Agreement have been fully performed and satisfied."  Selendy Decl. Ex. 4 ("Bid Letter") at 12 (emphasis added); *see also id.* at 13 (again recognizing the "funding obligations of [DBSI] with respect to the Claims").  The bid letter contemplates that DBSI would receive Allowed Customer Claims from the Funds.  But *DBSI*—not the Funds—had the "funding obligations" necessary to settle the Trustee's suit and lead to the Allowance of those Customer Claims.[2]

After the Funds rejected this initial bid, but then resumed negotiations, Compl. ¶ 18, DBSI sent the Funds a draft PSA on August 18, 2011, *id.* ¶ 19,[3] which explicitly provided that DBSI would, as part of its purchase price, fund the settlement with the Trustee that was necessary to permit recovery on the Customer Claims.  The draft specified that "Buyer [DBSI] shall fund: (A) that portion of the Purchase Price necessary to satisfy the Funding Obligations directly to the Trustee; and (B) the remainder of the Purchase Price directly to Seller," Selendy Decl. Ex. 5-A ("Aug. 18 Draft PSA") § 7(d)(i), and defined "Funding Obligations" as "any and all amounts to be paid by or on behalf of the Seller to the Trustee in connection with the Settlement Agreement," *id.*

---

[2] DBSI also proposed an alternative "Loan Option," Bid Letter at 3 & n.5, pursuant to which DBSI would lend the Funds money that would "be used solely to pay ... the required avoidance action payment under the Settlement Agreement," *id.* at 19, *i.e.*, to settle the Trustee's lawsuit.

[3] DBSI alleges that "DBSI counsel sent the Kingate Funds' counsel an initial draft of the PSA" on August 16, 2011.  Compl. ¶ 19.  In fact, that email was sent on August 18, 2011.  Selendy Decl. Ex. 5 (email from DBSI counsel to counsel for the Funds describing attachment as "our initial draft of the purchase agreement for the Kingate claims").

6

Annex A ¶ 16.  DBSI proposed to make payment "to Seller or the Trustee, as applicable," *id.*
§ 3(b), and included a space for the Trustee's wire instructions, *id.* Sch. A.

A week later, the Funds sent DBSI a revised draft PSA, Compl. ¶ 20, which did not mate-
rially change these key provisions.  Section 7(d)(i) still provided that DBSI would send "that por-
tion of the Purchase Price necessary to satisfy the Funding Obligations directly to the Trustee,"
Selendy Decl. Ex. 6-A ("Aug. 23 Draft PSA") § 7(d)(i); "Funding Obligation" was still defined as
amounts paid in connection with the Settlement Agreement, *id.* Annex A ¶ 17, and space was still
included for the Trustee's wire instructions, *id.* Sch. A.

One day later, on August 24, 2011, in the midst of exchanging draft PSAs, the parties
executed the Confirmation Letter.  Compl. ¶ 21; *id.* Ex. A.  The one-and-a-half-page Letter out-
lined a transaction by which the Funds would each "sell the Claims ... at the Purchase Rate ... to
[DBSI]."  Letter at 1.  The "Claims" included (1) "Allowed" Customer Claims, (2) the Remission
Claims, and (3) any other claims or rights related to those Claims.  *Id.*  The Letter defined "Al-
lowed" in a footnote as, among other things, "unavoidable[] and unsubordinated."  *Id.* at 1 n.1.[4]
The Letter valued the Funds' Claims at $938,862,953 and $685,885,142, respectively, and defined
the "Purchase Rate" as 66% of the Claim amounts.  *Id.* at 2.  The Letter did not state whether the
Customer Claims had been "Allowed," nor did it specify the time for the parties' performance.
While the Letter's preamble stated it was a "firm, irrevocable and binding agreement," the Letter
also  expressly  stated  that  the  "Transaction  is  *subject to*  execution  of  a  Purchase  and  Sale

---

[4] *See* Letter at 1 n.1 ("'Allowed' shall mean allowed as a valid, enforceable, liquidated, non-
contingent, undisputed, unavoidable, and unsubordinated claim that is not subject to any actual or
potential  avoidance,  reduction,  set-off,  offset,  recoupment,  recharacterization,  subordination
(whether  equitable,  contractual,  or  otherwise ... ),  counterclaim,  cross-claim,  defenses,
disallowance ... impairment, objection, or any other challenges under any applicable law, whether
foreign or domestic.").

Agreement (governed by New York law) in a form that is reasonably and mutually agreed between Seller and Buyer and which Seller and Buyer shall negotiate in good faith." *Id.* at 2 (emphasis added). The Letter also provided that the Funds "shall not discuss this Confirmation Letter and the terms contained herein with any potential purchasers." *Id.* at 2.

The day after executing the Confirmation Letter, DBSI sent the Funds another draft PSA, Compl. ¶ 20 n.2, which again provided that DBSI would fund settlement with the Trustee. DBSI combined prior versions of Sections 7(d)(i) and 3(b) to state:

> As of the Effective Date, Buyer agrees to pay (the "Payment"): (i) pursuant to a written instruction from the Trustee and Seller, that portion of the Purchase Price necessary to satisfy the Funding Obligations directly to the Trustee; and (ii) the remainder of the Purchase Price directly to Seller, in each case, on the Funding Date.

Selendy Decl. Ex. 7-A ("Aug. 25 Draft PSA") § 3(b); *see also id.* § 7(b)(iii) (proposing as a condition precedent to the "Funding Date" that "Seller shall have complied in all respects with all of its obligations and covenants required by the Settlement Documents (in each case *except* with respect to the Funding Obligations)") (emphasis added); *id.* Annex A ¶ 20 (defining "Funding Obligations"); *id.* Sch. A (including space for Trustee's wire instructions).

All three draft PSAs provided that time was of the essence. Aug. 18 Draft PSA § 28; Aug. 23 Draft PSA § 30; Aug. 25 Draft PSA § 29. In each draft PSA, the proposed "Outside Date," after which DBSI could terminate the deal if the Funding Date had not occurred, was less than seven months after closing. *See* Aug. 18 Draft PSA § 6(a), Annex A ¶ 26 (DBSI proposes December 31, 2011); Aug. 23 Draft PSA § 6(a), Annex A ¶ 27 (Funds propose February 29, 2012); Aug. 25 Draft PSA § 6(a), Annex A ¶ 30 (DBSI proposes December 15, 2011).

## C.    DBSI Abandons Negotiations And The Deal

The parties failed to execute a final PSA. *See* Compl. ¶¶ 28–29. As DBSI later acknowledged, the Funds would not agree to two of DBSI's demands: (1) a guarantee that DBSI be able to

recover on the Remission Claims on a pro rata and unsubordinated basis; and (2) that DBSI have the right to review and consent, and be deemed a third-party beneficiary, to any settlement between the Funds and the Trustee.  DBSI Counterclaim ¶¶ 57, 73–76.

The Funds sued DBSI in December 2011, seeking alternative declarations that (1) the Confirmation Letter was a binding contract of sale, and (2) DBSI breached its obligation to negotiate in good faith by insisting on terms unrelated to the settlement with the Trustee as a condition of signing the PSA.  *See* Selendy Decl. Ex. 8 ("2011 Compl.") at 21–22.  DBSI counterclaimed, seeking declarations that (1) the Letter was not a binding sales contract and did not obligate it to purchase the Claims; (2) DBSI complied with its obligation to negotiate in good faith; and (3) DBSI had "no ongoing obligation to continue negotiating the PSA with the Kingate Funds." DBSI Counterclaim ¶ 85.

In an effort to close a deal and avoid further litigation, the parties resumed exchanging draft PSAs in 2012 and 2013 but "[t]hose negotiations were not successful."  Compl. ¶ 40.  In November 2013, the DOJ released guidelines that made clear the Funds would obtain no recovery from the Forfeiture Fund, rendering the Remission Claims worthless.  *Id.* ¶ 41.

DBSI does not allege that the parties discussed terms or exchanged draft PSAs after that. In January 2014, the parties stipulated to the dismissal of their claims without prejudice.  Compl. ¶ 46.  While DBSI labels the parties' contacts from 2013 to 2019 as "[n]egotiations," *id.* at 16, its allegations describe only "stay[ing] in regular contact," *id.* ¶ 47, "discuss[ing]" the Trustee's suit against the Funds, *id.* ¶ 52, "rais[ing] the possibility of mediation with the Madoff Trustee," *id.* ¶ 55, and "update[s]" about that mediation, *id.* ¶ 61.  No further PSAs were exchanged, and the parties never executed a final PSA.

**D.     Nearly A Decade Later, The Funds Settle The Trustee's Lawsuit With No Support From DBSI, And DBSI Sues For Windfall Payments**

The Funds litigated with the Trustee for eight years after suing DBSI for its failure to con-clude the deal or transfer funds, finally settling in June 2019.  Compl. ¶ 70.  The settlement did not require external funding; instead the settlement amount was set off against the Funds' recoveries from the Estate.  *See* Selendy Decl. Ex. 9 ¶¶ 3, 5.  The Funds have received a catch-up payment, as they did not receive earlier distributions, and are now entitled to a proportionate share of all future distributions from the Madoff Estate.  *Id.* ¶ 4.  Both the Bankruptcy Court for the Southern District of New York overseeing BLMIS's liquidation and the foreign courts overseeing the Funds' liquidation approved the deal in August 2019.  Compl. ¶ 71.

Following approval, the Funds filed a Chapter 15 petition for recognition of their BVI liq-uidation in Bankruptcy Court in the Southern District of New York.  Compl. ¶ 72; *see also* Verified Pet. of Foreign Reps. Paul Pretlove and Tammy Fu, *In re Kingate Global Fund, Ltd.*, No. 19-12853 (Bankr. S.D.N.Y. Sept. 5, 2019), Dkt. No. 2.  Under Section 1520 of the Bankruptcy Code, recog-nition of the BVI liquidation would trigger an automatic stay of proceedings against the Funds' U.S. assets—including the Customer Claims—and allow for orderly administration of the estate in the BVI liquidation.  *See* 11 U.S.C. § 1520(a).

DBSI initially objected, arguing that the Funds had filed their petition in bad faith.  Selendy Decl. Ex. 10 ¶¶ 31–34; Compl. ¶ 73.  As DBSI acknowledges, the parties then "resolved" the ob-jection and jointly proposed an order recognizing the BVI bankruptcy.  Compl. ¶ 73; Selendy Decl. Ex. 11; Selendy Decl. Ex. 12 ("Proposed Order").  As reflected in that filing, DBSI agreed the Funds' petition was properly filed, and the Funds agreed to modify the stay so DBSI could file this suit.  Proposed Order 2, 4.  After the Court entered the order, Order Granting Recognition of For-eign Main Proceedings, *In re Kingate Global Fund, Ltd.*, No. 19-12853 (Bankr. S.D.N.Y. Oct. 18,

2019), Dkt. No. 28, DBSI filed this Complaint, claiming that the Confirmation Letter was a binding sales contract with an implied condition precedent and—contradicting its own stipulation to the contrary—that the Funds had filed their Chapter 15 petition in bad faith, Compl. ¶¶ 75, 94–99.

## ARGUMENT

DBSI brings four causes of action: two for purported breaches of the Confirmation Letter, Compl. ¶¶ 78–85, 86–93; one for a declaration of the parties' obligations under that Letter, *id.* ¶¶ 100–05; and one for purported breach of the covenant of good faith and fair dealing implicit in that Letter by filing a petition for recognition of the Funds' BVI bankruptcy, *id.* ¶¶ 94–99.  All these claims should be dismissed because they rest on a reading of the Confirmation Letter that is both incorrect as a matter of law and contradicted by the documents incorporated into the Complaint.  Dismissal should be with prejudice because DBSI cannot state a valid claim based on any plausible reading of the Letter.

## I.    DBSI'S CLAIMS FAIL BECAUSE THE IMPLIED CONDITION PRECEDENT ON WHICH THEY DEPEND IS CONTRARY TO NEW YORK LAW AND CONTRADICTED BY THE DOCUMENTS ON WHICH DBSI RELIES

DBSI's claims require the Court to accept that the Confirmation Letter contains an implied condition precedent triggering the parties' respective obligations to perform only when the Trustee's lawsuit is resolved and the Customer Claims become Allowed, no matter how or when that occurs.  *See* Compl. ¶ 24 ("[A]s the Agreement requires the Kingate Funds to transfer Allowed Claims, which the Kingate Funds did not at that time possess, the Agreement has been subject to a condition precedent."); *id.* ¶ 26 ("The Agreement does not contain an expiration date."); *see also id.* ¶¶ 25, 32, 44, 53, 63, 71, 76, 84, 90, 103 (relying on this purported condition precedent).  New York law prohibits this interpretation, and the documents that DBSI incorporates into its Complaint, *see* Compl. ¶¶ 17, 19, 20 & n.2, squarely contradict it.

A.   **Under New York Law, The Confirmation Letter Cannot Be Read To Condition DBSI's Performance On The Customer Claims Becoming Allowed**

1.   **The Letter Does Not Establish A Condition Precedent In "Unmistakable Language," As New York Law Requires**

DBSI's claims fail as a matter of law because they require the Court to infer an unstated condition precedent from the Confirmation Letter, but New York law requires that such conditions be explicit. DBSI does not and cannot cite *any* language in the Letter that conditions performance on the claims becoming Allowed. Instead, DBSI simply notes that the Letter "requires the Kingate Funds to transfer Allowed Claims, which the Kingate Funds did not at that time possess"—a situation which, it alleges, conditions performance on the Claims' Allowance. *See, e.g.*, Compl. ¶ 24.

Under New York law, "[c]onditions precedent are not readily assumed. While specific, talismanic words are not required, the law nevertheless demands that conditions precedent be 'expressed in unmistakable language.'" *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.* ("*BNY*"), 821 F.3d 297, 305 (2d Cir. 2016) (quoting *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995)). "[A]mbiguous" language is "insufficient." *DirectTV Latin Am., LLC v. RCTV Int'l Corp.*, 982 N.Y.S.2d 96, 97 (App. Div. 2014).

The Letter "does not caption or otherwise label the ... provision as a 'condition precedent' ... , as one might expect sophisticated parties to do if that were their intent." *BNY*, 821 F.3d at 305. Nor does it "employ any recognized 'linguistic conventions' of condition—such as 'if,' 'on condition that,' 'provided that,' 'in the event that,' and 'subject to'"—in describing Allowance of the Customer Claims. *Id.* (quoting *Israel v. Chabra*, 537 F.3d 86, 93 (2d Cir. 2008)). The lack of explicit conditional language "is particularly significant here because the sophisticated drafters elsewhere employed precisely such language to establish undoubted conditions precedent." *Id.* at 306. The Letter expressly states that the "Transaction is subject to execution of a Purchase and Sale Agreement." Letter 2. And the draft PSAs, prepared by the same parties at the same time,

12

each have a section titled "Conditions Precedent to Funding Date."  Aug. 18 Draft PSA § 7; Aug. 23 Draft PSA § 7; Aug. 25 Draft PSA § 7.  The Letter has "no comparable contract language ... that conditions" performance on the Customer Claims becoming Allowed, and therefore no such condition should be read into the Letter.  *BNY*, 821 F.3d at 306.  For this reason alone, DBSI has failed to state a claim, and the Complaint should be dismissed.

> **2.      DBSI's Reading Is Contrary To New York Law, Which Infers A Reasonable Time To Perform When Time Of Performance Is Not Specified—Not A Condition Precedent**

DBSI's proposed reading of the Letter fails as a matter of law in another respect:  New York law "requires ambiguous provisions to be construed as promises rather than conditions precedent."  *BNY*, 821 F.3d at 306 n.8; *accord Oppenheimer*, 660 N.E.2d at 418.  Likewise, if "a contract does not specify time of performance, the law implies a reasonable time," *Savasta v. 470 Newport Assocs.*, 623 N.E.2d 1171, 1172 (N.Y. 1993), not a condition precedent.  For example, if parties agree to the sale of goods the seller does not possess and the agreement is silent as to time of performance, the law infers a promise for the seller to obtain and deliver those goods within a reasonable time.  If the seller fails to do so, the buyer can sue for breach.  In DBSI's world, by contrast, a buyer could never sue a seller that fails to obtain promised goods because the contract would be an open-ended agreement to sell the goods whenever the seller happened to obtain them.  Such implied perpetual conditions precedent would be unworkable, and courts will not infer them.

DBSI has not alleged that the Letter contains a promise to perform within a reasonable time or any facts sufficient to support a claim based on such a reading.[5]  Instead, DBSI's claims require the Court to ignore well-settled law and read the Letter as implying a condition precedent,

---

[5] Nor could DBSI plausibly state such a claim if given the chance to amend.  *See infra* Section II.

obligating neither party to do anything until the Customer Claims become Allowed.  Because New York law does not permit such a reading, DBSI has failed to state a claim.

**B.      The Incorporated Documents Confirm DBSI's Payment Was Intended to Enable Allowance of the Customer Claims**

While the Court need not look past the face of the Confirmation Letter to dismiss DBSI's claims, the draft deal documents that DBSI incorporates into its Complaint, *see* Compl. ¶¶ 17, 19, 20 & n.2, also squarely contradict its reading of the Letter.  *See Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 222 (2d Cir. 2004) (dismissing complaint because general allegations were "belied by" attached documents).  Those documents all provided that DBSI would pay a portion of the purchase price directly to the Trustee to settle its claims against the Funds and thus Allow the Customer Claims.  DBSI's payment could not have been conditioned on the Customer Claims' Allowance because, under any contemplated agreement, DBSI's payment itself was intended to *enable* the Allowance of the Customer Claims.

DBSI alleges that its bid letter "specified that as a condition precedent to any transaction, any settlement agreement with the Madoff Trustee would need to provide that the Claims would be 'treated for all purposes as Allowed.'"  Compl. ¶ 17.  But DBSI's letter provides a mechanism for that Allowance:  As a condition precedent to the deal, DBSI was to receive "evidence" that "[the Funds'] obligations under the Settlement Agreement [with the Trustee] have been fully performed and satisfied"—"*except with respect to any funding obligations of [DBSI] with respect to the Claims*."  Bid Letter at 12 (emphasis added).  This key exception reveals the bid letter could not have conditioned DBSI's performance on delivery of Allowed claims because DBSI fulfilling its "funding obligations" is what made Allowance possible.

The draft PSAs were even more explicit.  All three drafts—including two that DBSI wrote just before and immediately after the Confirmation Letter—provided that DBSI would fund "that

portion of the Purchase Price necessary to satisfy the Funding Obligations directly to the Trustee." Aug. 18 Draft PSA § 7(d)(i); Aug. 23 Draft PSA § 7(d)(i); Aug. 25 Draft PSA § 3(b).  And all three draft PSAs defined "Funding Obligations" as "amounts to be paid by or on behalf of the Seller to the Trustee in connection with the Settlement Agreement."  Aug. 18 Draft PSA at Annex A ¶ 16; Aug. 23 Draft PSA at Annex A ¶ 17; Aug. 25 Draft PSA at Annex A ¶ 20.

These drafts confirm that DBSI's payment was not subject to a condition precedent that the claims be Allowed; rather, DBSI's payment was itself intended to fund the Allowance of the claims, which is the very reason the Funds started talking to DBSI in the first place.  Simply put, DBSI's alleged condition precedent contradicts the basic logic of the transaction.  That supposed condition precedent did not exist.  DBSI's claims thus should be dismissed.

## II.   THE COURT SHOULD DISMISS DBSI'S CLAIMS WITH PREJUDICE BECAUSE AMENDMENT WOULD BE FUTILE

Dismissal should be with prejudice because DBSI cannot state a claim for breach of the Confirmation Letter under any plausible reading.  Under New York law, there are two types of binding preliminary agreements.  "[A] Type I preliminary agreement 'binds both sides to their ultimate contractual objective,'" and "reflect[s] a meeting of the minds on 'all the issues perceived to require negotiation.'"  *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005) (citations omitted).  A Type II preliminary agreement, by contrast, "does not commit the parties to their ultimate contrac-tual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the objective within the agreed framework."  *Id*. at 157 (alteration omitted).

DBSI cannot state a claim regardless of whether the Confirmation Letter is a Type I or a Type II agreement.  The Letter is best read as a Type II agreement, binding the parties only to negotiate in good faith, and DBSI's own allegations show the Funds fulfilled their obligation long ago by negotiating until the parties reached impasse.  Even if the Letter could be read as a Type I

agreement that required a sale of the Customer Claims, however, DBSI acknowledges that it failed

to pay the Trustee as part of the settlement to Allow the claims, materially breaching the contract

and excusing the Funds' performance.  Therefore, any amendment would be futile, and the Court

should dismiss with prejudice.  *See Krys v. Pigott*, 749 F.3d 117, 134 (2d Cir. 2014).

### A.    If The Confirmation Letter Is A Type II Agreement, The Parties Fulfilled Their Obligation To Negotiate When Impasse Was Reached

#### 1.    The Letter Is Best Read As A Type II Agreement, As It Is "Subject To" Negotiation Of A Final Purchase And Sale Agreement

While the Funds sought to treat the Letter as a binding contract in 2011, they also recog-

nized it could be read as an agreement to negotiate and sought an alternative declaration that DBSI

had breached that obligation.  *See* 2011 Compl. at 22.  The Funds are not bound by their arguments

in that dismissed lawsuit, *see In re Parmalat Sec. Litig.*, 421 F. Supp. 2d 703, 713 (S.D.N.Y. 2006),

and, more importantly, the Letter's unambiguous language controls, *see Greenfield v. Philles Rec-

ords, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) ("[A] written agreement that is complete, clear and

unambiguous on its face must be enforced according to the plain meaning of its terms.").

To determine if a preliminary agreement is Type II, courts consider (1) whether the agree-

ments' language reveals an intent to be bound; (2) the context of the negotiations; (3) the existence

of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form,

as indicated by the customary form of such transactions.  *Brown*, 420 F.3d at 157.

##### a.    The Letter States That The Parties Did Not Intend To Be Bound Until They Negotiated A Purchase And Sale Agreement

The Confirmation Letter explicitly conditioned the deal on the execution of a subsequent

contract, which is "frequently the most important" factor in deciding whether a preliminary agree-

ment is Type I or II.  *Brown*, 420 F.3d at 154.  "There is a strong presumption against finding

binding obligation in agreements which ... expressly anticipate future participation and execution

16

Case 1:19-cv-10823-ER   Document 24   Filed 04/01/20   Page 23 of 32


of contract documents." *Bear Stearns Inv. Prod., Inc. v. Hitachi Auto. Prod. (USA), Inc.*, 401 B.R. 598, 625 (S.D.N.Y. 2009) (quoting *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 499 (S.D.N.Y. 1987)). In the seminal *Tribune* case, a commitment letter that was nominally a "binding agreement" was Type II because it was "*subject to* approval by the Company's Board of Directors and the preparation and execution of legal documentation satisfactory to the Company." *Tribune*, 670 F. Supp. at 500 (emphasis added).[6] Likewise, in *Bear Stearns*, an oral agreement that specified the price, type, and amount of bankruptcy claims being sold was nonetheless Type II, in part because a later "Trade Confirmation" stated the "transaction is '*subject to* [n]egotiation, execution and delivery of mutually acceptable contracts,'" 401 B.R. at 618–19 (original emphasis), showing the parties' intent "to reserve their right to be bound to the 'ultimate contractual objective' pending execution of formal documents," *id.* at 619.

Here, the Letter *expressly* states that "The Transaction is subject to execution of a Purchase and Sale Agreement" negotiated in good faith and mutually agreed by the parties. Letter at 2. Such a provision for further negotiation and contracting means there could have been no "meeting of the minds on 'all the issues perceived to require negotiation,'" as required for a Type I agreement.[7] *Brown*, 420 F.3d at 153 (citation omitted). The Court "need look no further than the first factor." *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989). The Letter's "references to the possibility that negotiations might fail and ... to a binding sales agreement to be completed at some future date ... shows that [the parties] did not intend to be bound." *Id.*

---

[6] The issue in *Tribune*, as in other cases, was whether there was an agreement at all, rather than whether it was Type I or Type II. 670 F. Supp. at 496. But the relevant factors are the same.

[7] The Letter also provides that "Seller shall cease any and all discussions or negotiations with other potential purchasers," and "shall not discuss this Confirmation Letter and the terms contained herein with any potential purchaser." Letter 2. These provisions make no sense if the Letter is binding, as the Funds could have no "potential purchasers" for claims they had just sold.

**b.    The Parties' Negotiations Show That They Intended The Purchase And Sale Agreement—Not The Confirmation Letter—To Be The Final Contract**

The draft PSAs exchanged before and after entering the Confirmation Letter support a finding that the Letter is a Type II agreement.  Language in a subsequent agreement—particularly merger clauses and later effective dates—can indicate the parties' intent to be bound only by that later agreement.  *See Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*, 14-cv-7343, 2015 WL 5671724, at *12 (S.D.N.Y. Sept. 22, 2015).  Unlike the Letter, the draft PSAs all contained a merger clause stating the PSA would "constitute[] the entire agreement between Seller and Buyer." Aug. 18 Draft PSA § 25; Aug. 23 Draft PSA § 25; Aug. 25 Draft PSA § 25.  And while the Confirmation Letter referred to a "Trade Date," the draft PSAs set an "Effective Date" on which the "Seller hereby sells, transfers and assigns to Buyer ... all right, title and interest, whether legal, equitable or otherwise, in the Claims."  *See, e.g.*, Aug. 23 Draft PSA § 3(a). That "Effective Date" was defined as "the date on which both Parties execute" the PSA, *id.* at Annex A ¶ 11, thus making plain that the Funds would not transfer the claims until the parties signed the PSA.  If the Confirmation Letter were binding, the parties would not have needed these provisions in the later PSA. "These provisions all demonstrate a clear intent to be bound only once the Agreement was signed by both Parties."  *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 357 (S.D.N.Y. 2012) (granting motion to dismiss).

**c.    The Confirmation Letter Left Open Numerous Terms**

The parties' decision to leave open terms in the Confirmation Letter "creates a presumption against finding a binding contract as to the ultimate goal," and instead "support[s] finding a binding Type II agreement."  *Brown*, 420 F.3d at 158; *see also Bulldog N.Y. LLC v. Pepsico, Inc.*, 8 F. Supp. 3d 152, 173 (D. Conn. 2014) (existence of open terms "counsels against finding there is a Type I preliminary agreement that is enforceable as to the ultimate goal").  DBSI's allegations

describe numerous material contingencies that the Letter did not address; most notably, while the Letter does *not* define the Remission Claims as being Allowed, Letter at 1, DBSI insisted that the PSAs include a provision "that the Remission Claim relating to the DOJ's Forfeiture Fund would be Allowed," Compl. ¶ 28; *see also id.* ¶ 43 (alleging that the delivery of "an Allowed Remission Claim" may have been "a condition precedent to the performance of the Agreement."). This was only one of many material omissions, including: (1) resolution of the Trustee's suit against the Funds and the terms and funding of any such settlement, *see* Compl. ¶¶ 13, 17, 40; (2) "the risk that the Claims themselves would be subordinated, disallowed, or avoided as contemplated in the Trustee Adversary Proceeding," *id.* ¶ 19; (3) determination of whether "DBSI would be a third-party beneficiary of the contemplated settlement agreement," *id.* ¶ 28; and (4) approval of any settlement by the New York and foreign bankruptcy courts, *id.* ¶ 71.

The draft PSAs incorporated into the Complaint confirm the Letter did not address numerous material issues. Each consists of over twenty pages of single-spaced terms, few of which are mentioned in the Letter. Significantly, the draft PSAs—unlike the Letter—address whether DBSI would be "entitled to receive recoveries from any and all Forfeiture Funds based on the Allowed amount of the Remission Claim," *e.g.*, Aug. 23 Draft PSA § 8(u), a hotly disputed issue that led to the 2011 litigation, *see supra* 8–9. The draft PSAs also include (1) numerous warranties, *id.* §§ 8–9; (2) requirements that the Funds file proofs of claim in the BLMIS liquidation, *id.* § 4; (3) provisions for terminating the agreement, *id.* § 6; (4) conditions precedent to payment obligation, including execution of transfer notices and delivery of the Settlement Agreement, *id.* § 7; (5) requirements for claim distributions, *id.* § 13; and (6) voting rights related to the bankruptcy claims, *id.* § 15. The Letter addresses none of these material issues.

19

DBSI acknowledges that good-faith negotiations continued for months.  *See* Compl. ¶¶ 27, 30.  These efforts to "negotiat[e] 'numerous' contract drafts after reaching a preliminary agreement on some terms" are "strong evidence that the parties intended to remain unbound pending the execution of formal documentation," *Worldwide Servs.*, 2015 WL 5671724 at *15 (quoting *Bear Stearns*, 401 B.R. at 619), and underscore that the Letter was a not a binding Type I contract.

### d.     The Parties Did Not Partially Perform Any Aspect Of The Deal Proposed In The Confirmation Letter—They Abandoned It

The fact that neither party partially performed also indicates that the Letter was Type II.  If "the putative agreement call[s] for the paying of consideration in exchange for ownership of [claims]," and payment is *not* made and ownership *not* transferred, this factor "weighs in favor of a finding that no Type I binding preliminary agreement existed."  *Bear Stearns*, 401 B.R. at 619–20.  DBSI acknowledges that it never paid the Funds, and the Funds never delivered any claims to DBSI.  Compl. ¶ 5.

### e.     A Transaction Like That Proposed In The Letter Is Usually Memorialized In A Detailed Contract, Not A Brief Letter

The "complexity of the transaction" and "amount of money at stake" also demonstrate that DBSI and the Funds did not intend to be bound until they executed a PSA.  *Bear Stearns*, 401 B.R. at 622.  The parties were negotiating the sale of a complicated, valuable asset that had to be approved in multiple different bankruptcy proceedings, and the transaction was intertwined with negotiation of a settlement agreement with the Trustee.  This type of deal is normally documented in a detailed contract—like the draft PSAs.  *See Worldwide Servs.*, 2015 WL 5671724, at *15 (holding that a "purported contract for the purchase of a long-range airplane . . . purchased years prior to manufacture and delivery may be assumed to be a complex contract normally committed to writing").  By contrast, the Letter's disproportionate brevity supports finding a Type II contract.

20

## 2.      The Funds' Obligation To Negotiate Terminated Upon Impasse

Under a Type II agreement, "[i]f the parties fail to reach ... a final agreement after making a good faith effort to do so, there is no further obligation." *Worldwide Servs.*, 2015 WL 5671724, at *9. The "obligation can come to an end without a breach by either party," as "not every good faith negotiation bears fruit." *IDT Corp. v. Tyco Grp., S.A.R.L.*, 15 N.E.3d 329, 332 (N.Y. 2014).

The Complaint shows that the parties reached impasse and abandoned the deal long ago. In 2011, that impasse was so insurmountable that the Funds sued for a declaration that DBSI had failed to negotiate in good faith, 2011 Compl. at 22, and DBSI counterclaimed for a declaration that it had "no ongoing obligation to continue negotiating the PSA," DBSI Counterclaim ¶ 85. DBSI does not allege that the parties exchanged a single draft PSA or even discussed potential deal terms after late 2013, when the DOJ made clear that the Remission Claims had no value. *See id.* ¶¶ 41–63. Nor does DBSI allege the Funds acted in bad faith at any point before 2019.[8] At the latest, and on DBSI's own allegations, the parties thus reached a good faith impasse in 2013, ending the Funds' obligation to negotiate. *See IDT Corp.*, 15 N.E.3d at 332 (finding parties' obligations ended due to impasse after negotiations "flagged" and "finally came to an end" "after more than a decade of back and forth"). The Court can dismiss DBSI's claims under a Type II reading of the Letter on this basis alone.

Even if matters were once unsettled, the Rubicon has been crossed. The Funds have now independently settled with the Trustee and are entitled to collect on their Customer Claims. Compl. ¶¶ 3, 5, 70–71. DBSI's own intransigence rendered it superfluous, and there is no basis to sell claims at a windfall to DBSI today. Further, the Bankruptcy Court must approve any transfer

---

[8] DBSI accuses the Funds of bad faith for refusing to negotiate in 2019, but cites only the Funds' position that they are no longer bound to do so. Compl. ¶¶ 66, 68. That is not enough. *See IDT Corp.*, 15 N.E.3d at 332 (good-faith legal positions insufficient to support inference of bad faith).

of claims, as DBSI agreed in resolving its objection to the Funds' Chapter 15 petition.  *See* Proposed Order 2, 4.  That court would never resuscitate the failed 2011 transaction, as it would transfer to DBSI money that belongs to the Funds' investors.  *See In re Fairfield Sentry Ltd.*, 768 F.3d 239, 246–47 (2d Cir. 2014) (requiring bankruptcy court approval of debtor's sale of claims against the Madoff Estate and specifically requiring the court to consider "the increase in value" after the signing of the sales contract).  Because no enforceable obligations remain under the Letter, DBSI cannot amend to state a claim.

### B.       Even If The Letter Were A Type I Agreement Requiring Purchase And Sale, DBSI Materially Breached Its Obligations And Cannot Sue The Funds

Even if the Confirmation Letter could plausibly be read as a Type I agreement requiring a purchase and sale, DBSI still could not state a claim.  Because the Letter is not fully integrated, the Court must look to the draft PSAs—incorporated into the Complaint—to determine the scope of the parties' agreement.  Indeed, even if the Letter were fully integrated, the Court would need to look to those same draft PSAs to determine what a reasonable time for performance would be.  Those drafts confirm that DBSI would have to pay the Trustee shortly after the parties executed the Letter.  DBSI failed to pay at any point, much less shortly after execution.  Thus, if the Letter were a Type I contract, DBSI materially breached it, excusing the Funds' performance.

### 1.       The Confirmation Letter Is Not Fully Integrated, And The Draft PSAs Show Terms That DBSI Breached, Terminating The Contract

Because the Confirmation Letter does not contain a merger clause, "the court must determine whether the agreement is integrated 'by reading the writing in the light of surrounding circumstances.'"  *Bourne v. Walt Disney Co.*, 68 F.3d 621, 627 (2d Cir. 1995) (quoting *Braten v. Bankers Trust Co.*, 456 N.E.2d 802, 804 (N.Y. 1983)).  "A written contract is considered integrated when the parties intend it to constitute the complete and final expression of their agreement."  *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 295 (2d Cir. 1999).  By asking the Court to plug in

a material condition precedent not contained in the Letter but allegedly found in the draft PSAs, *see* Compl. ¶¶ 17, 19, 20 & n.2, DBSI effectively concedes the Letter is not fully integrated.

In any event, the Letter's plain terms are dispositive.  "It is often clear from the face of a writing that it is incomplete and cannot be more than a partially integrated agreement."  Restatement (Second) of Contracts § 210 cmt. c (1981).  An agreement is partially integrated if it references a separate agreement that will contain additional terms, *see Intercont'l Packaging Co. v. China Nat'l Cereals, Oils & Foodstuff Imp. & Exp. Corp.*, 559 N.Y.S.2d 302, 304–05 (App. Div. 1990); *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 166–67, 169–70 (2d Cir. 2003), is disproportionately brief or informal, *see E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 303–04 (S.D.N.Y. 2000), or omits essential terms, *see* Restatement (Second) of Contracts § 204 cmt. e (1981).  All of that is true here.  The Letter is explicitly "subject to" a separate PSA, it describes a billion-dollar deal in one and a half pages, and it omits many material terms.  *See supra* Section II.A.1.  As a matter of law, it is not fully integrated.  *See, e.g., In re W. T. Grant Co.*, 1 B.R. 516, 519 (2d Cir. 1979) (holding on motion to dismiss that "letter agreements" at issue "were clearly not intended to be a complete and exclusive statement of the terms of the agreement because explicit reference is made to secondary documents" (internal quotation marks and citation omitted)).

Because the Letter is not fully integrated, the Court should look to the draft PSAs to determine the full scope of the parties' agreement.  *See World Trade Ctr. Props.*, 345 F.3d at 170 (forms exchanged in process of negotiating insurance binder, along with modifications to those forms, are "likely the most reliable manifestation of the terms by which the parties intended to be bound"); Restatement (Second) of Contracts § 204 cmt. e (when an agreement is partially integrated, "the omitted term[s] may be supplied by prior negotiations or a prior agreement").  The draft PSAs

confirm that the parties understood that DBSI would pay the Trustee to settle the Trustee's lawsuit against the Funds, thereby Allowing the Customer Claims. *See supra* Section I.B.

DBSI breached this agreement by failing to pay. "[F]ailure to tender payment is generally deemed a material breach of a contract," which excuses the non-breaching party's duty to perform. *ARP Films, Inc. v. Marvel Entm't Grp, Inc.*, 952 F.2d 643, 649 (2d Cir. 1991). That breach terminated any purported obligations of the Funds under the Letter, and requires dismissal of DBSI's action. *See id.*; *Awards.com, LLC v. Kinko's, Inc.*, 925 N.E.2d 926, 926–27 (N.Y. 2010).

### 2. Even If The Confirmation Letter Were Fully Integrated, The Court Should Still Look To Extrinsic Evidence To Determine Reasonable Terms Of Performance

Even if the Letter were a fully integrated Type I agreement—and it is not—the Letter does not provide a time for the parties' performance. "Where, as here, the duration of a contract is ambiguous, courts will imply a 'reasonable time' based on the circumstances of the negotiations of the parties to determine their intent." *New Eynon Assocs., L.P. v. Lehman Bros. Holdings Inc.*, 713 N.Y.S.2d 176, 178 (App. Div. 2000); *see also St. John's Univ., N.Y. v. Bolton*, 757 F. Supp. 2d 144, 152, 164–65 (E.D.N.Y. 2010) (determining, on a motion to dismiss and from the structure of the contract, that statute of limitations had run since defendant had failed to perform within a reasonable time); *Thorne v. Alexander & Louisa Calder Found.*, 890 N.Y.S.2d 16, 26–27 (App. Div. 2009) (same). Thus, the Court would still need to look at the draft PSAs to determine the reasonable time for DBSI's payment and for the Funds' delivery of the Allowed Customer Claims—as DBSI effectively concedes by citing those draft PSAs as the source of a supposed condition precedent controlling the time of performance. *See* Compl. ¶¶ 17, 19, 20 & n.2.

By their plain terms, the draft PSAs provide that DBSI's payment was required to resolve the Trustee's suit and thereby Allow the claims. *See supra* Section I.B. The draft PSAs provided that time was of the essence, and DBSI could cancel the deal if it was not closed within seven

months.  *See supra* 6–8.  Accordingly, DBSI was to pay—and the Funds were to deliver Allowed claims—at most within seven months after execution of the Letter.  If the Letter were a binding Type I agreement, DBSI materially breached it and cannot now sue the Funds.

## III.   DBSI'S IMPLIED COVENANT CLAIM FAILS FOR ADDITIONAL REASONS

DBSI is estopped from raising its tacked-on claim that the Funds breached the implied covenant of good faith and fair dealing by filing for relief under Chapter 15 of the Bankruptcy Code.  Compl. ¶¶ 75, 94–99.  DBSI first raised this accusation when the Funds filed their Chapter 15 petition.  *Compare* Selendy Decl. Ex. 10 ¶¶ 29–34 *with* Compl. ¶¶ 75, 97.  But DBSI *withdrew* that objection and agreed to a proposed order recognizing the BVI liquidation, thus acknowledging the fact that the Funds filed their petition in good faith.  Proposed Order at 2.  The bankruptcy court adopted that factual position when it entered the order, and the Funds relied on it when they agreed DBSI could sue in this Court.  DBSI is thus judicially and equitably estopped from claiming bad faith.  *See Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001); *In re Adelphia Recovery Tr.*, 634 F.3d 678, 695–96 (2d Cir. 2011).

In any event, this claim is facially meritless.  Good faith does not bar insolvent entities from filing for bankruptcy relief to ensure the orderly administration of their estates.  Even if it did, the Confirmation Letter—along with any implied covenants therein—terminated long ago.  *See supra* Section II.A.2, II.B.  Moreover, the Funds agreed DBSI could bring suit in this Court, Proposed Order at 2, 4, and DBSI does not explain how this result leaves it at any sort of tactical disadvantage.  DBSI's breach of covenant claim should be dismissed with prejudice.

## <u>CONCLUSION</u>

For the reasons stated above, Defendants respectfully request that the Court dismiss Plaintiff's Complaint with prejudice.

Dated:   New York, NY
         April 1, 2020

Respectfully submitted,

SELENDY & GAY PLLC

By:      /s/          *Philippe Z. Selendy*
         Philippe Z. Selendy
         Caitlin Halligan
         Andrew R. Dunlap
         Lena Konanova
         Oscar Shine
         Thad Eagles
         SELENDY & GAY PLLC
         1290 Avenue of the Americas
         New York, NY  10104
         Tel: 212-390-9000
         pselendy@selendygay.com
         challigan@selendygay.com
         adunlap@selendygay.com
         lkonanova@selendygay.com
         oshine@selendygay.com
         teagles@selendygay.com

         *Attorneys for Defendants Kingate Global Fund*
         *Ltd. and Kingate Euro Fund Ltd.*