**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DEUTSCHE BANK SECURITIES INC.,

    *Plaintiff*,

v.

KINGATE GLOBAL FUND LTD. and
KINGATE EURO FUND LTD.,

    *Defendants*.

Case No. 19-cv-10823

# MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Date:  June 1, 2020

Glenn M. Kurtz
Andrew W. Hammond
Jacqueline L. Chung
Timothy L. Wilson, Jr. (motion for
admission *pro hac vice* pending)

**WHITE & CASE**
1221 Avenue of the Americas
New York, NY 10020
Telephone: 212-819-8200

*Counsel for Deutsche Bank Securities Inc.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ......................................................................................................4

LEGAL STANDARD.................................................................................................9

ARGUMENT ..........................................................................................................9

I.    THE ALLEGATIONS IN THE COMPLAINT STATE A CLAIM FOR BREACH OF CONTRACT ...............................................................................................9

    A.    DBSI Has Adequately Alleged that the Agreement Is a Binding Contract for the Transfer of Allowed Claims...............................................................10

        1.    The Language of the Contract Evidences an Intent to Be Bound.............11

        2.    The Agreement Contains all Essential Terms of the Transaction.............13

        3.    The Parties Committed to Their Agreement in Writing ..........................15

        4.    DBSI Did Not Abandon its Obligation to Perform Under the Contract...17

    B.    The Funds Fail to Establish that DBSI Breached the Agreement.........................17

        1.    The Funds Cannot Prevail on an Unpled Affirmative Defense or Claim.17

        2.    The Funds Cannot Rely on Select Parol Evidence to Vary the Terms of a Binding Agreement ...................................................................17

        3.    DBSI Did Not Breach the Agreement ....................................................19

            a.    The Funds Were Required to Deliver Allowed Claims to DBSI..19

            b.    The Extrinsic Evidence Shows DBSI Was Not Required to Perform Until the Claims Were Allowed.....................................20

            c.    DBSI Did Not Fail to Perform Within the Time Required by the Agreement ...................................................................21

II.    IN THE ALTERNATIVE, THE PARTIES HAVE A TYPE II AGREEMENT AND THE FUNDS BREACHED THEIR OBLIGATION TO NEGOTIATE IN GOOD FAITH TO DELIVER DBSI ALLOWED CLAIMS ..........................................23

III.    BY FILING FOR CHAPTER 15 RELIEF TO BLOCK THIS LITIGATION, THE FUNDS BREACHED THE IMPLIED COVENANT ......................................24

CONCLUSION.....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adjustrite Sys. Inc. v. GAB Bus. Servs.*,
    145 F.3d 543 (2d Cir. 1998)................................................................................11, 13, 15, 16

*Ally Gargano/MCA Advertising, LTD v. Cooke Properties, Inc.*,
    1989 U.S. Dist. LEXIS 1245 (S.D.N.Y. Oct. 13, 1989).........................................................15

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*,
    692 F.3d 42 (2d Cir. 2012).......................................................................................................9

*Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods. (USA) Inc.*,
    401 B.R. 598 (S.D.N.Y. 2009)................................................................................................13

*Brown v. Cara*,
    420 F.3d 148 (2d Cir. 2005)........................................................................................11, 13, 16

*Crossroads Mortg. Corp. v. Columbia Equities*,
    No. 97 Civ. 1117 (LMM), 1997 U.S. Dist. LEXIS 9210 (S.D.N.Y. July 1,
    1997) .......................................................................................................................................10

*Deephaven Distressed Opportunities Tradings, Ltd. v. 3V Capital Master Fund
    Ltd.*,
    100 A.D.3d 505 (N.Y. App. Div. 1st Dep't 2012).................................................................14

*Deephaven Distressed Opportunities Tradings, Ltd. v. 3V Capital Master Fund
    Ltd.*,
    No. 600610/08, 2011 N.Y. Misc. LEXIS 7073 (N.Y. Sup. Ct. Oct. 27, 2011) ...........14, 16, 19

*DKR Capital, Inc. v. AIG Int'l W. Broadway Fund, Ltd.*,
    No. 03 Civ. 1568 (JGK), 2003 U.S. Dist. LEXIS 17498 (S.D.N.Y. Oct. 2,
    2003) ................................................................................................................................10, 19

*Emigrant Bank v. UBS Real Estate Sec., Inc.*,
    49 A.D.3d 382 (N.Y. App. Div. 1st Dep't 2008)...................................................................11

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*,
    375 F.3d 168 (2d Cir. 2004)....................................................................................................18

*FCOF UB Secs. LLC v. Morequity, Inc.*,
    663 F. Supp. 2d 224 (S.D.N.Y 2009).................................................................................9, 24

*Fin. Guar. Ins. Co. v. Putnam Advisory Co.*,
    783 F.3d 395 (2d Cir. 2015)....................................................................................................24

*Goldman Sachs Lending Partners, LLC v. High River Ltd. P'ship*,
    943 N.Y.S.2d 791 (N.Y. Sup. Ct. 2011) ................................................................16

*Guzman v. United States*,
    No. 11 Civ. 5834 (JPO), 2013 U.S. Dist. LEXIS 131684 (S.D.N.Y. Feb. 14,
    2013) ......................................................................................................................9

*In re Aerovias Nacionales de Colombia,*
    323 B.R. 879 (Bankr. S.D.N.Y. 2005) ..................................................................18

*In re Kingate Global Fund Ltd. et al.*,
    Case Nos. 19-12852, 19-12853 (SMB) (Bankr. S.D.N.Y. Sept. 5, 2019) ..............24

*In re NAP, Inc.*,
    No. 96 Civ. 640 (LLS), 1996 U.S. Dist. LEXIS 5857 (S.D.N.Y. May 1, 1996),
    *aff'd*, 1996 U.S. App. LEXIS 24944 (2d Cir. Sept. 20, 1996) ................................15

*Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment*
    *Securities LLC v. Kingate Global Fund, Ltd. et al.*,
    Adv. Pro. No. 09-1161 (BRL) (Bankr. S.D.N.Y. Nov. 20, 2019) ...........................8

*Marvel Characters v. Simon*,
    310 F.3d 280 (2d Cir. 2002) ................................................................................25

*MLRN LLC v U.S. Bank N.A.*,
    No. 652712/2018, 2019 N.Y. Misc. LEXIS 6085 (N.Y. Sup. Ct. Nov. 14,
    2019) ....................................................................................................................22

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
    709 F.3d 109 (2d Cir. 2013) ..................................................................................9

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*,
    660 N.E.2d 415 (N.Y. 1995) ..........................................................................20, 21

*Pesa v. Yoma Dev. Grp.*,
    965 N.E.2d 228 (N.Y. 2012) ................................................................................19

*Radiation Dynamics Inc. v. Goldmuntz*,
    464 F.2d 876 (2d Cir. 1972) ................................................................................12

*Ricatto v. M3 Innovations Unlimited, Inc.*,
    No. 18 Civ. 8404 (KPF), 2020 U.S. Dist. LEXIS 81550 (S.D.N.Y. May 8,
    2020) ....................................................................................................................19

*Savasta v. 470 Newport Assocs.*,
    623 N.E.2d 1171 (N.Y. 1993) ..............................................................................21

*Sawabeh Info. Servs. Co. v. Brody*,
    832 F .Supp. 2d 280, 307-08 (S.D.N.Y. 2011) ........................................................16

*Seaport Glob. Secs. LLC v. SB Grp. Holdco, LLC*,
    162 A.D.3d 466 (N.Y. App. Div. 1st Dep't 2018) ............................................12, 16

*Serdarevic v. Centex Homes, LLC*,
    760 F.Supp. 2d 322 (S.D.N.Y. 2010) ........................................................................9

*Sira v. Morton*,
    380 F.3d 57 (2d Cir. 2004) ......................................................................................18

*Spinelli v. NFL*,
    903 F.3d 185 (2d Cir. 2018) ....................................................................................24

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008) ......................................................................................9

*Stonehill Capital Mgmt., LLC v. Bank of the West*,
    68 N.E.3d 683 (N.Y. 2016) ......................................................................................11

*Subaru Distribs. Corp. v. Subaru of Am., Inc.*,
    425 F.3d 119 (2d Cir. 2005) ......................................................................................9

*Teachers Ins. & Annuity Ass'n v. Tribune Co.*,
    670 F. Supp. 491, 496 (S.D.N.Y. 1987) ......................................................13, 16, 23

*Tractebel Energy Mktg. v. AEP Power Mktg.*,
    487 F. 3d. 89 (2d Cir. 2007) ........................................................12, 13, 15, 16

*UBS AG v. Highland Capital Mgt. L.P.*,
    920 N.Y.S.2d 245 (N.Y. Sup. Ct. 2010) ................................................................21

*Vacold LLC v. Cerami*,
    545 F.3d 114 (2d Cir. 2008) ........................................................11, 12, 14, 16

*Wyly v. Weiss*,
    697 F.3d 131 (2d Cir. 2012) ....................................................................................25

## STATUTES AND RULES

Bankruptcy Code § 1517 ..............................................................................................24

Rule 12(b)(6) ................................................................................................................10

Plaintiff Deutsche Bank Securities Inc. ("DBSI") submits this brief in opposition to the motion of Defendants Kingate Global Fund Ltd. and Kingate Euro Fund Ltd. (the "Funds") to dismiss the Complaint.[1]

## PRELIMINARY STATEMENT

The Funds entered into a "firm, irrevocable and binding" agreement to sell certain claims arising from their investment in Bernard L. Madoff Investment Securities ("BLMIS") in the approximate amount of $1.6 billion to DBSI for a payment of 66 cents on the dollar (the "Agreement"), including customer claims against the Madoff Estate ("Customer Claims"). DBSI was required to close only after these claims became "Allowed" ("Allowed Claims"). At the time that the Agreement was executed, the Madoff Trustee had initiated an adversary proceeding against the Funds (the "Trustee Adversary Proceeding") seeking to avoid and subordinate the Funds' Customer Claims. The Funds would not have Allowed Claims to sell DBSI until that proceeding was resolved. The Claims were Allowed in November 2019, when the Funds entered into a settlement agreement with the Trustee, thus resolving the Trustee Adversary Proceeding.

Contrary to the Funds' assertion, DBSI does not claim it had a "risk free perpetual right to purchase the Funds' claims at the precise moment they became valuable." Mem. of Law in Support of Defs.' Mot. to Dismiss (ECF No. 024) ("Br.") at 2. DBSI had to close on Allowed Claims, and bore the risk that any recovery on the Claims would be less than the purchase price.

It is the Funds that treat the Allowed Claims like a risk-free option in their favor. As the Claims are now "in the money," the Funds simply repudiated the Agreement. DBSI has filed suit to enforce its rights under the Agreement.

---

[1] The term "Claims" is defined as set forth in the Agreement, which is attached to DBSI's Complaint. ECF No. 007-01. Capitalized terms in this brief that are not otherwise defined use the same definitions as those set forth in DBSI's Complaint. ECF No. 007.

The Funds have moved to dismiss the Complaint, arguing that the Court must first determine whether the Agreement is a binding sales contract ("Type I") or an agreement to negotiate in good faith ("Type II"), and then conclude that DBSI either breached the Agreement or reached an impasse in negotiations with the Funds.  The Funds' motion essentially ignores the standards for motions to dismiss by requiring the Court to (1) resolve contested issues of fact, including based on selective and incomplete parol evidence that conflicts with the terms of the Agreement; (2) resolve alleged ambiguities and alleged open terms in the Agreement against the non-moving party, and (3) adjudicate unpled affirmative defenses/claims that DBSI breached the Agreement.  The Funds' motion is premature and lacking in merit.

First, the Agreement is a binding Type I sales contract that explicitly provides that it is a "firm, irrevocable and binding agreement to sell [the Funds' Allowed] Claims at the Purchase Rate . . . to [DBSI]," and sets forth all of the essential terms of the transaction.  Furthermore, the parties' conduct—including the Funds' own lawsuit to enforce the Agreement—demonstrates their intent to be bound.  In any case, the Agreement should be treated as a Type I contract because all inferences must be drawn in favor of the non-moving party.  At a minimum, whether the Agreement is a Type I contract is a question of fact, not subject to resolution on a motion to dismiss.

Second, the Funds' attempt to excuse their failure to perform because DBSI did not fund the settlement of the Trustee Adversary Proceeding is without merit.  The Funds' argument amounts to an unpled affirmative defense or claim that *DBSI* breached the contract, and is improper on a motion to dismiss because it requires the Court to make findings of fact that conflict with DBSI's well-pled allegations.  Furthermore, the Funds ask this Court to conclude that DBSI breached the Agreement based on cherry-picked evidence, which is outside this motion record.  And this evidence does not support the Funds' arguments.  The Agreement does not even reference

a settlement of the Trustee Adversary Proceeding, let alone require that DBSI make payments to resolve such proceeding. Rather, the Agreement clearly provides for DBSI to purchase "Allowed" Claims and DBSI stood ready, willing, and able to purchase the Allowed Claims under the terms of the Agreement, but the Funds repudiated. At a minimum, these contested issues of fact cannot be resolved on a motion to dismiss.

Third, the Funds' argument that the Agreement is not fully integrated and that the Court therefore must import terms from the draft Purchase and Sales Agreements ("PSAs") is incorrect. No agreement was reached on such terms. Nor could such parol evidence be used to vary the essential terms of this Agreement for the sale of *Allowed* Claims. In any case, the draft PSAs also provide that the Customer Claims must be Allowed as a condition precedent to DBSI's obligation to fund the purchase price. Thus, if the Court resorted to parol evidence on this motion to dismiss, then the evidence directly contradicts the Funds' claim that DBSI breached the Agreement by failing to pay the purchase price before the condition precedent was satisfied.

Fourth, the Funds' contention that the Court must imply a "reasonable time" for DBSI to consummate the purchase is not supported by the plain language of the Agreement or the language in the draft PSAs. The factual question of what constitutes a "reasonable time" cannot be resolved on a motion to dismiss. In any event, as the Customer Claims would not be Allowed until the Trustee Adversary Proceeding was resolved, any reasonable time must be measured from the resolution of the Trustee Adversary Proceeding, not from the date the Agreement was executed. The Funds had no right to terminate the Agreement based on the time *they* took in resolving the Trustee Adversary Proceeding.

Fifth, even assuming *arguendo* that the Court could resolve the contested issues of fact and accept the Funds' assertion that the Agreement is a Type II agreement for purposes of this motion,

the Funds' motion would still fail because their argument rests on the faulty premise that "the Funds negotiated in good faith but reached impasse by 2013," thereby ending any obligations of the Funds under the Agreement.  Contrary to the Funds' assertions, there was no moment of "impasse" that relieved the Funds of their duty to negotiate, as the Complaint alleges that the parties' continued to communicate on the transaction and the settlement of the Trustee Adversary Proceeding until 2019 when the Funds asserted *for the first time* that the Agreement was no longer binding.  At a minimum, the determination as to whether the parties reached an impasse in negotiations is a contested issue of fact that cannot be resolved on this motion to dismiss.

Finally, the Funds' argument that DBSI should be estopped from pursuing its claim for breach of the implied covenant of good faith and fair dealing because DBSI resolved its objection to the Funds' petition for Chapter 15 recognition is baseless.  DBSI never asserted that the Funds breached the implied covenant in the bankruptcy proceeding, and the Funds have not and cannot demonstrate any recognized basis on which DBSI should be estopped.  The fact that the Funds were unsuccessful in their efforts to avoid their obligation through a Chapter 15 filing does not relieve them of their breach.  That DBSI was successful in convincing the Funds to modify the relief that it sought from the Bankruptcy Court is not a basis to preclude DBSI's claim for breach of the implied covenant.

The well-pled allegations in DBSI's Complaint support claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  Accordingly, the Court should deny the Funds' motion to dismiss.

## **BACKGROUND**

The Funds were customers of BLMIS and acted as so-called Madoff "feeder funds."  As BLMIS held the Funds' investments at the time BLMIS was placed into liquidation proceedings

under the Securities Investor Protection Act, the Funds held Customer Claims against the Madoff

Estate, as well as other rights and claims including a Remission Claim relating to claims the Funds

might have to any forfeiture fund administered by the US Department of Justice. Compl. (ECF

No. 7) ¶ 14.  In April 2009, the Madoff Trustee filed the Trustee Adversary Proceeding in the

Bankruptcy Court against the Funds and their former principals seeking to claw back nearly $1

billion that the Funds had redeemed from BLMIS and to disallow and equitably subordinate the

Funds' Customer Claims.  *Id.* ¶ 13.[2]

**DBSI Submits a Bid.**  In April 2011, the Funds began soliciting bids for the sale of their Claims.

*Id.* ¶ 16.  DBSI submitted a formal bid letter to acquire the Funds' Claims.  *Id.* ¶ 17.  DBSI's bid

letter proposed, as a condition precedent to closing the transaction, that the Trustee Adversary

proceeding be resolved through a settlement that "would result" in the Customer Claims "being

treated for all purposes as Allowed."   Bid Letter 6 (ECF No. 23-04); *see also* Compl. ¶ 17.

Although the Funds initially rejected DBSI's bid in favor of another, the Funds reached out to

DBSI when the other bid fell through and insisted that DBSI execute a written trade confirmation

to document the express terms of a binding deal.  Compl. ¶ 18.

**The Parties Reach Agreement.**  On August 24, 2011, the parties executed the Agreement, which

expressly states that it serves as "confirmation of [the Funds'] firm, irrevocable and binding

agreement . . . to sell the Claims . . . at the Purchase Rate . . . to [DBSI]."  Agreement 1 (ECF No.

007-1).  The Funds sold Claims in the total amount of $1,624,748,095 for a purchase price of 66%

of the claim amount, *i.e.*, $1,072,333,743.  *Id.* at 2; Compl. ¶ 21.  The Agreement obligated the

Funds to transfer to DBSI "Allowed" Claims, where the term "Allowed" was defined to mean:

> allowed as a valid, enforceable, liquidated, non-contingent, undisputed,
> unavoidable, and unsubordinated claim that is not subject to any actual or potential

---

[2] Because the Funds had invested almost all of their investors' capital with BLMIS, the revelation of the BLMIS fraud caused them to enter into liquidation proceedings initiated in the British Virgin Islands ("BVI").  Compl. ¶ 15.

> avoidance, reduction, set-off, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise, and whether pursuant to Section 510(c) of the United States Bankruptcy Code or otherwise), counterclaim, cross-claim, defenses, disallowance (whether under sections 502(b), (d), or (e) of the United States Bankruptcy Code or otherwise), impairment, objection, or any other challenges under any applicable law, whether foreign or domestic.

*Id.* at 1, n.1.

So, the Trustee Adversary Proceeding had to be resolved before the Customer Claims would be Allowed.  Compl. ¶ 22.  DBSI assumed the risk on what could be recovered from the Madoff Estate on the Customer Claims—and recovery was unknown—but it did not accept the risk that the Customer Claims would be subordinated, disallowed, or avoided.  *Id.* ¶ 19. The Agreement contains no expiration date.  *Id*. ¶ 26.

**The Parties Exchange Secondary Documentation.**  During a seven-day period surrounding the execution of the Agreement, the parties exchanged three draft PSAs.  *See* Aug. 18 Draft PSA (ECF No. 023-06); Aug. 23 Draft PSA (ECF No. 023-08); Aug. 25 Draft PSA (ECF No. 023-10).  All three drafts conditioned DBSI's payment upon the Funds' Customer Claims becoming Allowed. Compl. ¶¶ 19, 21-22.

The draft PSAs provided that DBSI would "agree[] to pay" the purchase price for the Claims as of the execution of a final PSA, *i.e.*, the "Effective Date."  *E.g.*, Aug. 25 Draft PSA§ 3(b); *see also id.* Annex A ¶ 11.  However, the draft PSAs did not require DBSI actually to make payment until the "Funding Date," which was subject to several conditions precedent.  *Id.* § 7(a) (defining "Funding Date" as the day on which "the Payment shall take place").  One of these conditions required that the Funds' representations and warranties in the PSA had to "be true and correct as of the Funding Date."  Aug. 25 Draft PSA § 7(b)(i); Compl. ¶¶ 19-20.  Among these representations and warranties was the requirement that "the Customer Claim is Allowed against the Debtor."  *E.g.*, Aug. 25 Draft PSA § 8(h).  The Funds further represented that they would have

entered into a "valid binding [settlement] agreement" with the Trustee" (*e.g.*, *id.* § 8(m)(i)-(ii), (iv)), and that the settlement agreement would have been approved by the bankruptcy courts in the United States and BVI as a condition precedent to payment.  *E.g.*, *id.* § 7(b)(iv); (vi).

Finally, none of the draft PSAs contained an expiration date or any rights for the Funds to terminate based on time.  Instead, all three drafts specified that the transaction could "be terminated by [DBSI] (and solely by [DBSI]) at any time by providing a written notice to the [Funds] after the Outside Date if the Funding Date has not occurred on or before the Outside Date."  *E.g.*, Aug. 18 Draft PSA § 6(a).  The "Outside Date" was a date certain after which DBSI could elect to exercise this right.  *See id.* Annex A, ¶ 26; Aug. 23 Draft PSA, Annex A ¶ 27; Aug. 25 Draft PSA, Annex A ¶ 30.

**The Funds Sue to Close the Transaction.**  The parties continued their negotiations through the remainder of 2011.  DBSI advised the Funds that it stood ready to purchase the Allowed Claims at the agreed-upon price under an appropriate PSA and conclusion of the Trustee Adversary Proceeding.  Compl. ¶ 29.  Unhappy with the pace of these negotiations, however, the Funds filed a complaint in the Southern District of New York in late-2011, seeking a declaration that the Agreement was a "firm, irrevocable and binding" commitment by DBSI to purchase the Claims.  *Id.* ¶ 30; Funds Compl. (ECF No. 023-11).  In response, DBSI filed an answer and counterclaim seeking a declaratory judgment that the Agreement did not bind DBSI to purchase the Customer Claims *before they became Allowed*.  Compl. ¶ 31 ("Any sale of the Kingate Funds' claims is predicated on the Funds' successful settlement of the lawsuit brought by the Madoff Trustee . . . [because] . . . the settlement with the Madoff Trustee is the event that will create the bundle of rights the Kingate Funds seek to sell.").

**The Parties Continue to Negotiate and Communicate for 7 Years.**  During the pendency of the

litigation, the parties continued to negotiate and exchange draft PSAs.  Compl. ¶¶ 32, 36-37, 40.
The parties also sought stays of discovery to facilitate these negotiations and continued to represent
that the Agreement bound them to consummate the transaction.  *Id.* ¶¶ 33-36, 38.  In late 2013, the
parties agreed to a voluntary dismissal of the litigation.  *Id.* ¶¶ 41-42, 44.

The parties thereafter remained in contact regarding the status of the Trustee Adversary
Proceeding, which was the primary impediment to closing the transaction.  *Id.* ¶ 47.  DBSI spoke
with representatives of the Funds or the Madoff Trustee more than a dozen times between
November 2014 and September 2018.  *Id.* ¶¶ 50-56; 58-60.  There would have been no reason for
these communications if DBSI was not to buy the Allowed Claims.  Indeed, the Funds' counsel
agreed to consider DBSI's request to participate in the mediation with the Trustee to resolve the
Trustee Adversary Proceeding in June 2018.  *Id.* ¶ 60.  Again, DBSI would have no role in the
mediation if it was not to buy the Allowed Claims.

**About to Possess Allowed Claims, The Funds Shut Out DBSI.**  In May 2019, on the eve of
resolving the Trustee Adversary Proceeding, the Funds abruptly renounced their obligations under
the Agreement.  *Id.* ¶ 66.  In response, DBSI, which had remained ready, willing, and able to
purchase the Customer Claims once they were Allowed, promptly reminded the Funds of their
obligations under the "firm, irrevocable and binding" Agreement.  *Id.* ¶ 67.

The Funds pressed forward without DBSI, executing a settlement agreement with the
Madoff Trustee that was approved by the Bankruptcy Court on August 6, 2019.  *Id.* ¶¶ 69-71.  The
Bankruptcy Court entered an order dismissing the Trustee Adversary Proceeding with prejudice
on November 20, 2019.  Hammond Decl. Ex. 1, Order of Dismissal with Prejudice (ECF No. 418),
*Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC v.*

*Kingate Global Fund, Ltd. et al.*, Adv. Pro. No. 09-1161 (BRL) (Bankr. S.D.N.Y. Nov. 20, 2019).[3]

    The Funds also filed for Chapter 15 relief to prevent DBSI from filing suit to enforce the Agreement.  *See* Compl. ¶¶ 72, 75.  The Funds agreed to permit DBSI to file this Complaint only after DBSI objected to the Funds' improper tactical maneuver.  *Id.* ¶ 73.

## LEGAL STANDARD

    On a 12(b)(6) motion to dismiss, the Court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119 (2d Cir. 2013) (quoting *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011) (internal quotation marks omitted)).  The Funds' motion turns on the interpretation of the Agreement, "but at [the motion to dismiss] stage" the Court "should resolve any contractual ambiguities in favor of the plaintiff."  *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005); *Serdarevic v. Centex Homes, LLC*, 760 F.Supp. 2d 322, 328 (S.D.N.Y. 2010); *see also Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 56-58 (2d Cir. 2012) (reversing dismissal of a breach of contract claim where relevant provision was ambiguous and plaintiff's reading was plausible).

## ARGUMENT

**I.**    **THE ALLEGATIONS IN THE COMPLAINT STATE A CLAIM FOR BREACH OF CONTRACT**

    At this stage of the proceedings, the Court need not determine whether the Agreement is a Type I or Type II agreement, but must simply determine whether DBSI has alleged a plausible breach under either scenario.  *FCOF UB Secs. LLC v. Morequity, Inc.*, 663 F. Supp. 2d 224, 231

---

[3] The Court is permitted to take judicial notice of the Bankruptcy Court's order.  *See Staehr v. Hartford Fin. Servs. Grp., Inc.,* 547 F.3d 406, 425-26 (2d Cir. 2008) (finding that courts may take judicial notice of court filings); *Guzman v. United States*, No. 11 Civ. 5834 (JPO), 2013 U.S. Dist. LEXIS 131684, at *9 (S.D.N.Y. Feb. 14, 2013) (noting that "[i]t is common and entirely proper for courts to take judicial notice of other court proceedings.").

(S.D.N.Y 2009) (denying motion to dismiss but withholding determination as to "whether the Initial Commitment is more appropriately classified as a Type I or Type II agreement"); *Crossroads Mortg. Corp. v. Columbia Equities*, No. 97 Civ. 1117 (LMM), 1997 U.S. Dist. LEXIS 9210, at *8 (S.D.N.Y. July 1, 1997) (denying motion to dismiss and stating that "at this stage of the proceedings, on defendant's motion to dismiss, it is unnecessary for the Court to decide whether the [Letter of Intent] was a Type I or Type II agreement").  Further, to the extent that there are issues of fact as to whether the Agreement is a Type I or Type II agreement, including whether the parties' intended to be bound, such issues cannot be resolved on a motion to dismiss.  *See DKR Capital, Inc. v. AIG Int'l W. Broadway Fund, Ltd.*, No. 03 Civ. 1568 (JGK), 2003 U.S. Dist. LEXIS 17498, *13 (S.D.N.Y. Oct. 2, 2003) ("In deciding a Rule 12(b)(6) motion to dismiss a breach of contract claim, the Court's role is not to resolve ambiguities in the language of the contract.  Where the intent of the parties is too ambiguous to be gleaned from the contract alone, the Court should receive evidence that might better clarify that intent.").

Here, the plain terms of the Agreement, coupled with the well-pled allegations in the Complaint, establish the Agreement is a Type I agreement for this motion to dismiss.  The Funds' assertion that they are not obligated to perform under the Agreement because DBSI breached the Agreement by failing to fund the settlement of the Trustee Adversary Proceeding should be rejected because there is no such contractual requirement in the Agreement (or in the draft versions of the PSA on which the Funds rely) and the Funds have not pled any such affirmative defense or claim, and such a defense or claim cannot be resolved on a motion to dismiss.

### A.   DBSI Has Adequately Alleged that the Agreement Is a Binding Contract for the Transfer of Allowed Claims

The plain language of the Agreement indicates that the parties entered into a Type I agreement that the Funds breached by refusing to sell the Allowed Claims to DBSI.  A Type I

agreement is a "fully binding preliminary agreement, which is created when the parties agree on all the points that require negotiation but agree to memorializing their agreement in a more formal document." *Adjustrite Sys. Inc. v. GAB Bus. Servs.*, 145 F.3d 543, 548 (2d Cir. 1998). Such an agreement binds the parties to "the ultimate objective despite the fact that a more formal or elaborate writing has yet to be produced." *Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005).

To determine whether the parties have a Type I agreement, the Court must consider: "(i) 'whether there is an expressed reservation of the right not to be bound in the absence of a writing'; (ii) 'whether there has been partial performance of the contract'; (iii) 'whether all of the terms of the alleged contract have been agreed upon'; and (iv) 'whether the agreement at issue is the type of contract that is usually committed to writing.'" *Vacold LLC v. Cerami*, 545 F.3d 114, 124 n.2 (2d Cir. 2008) (quoting *Brown*, 420 F.3d at 154). As discussed below, all of these factors support a finding that the parties entered into a Type I agreement.

### 1.    The Language of the Contract Evidences an Intent to Be Bound

The first factor in the Court's analysis, the language of the agreement, is the "the most important." *Brown*, 420 F. 3d at 154; *Adjustrite*, 145 F.3d at 549 (internal citation omitted). The Funds' failure to include language in the Agreement reserving the right to "not be bound in the absence of a further, definitive written instrument" is fatal to their argument that this is not a Type I agreement. *Vacold*, 545 F.3d at 125. In *Stonehill Capital Mgmt., LLC v. Bank of the West*, 68 N.E.3d 683 (N.Y. 2016), the New York Court of Appeals held that a seller's email acceptance of a bid to purchase a loan was binding, even though the seller's email had stated that it was "[s]ubject to mutual execution of an acceptable [Loan Sale Agreement]." *Id.* at 686. The court held that "less ambiguous and more certain language is necessary to remove any doubt of the parties' intent not to be bound absent a writing." *Id.* at 690-91 (internal citations omitted). *See also Emigrant*

11

*Bank v. UBS Real Estate Sec., Inc.*, 49 A.D.3d 382, 383 (N.Y. App. Div. 1st Dep't 2008) ("'Subject to' in the bid form did not unmistakably condition assent on the execution of a definitive agreement at some later juncture"). Here, the Funds did the opposite; the Funds explicitly agreed to be bound by the Agreement. *See* Funds Compl. ¶¶ 1, 4.

As noted above, the Funds entered into a "firm, irrevocable and binding agreement (the "Transaction") to sell the claims . . . at the Purchase Rate . . . to Deutsche Bank Securities Inc." Agreement 1. This definitive language—which the Funds previously acknowledged reflected a "done deal"—confirms the parties' intent to enter into a binding Type I agreement. *See* Funds Compl. ¶ 7; *Tractebel Energy Mktg. v. AEP Power Mktg.*, 487 F.3d. 89, 94-101 (2d Cir. 2007) (affirming lower court finding that a purchasing contract described as a "binding agreement" was enforceable, even where it provided for the execution of a "mutually agreeable" protocol governing the sale and delivery of products to the buyer); *Seaport Glob. Secs. LLC v. SB Grp. Holdco, LLC*, 162 A.D.3d 466, 467 (N.Y. App. Div. 1st Dep't 2018) (denying motion to dismiss breach of contract claim relating to trade confirmation that stated it "shall constitute a binding agreement between the parties"). And the Funds have specifically acknowledged, indeed, advocated such intent. Funds Compl. ¶¶ 1, 5, 24-31.

Further evidencing the parties' intent to be bound, the Agreement contains a firm "Trade Date" of August 24, 2011 for the parties to be bound.[4] The Funds' assertion that the "[l]anguage in a subsequent agreement – particularly merger clauses and effective dates – can indicate the

---

[4] This situation can also be analogized to the securities trading context, where for purposes of determining Section 10-b(5) liability, courts have held that the "'purchase or sale' of securities . . . is to be determined as at the time when the parties to the transaction are committed to one another,' even if the exchange of money and shares happens at a later time." *Vacold*, 545 F.3d 114 at 122 (internal citations omitted); *Radiation Dynamics Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972) ("'Commitment' is a simple and direct way of designating the point at which, in the classical contractual sense, there was a meeting of the minds of the parties; it marks the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time.").

parties' intent to be bound only by that later agreement" falls flat because the draft PSAs are not a "subsequent agreement" as they were never executed.  Br. at 18.   And the cases cited by the Funds are inapposite because they do not address executed contracts evidencing the parties' intent to be bound, as is the case here.  *See id.* (citing *Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*, No. 14-cv-7343, 2015 WL 5671724, *12 (S.D.N.Y. Sept. 22, 2015) (no Type I agreement where agreement was unexecuted and the parties' communications indicated no intent to be bound until the formal execution of an agreement); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 357 (S.D.N.Y. 2012) (no Type I agreement where agreement was unexecuted and its terms indicated the parties' intent not to be bound until execution)).

That the Agreement also states that it is "subject to execution of a Purchase and Sale Agreement" is irrelevant.  Br. at 16-17.  Type I agreements are binding "despite the fact that a more formal or elaborate writing has yet to be produced" and renders the parties "fully bound to carry out the terms of the agreement *even if the formal instrument is never executed*."  *Brown*, 420 F.3d at 154; *Adjustrite*, 145 F. 3d at 548 (emphasis added).  *See also Tractebel*, 487 F.3d at 95 ("[A] contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement.") (internal quotation omitted)).[5]

## 2.   The Agreement Contains all Essential Terms of the Transaction

The Agreement qualifies as a Type I agreement because it includes all of the essential economic terms governing the transaction.  It identifies: (i) the Claims that the Funds are conveying

---

[5] The cases on which the Funds rely to argue that the "subject to" language in the Agreement necessarily creates a Type II agreement are inapposite.  In *Teachers Ins. & Annuity Ass'n v. Tribune Co.*, the court did not address whether the parties had a Type I agreement because the party seeking to enforce contractual terms sought solely to enforce a "binding commitment . . . to negotiate in good faith toward a final contract conforming to the agreed terms."  670 F. Supp. 491, 496 (S.D.N.Y. 1987).  *Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods. (USA) Inc.* is distinguishable because the would-be purchaser of bankruptcy claims in that case tried to enforce an oral agreement to conduct the trade made by principals on a telephone call and the written trade confirmation was never executed.  401 B.R. 598, 625 (S.D.N.Y. 2009).  That is nothing like the expressly binding trade confirmation that was executed here.

to DBSI, (ii) the amount of Claims that DBSI is purchasing, and (iii) the price that DBSI will pay for such Claims.  As the Funds previously represented to the court, this "is a detailed agreement, providing all essential terms of the parties' sale and purchase."  Funds Compl. ¶ 26.  Agreements containing these essential terms are binding.  *See, e.g.*, *Deephaven Distressed Opportunities Tradings, Ltd. v 3V Capital Master Fund Ltd.*, No. 600610/08, 2011 N.Y. Misc. LEXIS 7073, at *2 (N.Y. Sup. Ct. Oct. 27, 2011), *aff'd*, 100 A.D.3d 505 (N.Y. App. Div. 1st Dep't 2012) (finding a trade confirmation to sell bankruptcy claims that included information about "price, amount, identity of the asset, purchaser name, seller name" binding, even though agreement provided for execution of additional assignment agreement).

Although the Funds newly argue that there were "material omissions" in the Agreement (Br. at 19), contrary to their prior admissions, none of these "omissions" is an essential open term given that the Agreement sets forth the economics of the transaction in its entirety.  Indeed, the majority of these purported omissions are now moot because they were relevant only when the Customer Claims were yet to be Allowed (e.g., "resolution of the Trustee's suit against the Funds and the terms and funding of any such settlement" (*id.*); "the risk that the Claims themselves would be subordinated, disallowed, or avoided as contemplated in the Trustee Adversary Proceeding" (*id.*); and "approval of any settlement by the New York and foreign bankruptcy courts."  *Id.*

In any event, an agreement that contains open terms is binding if the "parties intended to be bound," as here.  *Vacold*, 545 F.3d at 128 (stating that "the parties' intent is ultimately controlling:  if the parties intended to be bound despite the presence of open terms, 'courts should not frustrate their achieving that objective or disappoint legitimately bargained contract expectations . . . .'") (quoting *Tribune Co.*, 670 F. Supp. at 499).  First, the Funds insisted on entering into a written agreement with DBSI after their first deal fell through, demonstrating that

they intended to be bound.  Compl. ¶ 18.  Second, the Funds' 2011 complaint alleged that DBSI made a *"**written, binding commitment to purchase the Kingate Funds' claims** . . . ."* that "everyone understood to be . . . a ***done deal***."  Funds Compl. ¶¶ 6-7 (emphasis added).  The Funds sought "declarations from this Court that will clarify (a) the ***binding nature of the [Agreement]*** and Deutsche Bank's commitment to purchase Kingate Funds' claims thereunder . . . ." *Id.* ¶ 8 (emphasis added).  On that record, where the Funds considered the Agreement sufficiently binding to pursue litigation to enforce its terms, they cannot now establish as a matter of law that they did not intend to be bound.  *See Tractebel*, 487 F.3d at 97 (finding "[u]pon review of [the purchaser's] conduct in the years after it signed [the purchase agreement at issue], it is clear that [the purchaser] understood the [purchase agreement] to be binding and enforceable").[6]

Moreover, to the extent that there is any dispute about the parties' intent to be bound, this is a quintessential question of fact that cannot be resolved on a motion to dismiss.  *See Ally Gargano/MCA Advertising, LTD v. Cooke Properties, Inc.*, 1989 U.S. Dist. LEXIS 1245, *39 (S.D.N.Y. Oct. 13, 1989) ("The critical issue is the parties' intent at the time the alleged agreement was reached, a determination which 'is a factual one, not a legal one, and except in the clearest case, the question is for the fact finder to resolve.'") (internal citations omitted).

**3.**     **The Parties Committed to Their Agreement in Writing**

This factor requires the Court to consider "whether the Agreement is the type of contract that is usually committed to writing." *Adjustrite*, 145 F.3d at 551.  This factor is less important to the Court's analysis when the agreement at issue is in writing, as is the case here.  *See In re NAP, Inc.*, No. 96 Civ. 640 (LLS), 1996 U.S. Dist. LEXIS 5857, *13 (S.D.N.Y. May 1, 1996), *aff'd*,

---

[6] In its Answer and Counterclaim to the Funds' complaint, DBSI explained that the Agreement could not be enforced because the Funds did not have Allowed Claims to sell.  DBSI Answer and Counterclaim (ECF No. 023-03) ¶ 5.  It was in that context that DBSI requested a declaratory finding that the "[Agreement], standing alone, is not a firm, binding, irrevocable agreement by DBSI to purchase the Claims." *Id.* ¶ 17.

1996 U.S. App. LEXIS 20835 (2d Cir. Aug. 16, 1996) (finding that this factor "is less meaningful when the agreement is in writing (and needs only to be reduced to a formal agreement) than when a party is trying to enforce an oral agreement").  In any event, the parties' execution of a written contract weighs in favor of finding a Type I contract.

The Funds' unsupported contention that trade confirmations for transactions of this kind are "normally documented in a detailed contract—like the draft PSAs" (Br. at 20) cannot be credited at this stage of the proceedings.  Additionally, contrary to the Funds' claim, the purchase and sale of bankruptcy claims using short-form trade confirmations is standard commercial practice in the bankruptcy claims trading industry (*see, e.g.*, Hammond Decl. Ex. 2, Exs. 1-3 to Aff. of Mark Martis, *Deephaven Distressed Opportunities Tradings, Ltd. v. 3V Capital Master Fund Ltd.*, No. 600610/08 (N.Y. Sup. Ct. Jan. 15, 2009)), and New York courts have routinely enforced short-form agreements.  *See, e.g.*, *Deephaven Distressed Opportunities Tradings, Ltd.*, 2011 N.Y. Misc. LEXIS 7073, at *13-14; *Seaport Glob. Secs. LLC v. SB Grp. Holdco, LLC*, 162 A.D.3d 466 (N.Y. App. Div. 1st Dep't 2018); *Goldman Sachs Lending Partners, LLC v High River Ltd. P'ship*, 943 N.Y.S.2d 791 (N.Y. Sup. Ct. 2011).  In any event, determinations about industry custom are for the fact finder to make, and only after the parties have had an opportunity to develop the necessary evidence through discovery and expert testimony.  *See, e.g.*, *Sawabeh Info. Servs. Co. v. Brody*, 832 F .Supp. 2d 280, 307-08 (S.D.N.Y. 2011) ("[I]t is nearly impossible to determine at the motion to dismiss stage whether a more formal contract would normally be expected under prevailing industry conditions.").[7]

---

[7] Indeed, the seminal cases in this Circuit that address whether preliminary agreements are Type I or Type II agreements are determinations rendered at summary judgment.  *See, e.g.*, *Vacold*, 545 F.3d at 124-29 (affirming district court's determination at summary judgment that parties had a Type I agreement); *Tractebel*, 487 F.3d at 94-98 (same); *Brown*, 420 F.3d at 153-59 (affirming district court's determination at summary judgment that the parties had a Type II agreement); *Adjustrite*, 145 F.3d at 549-51 (same).  *See also Tribune Co.*, 670 F. Supp. at 491 (issuing

### 4.   DBSI Did Not Abandon its Obligation to Perform Under the Contract

The Funds' argument that DBSI's failure to fund the transaction "weighs in favor of finding that no Type I binding preliminary agreement existed" is incorrect.  Br. at 20 (internal quotation omitted).  DBSI was not required to fund until the Customer Claims were Allowed.  *See infra* Section (I)(B)(3)(a)-(b).  Thus, the Funds cite no evidence in their motion papers that they ever even requested DBSI to fund the purchase price before the Customer Claims were Allowed.

## B.   The Funds Fail to Establish that DBSI Breached the Agreement

### 1.   The Funds Cannot Prevail on an Unpled Affirmative Defense or Claim

The Funds argue incorrectly that, if the Agreement is treated as a Type I agreement, DBSI's claims should be dismissed because DBSI breached the Agreement by failing to fund the purchase price.  Br. at 24. The Funds' affirmative defense or claim has not been pled and cannot be resolved on a motion to dismiss.  *See supra* Section I.

### 2.   The Funds Cannot Rely on Select Parol Evidence to Vary the Terms of a Binding Agreement

The Funds' selective references to the draft PSAs cannot support dismissal.

First, the Funds' argument that the Court must look to the draft PSAs to determine "the full scope of the parties' agreement" is incorrect.  Br. at 22-24.  As an initial matter, the Agreement is fully integrated as it contains all of the essential terms of the transaction and is not ambiguous. Accordingly, the Court need not look at other extraneous documents to understand the parties' intent.  But even if the Court were to conclude that the Agreement was not fully integrated, the PSA drafts on which the Funds rely should not be used to fill in any purported open terms because they do not reflect a meeting of the minds between the parties.  These drafts were never executed.

---

"findings of fact and conclusions of law" as to the "nature of the obligations that arose out of the commitment letter agreement" based on a review of discovery and expert testimony).

In none of the cases that the Funds cite do the courts consider other *unexecuted* contracts to discern the deals between the parties.  *See* Br. at 22 (citing *Starter Corp. v. Converse, Inc.*, 170 F.3d 286 (2d Cir. 1999); *Bourne v. Walt Disney Co.*, 68 F.3d 621 (2d Cir. 1995)).

Second, the Funds' motion to dismiss improperly substitutes selective parol evidence—here, various sections of the draft PSAs—for the clear terms of the Agreement itself.  *See Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*, 375 F.3d 168, 177 (2d Cir. 2004) ("[I]f an agreement is complete, clear and unambiguous on its face," it "must be enforced according to the plain meaning of its terms.") (quoting *Greenfield v. Philles Records*, 780 N.E.2d 166, 170 (N.Y. 2002) (internal citation omitted).  The Funds' reliance on extrinsic evidence is improper because the Complaint mentions these draft PSAs only in passing.  Compl. ¶ 19-20; *see, e.g.*, *Sira v. Morton*, 380 F.3d 57, 67-68 (2d Cir. 2004) ("Limited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint.").

Third, parol evidence cannot be used to vary the terms of the Agreement, as the Funds seek to do here.  *See In re Aerovias Nacionales de Colombia,* 323 B.R. 879, 890 (Bankr. S.D.N.Y. 2005) ("[W]here there is a binding agreement, either completely or partially integrated, evidence of prior or contemporaneous agreements or negotiations is not admissible in evidence to contradict a term of the writing.") (internal quotation omitted).  Accordingly, the Funds' argument that DBSI was obligated to Fund the settlement prior to the transfer of the Claims, based on the draft PSAs, should be rejected (and the PSAs contain no such requirement, as addressed below).  *See* Br. at 14-15, *infra* Section (I)(B)(3).  Likewise, the Funds' attempt to change the binding "Trade Date" in the Agreement by arguing that the contemplated "Effective Date" in the draft PSAs should

govern when parties were legally bound to the terms of the transaction also fails. *See* Br. at 18, *supra* (I)(A)(1).

Finally, introducing ambiguity raises questions of fact about the parties' intent that cannot be resolved on a motion to dismiss. *See DKR Capital, Inc.*, 2003 U.S. Dist. LEXIS 17498, at *13.

### 3. DBSI Did Not Breach the Agreement

The Funds' claim that DBSI breached the Agreement by failing to fund the settlement is unsupported by the language in the Agreement and the draft PSAs upon which they rely. The Funds' assertion that the Allowance of the Customer Claims was not a condition precedent to DBSI's performance is also unsupported by the Agreement and other extrinsic documents.

### a. The Funds Were Required to Deliver Allowed Claims to DBSI

As noted above, the Agreement sets forth the essential terms of the parties' trade. *See supra* Section (I)(A)(2). Included in these essential terms is the requirement that the Funds deliver Allowed Claims, which were "non-contingent, undisputed, unavoidable and unsubordinated" and "not subject to any actual or potential avoidance." *See* Agreement 1, n.1. There is no dispute that the identity of the asset being transferred is an essential term of a trade confirmation. Because the Funds were obligated to transfer Allowed Claims, there is no situation in which DBSI could have breached the Agreement before the Customer Claims were Allowed. *See Pesa v. Yoma Dev. Grp.*, 965 N.E.2d 228, 230 (N.Y. 2012) ("Where one party to a contract repudiates it and refuses to perform, the other party . . . . must be ready, willing, and able to perform . . . .") (internal quotations omitted); *Ricatto v. M3 Innovations Unlimited, Inc.*, No. 18 Civ. 8404 (KPF), 2020 U.S. Dist. LEXIS 81550, at *18-21 (S.D.N.Y. May 8, 2020) (no breach of contract where claimant did not show he "was ready, willing, and able to perform his contractual obligations"); *see also Deephaven Distressed Opportunities Tradings, Ltd.*, 2011 N.Y. Misc. LEXIS 7073, at *12

(construing a trade confirmation's identification of the asset sold as a "material term[]" of that agreement).  Thus, the Allowance of the Customer Claims was also a condition precedent to DBSI's performance.  Br. at 23.  The Funds' argument that a condition precedent does not exist because the Agreement does not expressly label the Allowance of the Customer Claims as a condition precedent or use "linguistic conventions of condition" to performance is baseless.  Br. at 12 (internal quotation omitted).  New York law does not require the use of talismanic phrases to create a condition precedent (*see, e.g.*, *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995)), nor would one expect parties entering into a trade confirmation to use such language.

Here, the Agreement is clear that performance was to occur upon the Customer Claims becoming Allowed.  When the parties executed the Agreement, the Trustee Adversary Proceeding was still pending, and there remained a risk that the Claims would be avoided, subordinated, and disallowed.  Compl. ¶¶ 13, 21-24.  Thus, both parties understood that the transaction contemplated in the Agreement could not be consummated until the Funds had Allowed Claims to transfer.  The Funds cannot demonstrate that DBSI breached the Agreement by failing to tender payment for the Customer Claims before they were Allowed.

### b.     The Extrinsic Evidence Shows DBSI Was Not Required to Perform Until the Claims Were Allowed

The extrinsic evidence to which the Funds cite also does not support their position that the draft PSAs "confirm that DBSI would have to pay the Trustee shortly after the parties executed the [Agreement]."  Br. at 15, 22.  Rather, these documents confirm that DBSI was not obligated to pay the Funds until the Customer Claims were Allowed.

The draft PSAs provide that DBSI's obligation to pay would not accrue until certain conditions precedent to funding were met.  In particular, the Funds' representation that the

"Customer Claim is Allowed against the Debtor" was required to be "true and correct as of the Funding Date." *See, e.g.*, Aug. 25 Draft PSA § 7(b)(i). The PSAs further require the settlement agreement between the Funds and the Trustee to be finalized by the parties (*see, e.g.*, *id.* § 8(m)(i)(ii), (iv)), and approved by the bankruptcy courts in the BVI and the Southern District of New York, *before* DBSI paid the Funds or the Trustee. *See, e.g.*, *id.* § 7(b)(iv) ("the Bankruptcy Court shall have entered a Final U.S. Settlement Agreement Order"); *id.* § 7(b)(vi) ("the BVI Court shall have entered a Final BVI Settlement Agreement Order"). Thus, contrary to the Funds' claims, the selective parol evidence upon which they rely demonstrates that DBSI was not obligated to fund until the Customer Claims were Allowed.

### c. DBSI Did Not Fail to Perform Within the Time Required by the Agreement

As the Agreement required the Customer Claims to be Allowed before DBSI was obligated to fund, the trigger for DBSI's performance was not some undefined "reasonable time," as the Funds urge. Br. at 24; *see Oppenheimer & Co.*, 660 N.E.2d at 418 (defining a contractual condition precedent as "an act or event, *other than a lapse of time*, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises") (internal citation omitted) (emphasis added). Even if the Court were to apply the Funds' "reasonable time" standard, however, "what constitutes a reasonable time for performance depends on the facts and circumstances of the particular case," *Savasta v. 470 Newport Assocs.*, 623 N.E.2d 1171, 1172 (N.Y. 1993), thus precluding this issue from being resolved on the pleadings. *See UBS AG v. Highland Capital Mgmt. L.P.*, 920 N.Y.S.2d 245 (N.Y. Sup. Ct. Dec. 1, 2010) (holding that the reasonableness of defendant's failure to pay within a certain time "cannot be resolved on the pleadings").

Here, given that the Allowed Claims would only exist upon resolution of the Trustee

Adversary Proceeding (Compl. ¶ 19), a reasonable time to perform would begin to run only after that proceeding was resolved.  The Funds essentially admitted as much in their 2011 Complaint, which did *not* allege that DBSI breached the Agreement, but merely sought a declaration that the Agreement was a binding and enforceable contract.  *See* Funds Compl. at 21-22.  In any event, litigation is generally lengthy and unpredictable, but any delay in the Allowance of the Claims was caused by the Funds' failure to resolve the Trustee Adversary Proceeding, so they cannot rely on such delay to evade their obligations under the Agreement.  S*ee MLRN LLC v U.S. Bank N.A.*, No. 652712/2018, 2019 N.Y. Misc. LEXIS 6085, at *19 (N.Y. Sup. Ct. Nov. 14, 2019) ("[A] party cannot argue that its contractual obligations have not been triggered by a condition precedent when it is, itself, the one who prevented the triggering of such condition precedent.").

Finally, the Funds' reliance on the "Outside Date" contained in the draft PSAs to determine a "reasonable time" for DBSI's performance is misplaced.  Br. at 8, 24-25.  Putting aside the fact that no such term is contained in the Agreement, the draft PSAs do not provide that the Funds' obligation to transfer Allowed Claims to DBSI terminates after the Outside Date; they merely provide DBSI with the exclusive *option* to terminate the transaction after the Outside Date, an option that was not exercised.  *See, e.g.*, Aug. 18 Draft PSA § 6(a) ("This Agreement may be terminated by Buyer (and solely by Buyer) at any time by providing a written notice to the Seller after the Outside Date if the Funding Date has not occurred on or before the Outside Date."); Br. at 8 (acknowledging same).  Accordingly, both the plain terms of the Agreement and the parol evidence cited by the Funds support the conclusion that DBSI's obligation to perform was not due until the Customer Claims were Allowed.[8]

---

[8] Although the Funds claim that the PSAs had a time is of the essence provision (Br. at 8, 24), they fail to account for the fact that the Funds were still actively negotiating with DBSI to close the transaction in late 2013.  Compl ¶ 45.

## II. IN THE ALTERNATIVE, THE PARTIES HAVE A TYPE II AGREEMENT AND THE FUNDS BREACHED THEIR OBLIGATION TO NEGOTIATE IN GOOD FAITH TO DELIVER DBSI ALLOWED CLAIMS

DBSI has also stated a claim if the Agreement is a Type II contract, as the Funds breached their obligation to negotiate in good faith to close the transaction.  The Funds abruptly rebuffed DBSI's efforts to continue negotiations just as the Customer Claims were on the verge of being Allowed.  Compl. ¶ 66.  Where a party is bound by a Type II agreement, it is not "free . . . to walk away from its deal merely because it later decides that the deal is not in its interest."  *Tribune Co.*, 670 F. Supp. at 500.

The Funds contend incorrectly that the parties reached a "good faith impasse in 2013, ending the Funds' obligation to negotiate."  Br. at 21.  Although the Funds rely in part on the Funds' lawsuit as evidence of an "impasse" that was "insurmountable" (*id.* at 21-22), that proceeding did not end the parties' negotiations; rather, the parties represented to the court that they were willing to continue negotiations notwithstanding the litigation.  Compl. ¶¶ 32-33, 36.  And, even after the court dismissed the lawsuit in 2014, the parties continued to communicate regarding the transaction and the settlement of the Trustee Adversary Proceeding into late-2018.  *Id.* ¶¶ 47-48, 51-52, 55-56, 58-60.  The fact that the parties did not circulate more drafts of the PSA does not indicate that they had abandoned negotiations; rather, they were waiting for the Trustee Adversary Proceeding to be resolved, when the sale could be consummated.  *Id.* ¶ 63.  The parties would not have continued discussions and the Funds would not have advised that they were considering including DBSI in the mediation in 2018 if the parties had reached an impasse in negotiations.  *Id.* ¶ 60.  Indeed, until May 2019, the Funds had *never* said that the Agreement was not binding or that there was some contract ending impasse.

Drawing all inferences in favor of DBSI, as the Court must do on a motion to dismiss, the

well-pled allegations of the Complaint establish that the parties were not at an impasse until the Funds walked away from negotiations in 2019.[9]  Moreover, the contested issues of fact raised in the Funds' motion regarding the purported impasse in negotiations cannot be resolved at this stage of the proceedings.  *See, e.g.*, *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 405 (2d Cir. 2015) (vacating dismissal of complaint where defendant's motion to dismiss had "raise[d] a factual dispute . . . inappropriate for resolution on a motion to dismiss").

## III.    BY FILING FOR CHAPTER 15 RELIEF TO BLOCK THIS LITIGATION, THE FUNDS BREACHED THE IMPLIED COVENANT

When the Funds applied for Chapter 15 relief in the Southern District of New York in September 2019, they did so expressly out of a concern that DBSI would "initiate litigation against the Kingate Funds."  *See* Hammond Decl. Ex. 3, Verified Petition of Foreign Representatives Paul Pretlove and Tammy Fu in Support of Application of Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. for Recognition of Foreign Main Proceedings Pursuant To Section 1517 Of The Bankruptcy Code and Seeking Related Relief § E ¶ 29 (ECF No. 2), *In re Kingate Global Fund Ltd. et al.*, Case Nos. 19-12852, 19-12853 (SMB) (Jointly Administered) (Bankr. S.D.N.Y. Sept. 5, 2019).  By seeking to use a Chapter 15 petition to block DBSI from enforcing its rights and enjoying the fruits of the Agreement, the Funds breached the implied covenant of good faith and fair dealing.  *See, e.g.*, *Spinelli v. NFL*, 903 F.3d 185, 205 (2d Cir. 2018) (the implied covenant prohibits either party from "do[ing] anything [that] has the effect of destroying or injuring the right

---

[9] The Funds' argument that DBSI's claims should be dismissed because the Bankruptcy Court presiding over the Funds' Chapter 15 estate must approve any final agreement is meritless. Br. at 22.  The Funds breached these obligations and caused damage to DBSI before the Bankruptcy Court recognized the Funds' chapter 15 petition.  As such, DBSI is permitted to pursue its cause of action, and the Funds can raise any defenses it may have to the claims asserted by DBSI.  In any event, the Funds' arguments as to whether DBSI sustained damages arising from the Funds' failure to negotiate in good faith are premature.  *See FCOF*, 663 F. Supp. 2d at 231 n. 2 (finding that on a motion to dismiss for breach of a preliminary agreement that "it is premature to determine what form of damages might be appropriate" and that "[t]he Court will not address [defendant's] motion to dismiss as to the issue of damages or specific performance.").

of the other party to receive the fruits of the contract, or to violate the party's presumed intentions or reasonable expectations.") (internal quotations omitted).

The Funds contend that DBSI is "estopped" from making this claim because DBSI withdrew its objection to the Funds' Chapter 15 petition.  Br. at 25.  The Funds are mistaken. DBSI never asserted a claim for breach of the implied covenant in the bankruptcy proceeding, and the Bankruptcy Court did not render any "final judgment on the merits" of such a claim.  *See, e.g.*, *Wyly v. Weiss*, 697 F.3d 131, 141 (2d Cir. 2012) (stating that "issue preclusion requires that the issue was actually litigated and resolved in a valid court determination essential to the prior judgment") (internal quotation omitted); *Marvel Characters v. Simon*, 310 F.3d 280, 286-87 (2d Cir. 2002) ("[Only] a final judgment on the merits of an action precludes the parties or their privies from relitigating claims that were or could have been raised in that action.").[10]  Instead, DBSI objected to the Funds' petition for Chapter 15 recognition as it sought to preclude DBSI from enforcing its rights under this Agreement.  Ultimately, the Bankruptcy Court entered an order allowing DBSI to file this action in this Court.  Compl. ¶ 73.  The Funds' bad faith is not eliminated because DBSI withdrew its objection after the Funds relented.

## CONCLUSION

For the foregoing reasons, DBSI respectfully requests that this Court deny the Funds' Motion to Dismiss.

Dated:     June 1, 2020                          Respectfully submitted
           New York, New York

                                                 s/ *Glenn M. Kurtz*

---

[10] DBSI also never "acknowledg[ed]" that the Funds filed their Chapter 15 application in "good faith" (Br. at 25), but merely withdrew its limited objection when the Funds finally relented in preventing DBSI from filing this action.  *See* Notice of (I) Resolution of Deutsche Bank Securities, Inc.'s Limited Objection to Recognition of Foreign Main Proceedings and (II) Filing of Revised Agreed Form of Order Granting Recognition (ECF No. 23-14).

Glenn M. Kurtz
Andrew W. Hammond
Jacqueline L. Chung
Timothy L. Wilson, Jr. (motion for admission *pro hac vice* pending)
**WHITE & CASE**
1221 Avenue of the Americas
New York, NY 10020
Telephone: 212-819-8200

*Counsel for Deutsche Bank Securities Inc.*