UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEUTSCHE BANK SECURITIES INC.,

Plaintiff,

v.

KINGATE GLOBAL FUND LTD. and KINGATE
EURO FUND LTD.,

Defendants.

**OPINION AND ORDER**

19 Civ. 10823 (ER)

Ramos, D.J.:

Deutsche Bank Securities Inc. ("Deutsche Bank") brings this action against Kingate Global Fund Ltd. and Kingate Euro Fund Ltd. (together, the "Funds") for breach of contract and related claims. Doc. 1. Now pending before the Court is the Funds' motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Doc. 22. For the reasons set forth below, the motion is denied.

**I.     Factual Background**

**A.     Background Circumstances**

The Funds are investment funds incorporated in the British Virgin Islands that raise capital through customer subscription in its shares. Doc. 1 at ¶¶ 7-8. The Funds acted as feeder funds for, and invested $1.6 billion in, Bernie L. Madoff Investment Securities LLC ("BLMIS"). *Id.* at ¶ 11. In December 2008, Bernie Madoff confessed that BLMIS was a Ponzi scheme. *Id.* at ¶ 11. In a nutshell, the scheme worked as follows:

> Madoff claimed he was investing BLMIS's customers' funds in stocks and then hedging with option trades.  In reality, Madoff never invested any of the funds.  Instead, BLMIS generated fictitious account statements reflecting trades that were never actually completed and profits that were never actually generated.  Because BLMIS was not actually generating profit, it paid customers who withdrew funds with the proceeds of other customers' investments.  Eventually, BLMIS was unable to meet its customers' demands for withdrawals, and the scheme collapsed.

*Sec. Inv. Prot. Corp. v. BLMIS*, 598 B.R. 102, 106 (S.D.N.Y. 2019) (citing *In re BLMIS*, 739 F. App'x 679, 681 (2d Cir. 2018)).  Following Madoff's confession, BLMIS was placed in a Securities Investor Protection Act proceeding (the "SIPA Proceeding") overseen by a trustee, Irving Picard (the "Trustee").  *Id.* at ¶¶ 2, 12.

The Funds brought customer claims for assets recovered by the Trustee on behalf of the Madoff Estate (the "Customer Claims").  *Id.* at ¶ 14.  The Funds also raised remission claims with any forfeiture fund, including the forfeiture fund established by the Department of Justice ("DOJ Forfeiture Fund"), to distribute funds to victims of Madoff's scheme (the "Remission Claims" and, together with the Customer Claims, the "Claims").  *Id.*

On April 17, 2009, the Trustee commenced an adversary proceeding against the Funds, *Picard v. Kingate Global Fund, Ltd. et al.*, Adv. Pro. No. 09-1161 (BRL) (Bankr. S.D.N.Y. Apr. 17, 2009) (the "Adversary Proceeding").  *Id.* at ¶ 13.  The Trustee alleged that the Funds had actual notice of Madoff's fraud.  *Id.*  The Trustee sought return of $1 billion and preclusion of the Funds' Customer Claims.  *Id.*

Shortly thereafter on May 6, 2009, the Funds began liquidation proceedings in the Commercial Division of the High Court, British Virgin Islands ("BVI Court") and in

Bermuda.[1]  *Id.* at ¶¶ 3, 15, 71.  The BVI Court appointed William Tacon and Richard

Fogerty as liquidators (the "Liquidators").  *Id.* at ¶ 15.

      In approximately April 2011, the Funds solicited bids for their Claims against the

Madoff Estate.[2]  Doc. 1 at ¶ 16.  Deutsche Bank submitted a formal bid, which specified

that Deutsche Bank would only purchase allowed Claims.  *Id.* at ¶ 17.  Under the terms of

Deutsche Bank's bid letter (the "Bid Letter"), allowed means

> a valid, enforceable, liquidated, non-contingent, undisputed, unavoidable,
> and unsubordinated claim that is not subject to any actual or potential
> avoidance, reduction, set-off, offset, recoupment, recharacterization,
> subordination (whether equitable, contractual or otherwise, and whether
> pursuant to Section 510(c) of the United States Bankruptcy Code or
> otherwise), counterclaim, cross-claim, defenses, disallowance (whether
> under sections 502(b), (d), or (e) of the United States Bankruptcy Code or
> otherwise), impairment, objection, or any other challenges under any
> applicable law, whether foreign or domestic.

*Id.*  Because the Adversary Proceeding sought to disallow the Funds' Customer Claims,

Deutsche Bank's bid was therefore conditioned on a resolution of the Adversary

Proceeding that allowed the Funds' Customer Claims to proceed.  *Id.*  The Bid Letter

further listed as a condition precedent

> receipt of evidence, to [Deutsche Bank]'s satisfaction, that, except with
> respect to any funding obligations of [Deutsche Bank] with respect to the
> Claims, all of [the Funds'] obligations under the Settlement Agreement
> have been fully performed and satisfied[.]

Doc. 23-4 at 12.  Ultimately, the Funds selected a competing bid.  Doc. 1 at ¶ 18.

---

[1]  Deutsche Bank never identifies the Bermuda court hearing their liquidation proceeding.

[2]  As Chief Judge McMahon has explained, "There is a market for the purchase and sale of claims held by creditors against debtors in bankruptcy."  *Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods. (USA), Inc.*, 401 B.R. 598, 604 (S.D.N.Y. 2009).  The "trade claim industry" or "trade claim market" involves a purchaser buying a claim at a percentage of the claim's value and "betting that he is paying less for the claim than will ultimately be paid out by the bankruptcy court, or that he can sell it to a third party for a higher price prior to the confirmation of the liquidation plan in the bankruptcy court."  *Id.*

**B.    Early Negotiations Memorialized in Writing**

When the competing bid fell through, the Funds reengaged with Deutsche Bank. Doc. 1 at ¶ 18.  On August 18, 2011[3], Deutsche Bank sent a draft purchase and sale agreement ("PSA") to the Funds which stated that, as part of the Funds' "Representations and Warranties," the Claims would be "Allowed against the Debtor in the amounts set forth in the Settlement Agreement" with the Trustee and defined allowed as it had been defined in Deutsche Bank's Bid Letter ("August 18 PSA").  *Id.* at ¶ 19; Doc. 23-6 at § 8(i).  Under the "Conditions Precedent" section, the August 18 PSA provided that the Funds' "representations and warranties in this Agreement shall be true and correct as of the Funding Date[.]"  Doc. 23-6 at § 7(b)(i).  The August 18 PSA further required as a condition precedent that Deutsche Bank "shall fund:  (A) that portion of the Purchase Price necessary to satisfy the Funding Obligations directly to the Trustee[.]"  *Id.* at § 7(d)(i).  The August 18 PSA included an outside date after which point Deutsche Bank could terminate the deal upon written notice if the funding date had yet to occur, and a merger clause.  *Id.* at §§ 6(a), 25.

On August 23, 2011, the Funds returned a revised draft PSA leaving the definition of allowed unchanged, and promising "The Claims are allowed against [BLMIS] in the amounts set forth in the Settlement Agreement (the 'Settlement Amount' in accordance with the Net Investment Method and the Last Statement Method, inclusive of any and all Funding Obligations" ("August 23 PSA").  Doc. 1 at ¶ 20.  The August 23 PSA continued to require as conditions precedent that the Funds fulfill their representations and warranties, including that the Claims be allowed, and that Deutsche Bank fund "that

---

[3]  The complaint lists the date of the first draft PSA as August 16, 2011, but the Funds' submissions confirm that it was actually circulated on August 18, 2011.  Docs. 1 at ¶ 19; 23-5.

portion of the Purchase Price necessary to satisfy the Funding Obligations directly to the Trustee[.]"  Doc. 23-8 at §§ 7(b)(i), 7(d)(i), 8(h).  Just as the August 18 PSA had, the August 23 PSA also contained an outside date and a merger clause.  *Id.* at §§ 6(a), 25.

On August 24, 2011, Deutsche Bank and the Funds executed a confirmation letter explaining the terms of the sale (the "Confirmation Letter").  Docs. 1 at ¶ 21; 1-1.  The Confirmation Letter begins, "Please accept this letter . . . as confirmation of [the Funds'] firm, irrevocable and binding agreement . . . to sell the Claims (defined below) at the Purchase Rate (defined below) to" Deutsche Bank.  Doc. 1-1 at 1.  The Claims are defined as a Global Claim and a Euro Claim, which were both comprised, in relevant part, of "all right, title and interest, whether legal, equitable or otherwise, in the Allowed claim . . . against" BLMIS.  *Id.*  Allowed is again defined as it was in the bid letter.  *Id.* at 1 n.1.  The Purchase Rate is defined as 66%.  *Id.* at 2.  The Confirmation Letter further confirms that the Funds "shall cease any and all discussions or negotiations with other potential purchasers and will not solicit any other bids and will not respond in any way to any solicitation with respect to the Claims."  *Id.*  The Confirmation Letter also states that Deutsche Bank "shall be the sole purchaser of the Claims[.]"  *Id.*  Finally, the Confirmation Letter stipulates that, "[t]he Transaction is subject to execution of a Purchase and Sale Agreement (governed by New York law) in a form that is reasonably and mutually agreed between Seller and Buyer and which Seller and Buyer shall negotiate in good faith."  *Id.*  The Confirmation Letter did not include a merger clause, or an outside date.  *Id.*

The following day, Deutsche Bank returned a third draft of the PSA ("August 25 PSA").  Doc. 1 at 20 n.2.  The August 25 PSA continued to define allowed in the same

way as the Bid Letter had, and included an outside date and a merger clause.  Doc. 23-10 at Annex A, §2, §§ 6(a), 25.  The August 25 PSA also continued to commit the Funds to fulfilling their representations and warranties, including that the Claims be allowed, as a condition precedent to the transaction.  *Id.* at §§ 7(b)(i), 8(h).  In this draft, however, the provision that Deutsche Bank fund a "portion of the Purchase Price necessary to satisfy the Funding Obligations directly to the Trustee" was removed from the conditions precedent section and placed in the "Purchase, Sale, and Participation" section.  *Id.* at § 3(b).

> ### C.    The Breakdown of the Relationship between Deutsche Bank and the Funds

In September 2011, the Funds were engaged in negotiations with the Trustee to resolve the Adversary Proceeding.  Doc. 1 at ¶ 28.  Deutsche Bank requested the right to review and consent to any proposed settlement between the Funds and the Trustee, as well as reasonable accommodations, including being a third-party beneficiary, and specification that the Remission Claims would be allowed.  *Id.*

On December 21, 2011, the Funds filed a complaint against Deutsche Bank seeking declaratory judgment that the Confirmation Letter was "firm, irrevocable and binding" on Deutsche Bank to purchase the Claims.  *Id.* at ¶ 30; *Kingate Global Fund Ltd. v. Deutsche Bank*, No. 11 Civ. 9364 (DAB) (S.D.N.Y. Dec. 21, 2011) (the "2011 Action").  On January 11, 2012, Deutsche Bank filed its answer in the 2011 Action and asserted a counterclaim for declaratory judgment that the Confirmation Letter did not bind Deutsche Bank to purchase any of the Funds' Claims until they were allowed.  Doc. 1 at ¶ 31.  In particular, Deutsche Bank alleged that "[a]ny sale of [the Funds'] claims is predicated on the Funds' successful settlement of the lawsuit brought by [the Trustee]"

and that the Funds "would have no claims to sell to [Deutsche Bank] unless . . . [they] achieved a settlement with the" Trustee.  Doc. 23-3 at ¶ 5.  Following a conference on April 12, 2012, the 2011 Action was stayed pending continued negotiations between Deutsche Bank, the Funds, and the Trustee to resolve the Adversary Proceeding.  Doc. 1 at ¶ 33.

On May 1, 2012, Deutsche Bank informed the Funds that it wished to finalize the transaction and warned that any resolution of the Adversary Proceeding that blocked the transaction would violate the Confirmation Letter and run contrary to the justification for the stay in the 2011 action.  *Id.* at ¶ 34.  On May 4, 2012, the Funds responded that Deutsche Bank "is bound by the [Confirmation Letter] to purchase the Claims."  *Id.* at ¶ 35.

On June 1, 2012, the Funds' request to extend the stay of the 2011 Action pending resolution of the Adversary Proceeding was granted.  *Id.* at ¶ 36.  On July 10, 2012, the Funds proposed dismissal of the 2011 Action to Deutsche Bank.  *Id.* at ¶ 37.  On July 17, 2012, Deutsche Bank responded that dismissal was "premature" because negotiations to close the transaction were still ongoing.  *Id.* at ¶ 38.

From late 2012 through early 2013, Deutsche Bank and the Funds exchanged drafts of the PSA and proposed settlement agreement between the Trustee and the Funds. *Id.* at ¶ 40.  Negotiations were not successful because it was still unclear whether the Funds would be able to recover on the Remission Claims or if the Claims would be allowed.  *Id.*

On November 22, 2013, the Funds again asked Deutsche Bank to discontinue the 2011 Action in light of DOJ guidance that feeder funds would not receive distributions

from the DOJ Forfeiture Fund.  *Id.* at ¶ 41.  On December 6, 2013, Deutsche Bank responded, taking the position that the Confirmation Letter was still in full effect.  *Id.* at ¶ 42.  The Funds did not challenge Deutsche Bank's position.[4]  *Id.* at ¶ 43.  On January 2, 2014, the parties voluntarily dismissed the 2011 Action pursuant to Rules 41(a)(1)(A)(ii) and 41(c) of the Federal Rules of Civil Procedure.  *Id.* at ¶ 46; 2011 Action, Dkt. 18.

On August 11, 2015, the Funds' motion to dismiss the Adversary Proceeding was granted in part and denied in part.  Doc. 1 at ¶ 53.  That same day, the Trustee indicated interest in settling the Adversary Proceeding and the next day, Liquidators agreed to consider mediation.  *Id.* at ¶¶ 54-55.  On July 21, 2016, while Deutsche Bank and the Funds discussed settlement of the Adversary Proceeding, Deutsche Bank emphasized its continuing expectation to buy allowed Claims under the Confirmation Letter and the Funds did not dispute Deutsche Bank's expectation.  *Id.* at ¶ 58.  Deutsche Bank communicated with the Funds or the Liquidators regarding the status of the Adversary Proceeding eight times between December 2016 and September 2018.  *Id.* at ¶ 59.  At these times, neither the Funds nor the Liquidators disclaimed their obligations under the Confirmation Letter.  *Id.*

On June 17, 2018, Deutsche Bank learned of a potential mediation to resolve the Adversary Proceeding and asked to participate.  *Id.* at ¶ 60.  The Funds agreed to consider Deutsche Bank's request and assured Deutsche Bank that any mediation would benefit all parties.  *Id.*  On September 26, 2018, the Liquidators informed Deutsche Bank that they wished to resolve any mediation at the same time they resolved Deutsche Bank's claims

---

[4]  To the extent the Remission Claims becoming allowed was a condition precedent to the Confirmation Letter, Deutsche Bank agreed to waive that condition.  *Id.*

related to the Confirmation Letter.  *Id.*  The Funds continued to update Deutsche Bank regarding the proposed mediation through at least November 2018.  *Id.* at ¶ 61.

In approximately May 2019, Deutsche Bank learned that the Funds were coming near to holding a mediation in the Adversary Proceeding and had not contacted Deutsche Bank.  *Id.* at ¶ 64.  Deutsche Bank immediately offered to participate in the mediation, but, on May 16, 2019, the Funds informed Deutsche Bank that they no longer considered the Confirmation Letter binding because a PSA had never been finalized.  *Id.* at ¶¶ 65-66.

On June 4, 2019, Deutsche Bank wrote to the Funds explaining that the Funds had never before claimed that the Confirmation Letter was not binding, and had in fact brought the 2011 Action seeking declaratory judgment that it is binding.  *Id.* at ¶ 67.  That same month, the Funds cut off communication with Deutsche Bank and agreed to settle the Adversary Proceeding with the Trustee.  *Id.* at ¶¶ 69-70.

On or about June 26, 2019, the Funds entered a settlement agreement with the Trustee to resolve the Adversary Proceeding (the "Settlement Agreement").  *Id.* at ¶ 70.  The Settlement Agreement provided the Funds with the Customer Claims, which were now allowed, and permitted the Funds to transfer them.  *Id.*  On August 6, 2019, the Bankruptcy Court approved the Settlement Agreement.  *Id.* at ¶ 71.  The BVI and Bermuda Courts overseeing liquidation of the Funds also approved the Settlement Agreement.  *Id.*

On September 5, 2019, the Funds filed a verified petition pursuant to Chapter 15 seeking recognition of the BVI insolvency proceedings in the United States Bankruptcy Court for the Southern District of New York.  *Id.* at ¶ 72; *In re Kingate Global Fund, Ltd.*, No. 19-12853 (DSJ) (Bankr. S.D.N.Y. Sept. 5, 2019) (the "Chapter 15

Proceeding"). In their verified petition, the Funds alleged that Deutsche Bank "may now attempt to resurrect the [Confirmation Letter], based on the increase in value of [the Funds'] Customer Claims." Doc. 27-3 at ¶ 29. On October 1, 2019, Deutsche Bank filed a limited objection in the Chapter 15 Proceeding. Doc. 1 at ¶ 73. In its limited objection, Deutsche Bank argued that the Funds had brought the Chapter 15 Proceeding "to eliminate entirely [Deutsche Bank's] right to sue on the [Confirmation Letter] to liquidate its claims[.]" Doc. 23-13 at ¶ 1. Deutsche Bank and the Funds ultimately agreed to a settlement of the Chapter 15 Proceeding that preserved Deutsche Bank's right to pursue its claims arising under the Confirmation Letter in the Southern District of New York. Docs. 1 at ¶ 73; Chapter 15 Proceeding, Dkt. 28 at 2 ("notwithstanding anything set forth herein to the contrary, that any stay or injunction included in or arising out of this Order . . . shall not apply to (i) any action by [Deutsche Bank] in the . . . Southern District of New York in connection with, arising from, or relating to the Confirmation Letter").

On November 21, 2019, Deutsche Bank filed the instant action for breach of contract and the implied covenant of good faith and fair dealing, and requested declaratory judgment that the Confirmation Letter is binding and enforceable. *Id.* at ¶¶ 78-105. In particular, Deutsche Bank alleges that the Funds breached the Confirmation Letter by refusing to consummate the transaction and refusing to negotiate in good faith. *Id.* at ¶¶ 84, 92. Deutsche Bank alleges that the Funds breached the implied covenant of good faith and fair dealing by filing the Chapter 15 Proceeding in an effort to thwart Deutsche Bank's claims. *Id.* at ¶ 97. On April 1, 2020, the Funds moved to dismiss the complaint for failure to state a claim. Doc. 22.

## II.    Legal Standards

When ruling on a motion to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6), district courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in plaintiff's favor. *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). However, this requirement does not apply to legal conclusions, bare assertions, or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To satisfy the pleading standard under Fed. R. Civ. Pro. 8, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). Thus, a plaintiff is required to support his claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557).

On a Rule 12(b)(6) motion, in addition to the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted).

Deutsche Bank affixed the Confirmation Letter to the complaint. Doc. 1-1. In support of its opposition papers, Deutsche Bank filed the Declaration of Andrew W. Hammond attaching the order of dismissal entered in the Adversary Proceeding, the verified petition from the Chapter 15 Proceeding, and trade confirmations from the case captioned *Deephaven Distressed Opportunities Tradings, Ltd. v. 3V Capital Master Fund*

11

*Ltd.*, No. 600610/08 (N.Y. Sup. Ct. Jan. 15, 2009). Docs. 27-1 to 27-3. The Funds'

motion to dismiss included the Declaration of Philippe Z. Selendy, which attached court

filings in the Adversary Proceeding, the SIPA Proceeding, the 2011 Action, and the

Chapter 15 Proceeding, the draft PSAs, and other communications referenced in the

complaint. Docs. 23; 23-1 to 23-15. Because each of these documents is the proper

subject of judicial notice, or is integral to the complaint, the Court considers them on this

motion. *ATSI Commc'ns.*, 493 F.3d at 98; *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir.

2004).

## III.   Discussion

### A.   Breach of Contract and Declaratory Judgment (Claims I, II, and IV)

To assert a claim of breach of contract, plaintiff must sufficiently allege the

existence of an agreement, performance by plaintiff under the agreement, breach of the

agreement by defendant, and resulting damages. *Donohue v. Cuomo*, 980 F.3d 53, 67 (2d

Cir. 2020). "To create a binding contract, there must be a manifestation of mutual assent

sufficiently definite to assure that the parties are truly in agreement with respect to all

material terms." *Tractebel Energy Mktg. v. AEP Power Mktg., Inc.,* 487 F.3d 89, 95 (2d

Cir. 2007); *see also FCOF UB Sec. LLC v. MorEquity, Inc.*, 663 F. Supp. 2d 224, 227-28

(S.D.N.Y. 2009). "Ordinarily, where the parties contemplate further negotiations and the

execution of a formal instrument, a preliminary agreement does not create a binding

contract." *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005) (quoting *Adjustrite Sys., Inc.*

*v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998)). "In some circumstances,

however, preliminary agreements can create binding obligations." *Brown*, 420 F.3d at

153 (quoting *Adjustrite*, 145 F.3d at 548).

Binding preliminary agreements generally fall into two categories:  Type I and Type II.[5]  Type I agreements are "fully binding" and occur "when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document."  *Vacold LLC v. Cerami*, 545 F.3d 114, 124 (2d Cir. 2008) (citation omitted).  Parties to a Type I agreement are "fully bound to carry out the terms of the agreement even if the formal instrument is never executed."  *Id.* (quoting *Adjustrite*, 145 F.3d at 548).  A Type I agreement is thus "preliminary . . . only in the sense that the parties desire a more elaborate formalization of the agreement."  *Bear Stearns*, 401 B.R. at 618.

Type II agreements, on the other hand, are "'binding only to a certain degree' because 'the parties agree on certain major terms, but leave other terms open for further negotiation.'"  *Vacold*, 545 F.3d at 124 (citing *Adjustrite*, 145 F.3d at 548).  Unlike a Type I agreement, a Type II agreement "does not commit the parties to their ultimate contractual objective[.]"  *Adjustrite*, 145 F.3d at 548 (citation omitted).  Instead, Type II agreements obligate the parties "to negotiate the open issues in good faith" to reach their objective.  *Id.* (citation omitted).

Deutsche Bank contends that the Confirmation Letter is a binding Type I agreement committing the Funds to sell their Customer Claims, once allowed, to

---

[5] In *IDT Corp. v. Tyco Grp.*, the New York Court of Appeals held that while it did not disagree with the federal courts that apply the Type I/Type II analysis, it did not find that analysis useful.  13 N.Y.3d 209, 213 n.2 (2009).  Since *IDT*, however, the courts in this Circuit have continued to apply the Type I/Type II framework.  *See, e.g.*, *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 199 n.19 (2d Cir. 2019); *SSP Cap. Partners, LLP v. Mandala, LLC*, 402 F. App'x 572, 573 (2d Cir. 2010); *Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*, No. 14 Civ. 7343 (ER), 2015 WL 5671724, at *9 n.9 (S.D.N.Y. Sept. 22, 2015); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 356 (S.D.N.Y. 2012).  "Accordingly, absent guidance from the Second Circuit or the New York Court of Appeals to the contrary, this Court will continue to rely on the [Type I/Type II] framework."  *Gas Natural, Inc. v. Iberdrola, S.A.*, 33 F. Supp. 3d 373, 378 n.1 (S.D.N.Y. 2014).

Deutsche Bank.  The Funds argue that the Confirmation Letter is actually a Type II agreement that bound the parties only to the extent of good faith negotiation towards a final PSA and because the PSA was never finalized, they were under no obligation to sell the Customer Claims to Deutsche Bank.  The Funds further argue that the Customer Claims becoming allowed was not a condition precedent to the parties' agreement, but that Deutsche Bank paying the Trustee was a condition precedent that Deutsche Bank failed to perform.

The Court addresses each argument in turn, keeping in mind that courts must "avoid trapping parties in surprise contractual obligations that they never intended" while also enforcing and preserving agreements that were intended to be binding.  *Gas Natural*, 33 F. Supp. 3d at 379 (citing *Adjustrite*, 145 F.3d at 548).

### i.      Type I Agreement

When deciding whether an agreement is a Type I agreement, Courts consider four factors:

> (1) whether there is an expressed reservation of the right not to be bound in the absence of a writing;
> (2) whether there has been partial performance of the contract;
> (3) whether all of the terms of the alleged contract have been agreed upon; and
> (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Brown*, 420 F.3d at 154 (citing *Adjustrite*, 145 F.3d at 549).

**Reservation.**  The first factor is often the most important factor and requires the court to look at the language of the agreement to discern whether there is "explicit language of commitment or reservation."  *Brown*, 420 F.3d at 154 (citing *Adjustrite*, 145 F.3d at 549); *see also SSP Cap. Partners*, 402 F. App'x at 573 (describing the first factor as "undoubtedly the most important" factor) (citation omitted).

14

Rather than reserve the right not to be bound, the Confirmation Letter contains explicit language of commitment.  In the very first line of the Confirmation Letter, the Funds "confirm[]" their "firm, irrevocable and binding agreement" to sell the Claims to Deutsche Bank at the Purchase Rate.  Doc. 1-1 at 1.  In *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, the Second Circuit found that parties intended to be bound where the agreement expressly stated that it was "binding."  487 F.3d 95-96.  The Second Circuit further explained that, "a party that does not wish to be bound can very easily protect itself by not accepting language that indicates a firm commitment or binding agreement."  *Id.* (citing *Teachers Ins. and Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 499 (S.D.N.Y. 1987)) (alterations omitted).  Here, two sophisticated parties agreed of their own free will to be bound.

Despite the commitment language in the Confirmation Letter, the Funds argue that the Confirmation Letter is not binding because it clearly states that "[t]he Transaction is subject to execution of a Purchase and Sale Agreement[.]"  Docs. 1-1 at 2; Doc. 24 at 17.  The Funds primarily rely on *Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods. (USA), Inc*, where Chief Judge McMahon wrote that, "[o]rdinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract."  *Bear Stearns*, 401 B.R. at 619 (citing *Brown*, 420 F.3d at 153).  The *Bear Stearns* Court further held that the exchange of draft contracts following such an agreement is "strong evidence that the parties intended to remain unbound pending the execution of formal documentation."  *Bear Stearns*, 401 B.R. at 619 (citing *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262 (2d Cir. 1984)).  However, in *Bear Stearns*, the parties had not committed any alleged preliminary

agreement to writing, let alone to a writing with explicit language that it was "binding."
*Bear Stearns*, 401 B.R. at 618-19.

Indeed, the presumption that a preliminary agreement was not intended to be binding because of a provision providing for the execution of a future agreement is overcome where, as here, the preliminary agreement contains express indication of commitment. *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989). In *Teachers Ins. and Annuity Ass'n of Am. v. Tribune Co.*, while establishing the Type I/Type II framework, then District Judge Leval explained that, "[a]lthough such reservations, considered alone, undoubtedly tend to indicate an intention not to be finally bound, they do not necessarily require that conclusion" and urged "[s]uch terms are not to be considered in isolation, but in the context of the overall agreement." 670 F. Supp. at 500. Judge Leval further reasoned that "[s]uch terms are by no means incompatible with intention to be bound." *Id.*

The Funds further argue that the provision of the Confirmation Letter forbidding them from continuing negotiations with, and solicitation of, other potential buyers is evidence that the Confirmation Letter was not intended to be binding. Docs. 1-1 at 2; 24 at 17 n.7. The Funds cite no authority supporting this argument, and the Court finds that, on balance, this provision supports rather than undermines the parties' intent to be bound.

Finally, the Funds argue that the merger and effective date provisions of the draft PSAs, and the missing terms in the Confirmation Letter, support a finding that the Confirmation Letter was not intended to be binding. Doc. 24 at 18-19. However, the PSAs were never executed by the parties and the cases upon which the Funds rely are inapposite. In both cases, plaintiffs sought to enforce unexecuted agreements.

*Worldwide Servs.*, 2015 WL 5671724, at \*12 ("the July 2013 Contract and emails sent and received during and after the Defendant's Board's approval of the contract terms are insufficient to show that the parties intended to be bound in the absence of an executed agreement."); *Nat'l Gear & Piston*, 861 F. Supp. 2d at 357 ("No party argues that the Agreement has been fully executed, as it remains unsigned").  Not so here, where Deutsche Bank is seeking to enforce the Confirmation Letter, replete with language of commitment, which both sophisticated parties executed.

Accordingly, the first and most important factor weighs in favor of Deutsche Bank.

**Partial Performance.**  The parties do not dispute that neither party partially performed.  Doc. 24 at 20.  Although partial performance is not given "great importance[,]"  it is considered a good indication that the parties intended for the agreement to be binding.  *Bear Stearns*, 401 B.R. at 619-20, 626-27.  Therefore, the second factor weighs in favor of the Funds.

**Terms.**  Noting that the draft PSAs are significantly longer than the Confirmation Letter, the Funds argue that the Confirmation Letter left several material terms open.[6] Doc. 24 at 19.  The Funds further contend that any negotiation following the execution of the Confirmation Letter is strong evidence that there were open terms.  *Id.*  In opposition, Deutsche Bank argues that the Confirmation Letter contains the essential terms of which Claims the Funds are selling, the amount of Claims being sold, and the price.  Doc. 26 at

---

[6]  The Funds also argue that one material term the parties did not memorialize in the Confirmation Letter is whether the Remission Claims had to be allowed.  Doc. 24 at 19.  Because Deutsche Bank has expressly waived any condition that the Remission Claims be allowed, *see supra* n. 4, the Court finds this argument unpersuasive.  Moreover, the Funds cite no authority for why lack of such a provision would render the Confirmation Letter nonbinding with respect to the Customer Claims.

13-14. According to Deutsche Bank, any open terms are immaterial. *Id.* at 14. The Court agrees with Deutsche Bank.

In *Deephaven Distressed Opportunities Tradings, Ltd. v. 3V Cap. Master Fund Ltd.*, the New York Supreme Court found that trade confirmations executed by sophisticated hedge funds detailing "price, amount, identity of the asset, purchaser name, seller name" created binding contracts despite proviso that the transaction was subject to a future agreement. No. 600610/08, 2011 WL 11415362 (N.Y. Sup. Ct. Oct. 27, 2011), *aff'd*, 100 A.D.3d 505 (1st Dep't 2012).

Moreover, open terms are not dispositive. "[I]f the parties intended to be bound despite the presence of open terms, 'courts should not frustrate their achieving that objective or disappoint legitimately bargained contract expectations[.]'" *Vacold*, 545 F.3d at 128 (citing *Tribune*, 670 F. Supp. at 499). Nor is the fact that the parties engaged in further negotiations dispositive where, as here, the Confirmation Letter explicitly states it is binding on the parties. *Arcadian Phosphates*, 884 F.2d at 73.

The third factor therefore weighs in favor of Deutsche Bank.

**Type of Contract Committed to Writing.** Because the Confirmation Letter is already committed to writing, this factor carries less weight in the Type I analysis. *In the Matter of Application of NAP, Inc.*, No. 96 Civ. 640 (LLS), 1996 WL 221623, at *5 (S.D.N.Y. May 1, 1996), *aff'd sub nom. NAP Inc. v, FRAJAC*, 104 F.3d 350 (2d Cir. 1996) ("The customary form factor is less meaningful when the agreement is in writing (and needs only be reduced to a formal agreement) than when one party is trying to enforce an oral agreement."). Although the Funds state that a transaction as complicated as this one is typically memorialized by a PSA, they cite no authority in support of their

position.  Doc. 24 at 20.  The Funds rely solely on *Worldwide Servs.*, 2015 WL 5671724, at *15.  But, in *Worldwide Servs.*, this Court found that the parties had not committed to a Type I agreement in part because there was no executed written document and the commitment to buy airplanes would ordinarily be committed to writing.  *Id.*  Here, by contrast, a written instrument memorializing the parties' intentions does exist.

"In any event, it is nearly impossible to determine at the motion to dismiss stage whether a more formal contract would normally be expected under prevailing industry conditions."  *Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 307-08 (S.D.N.Y. 2011); *FCOF*, 663 F. Supp.2d at 231 ("the question of whether it is customary to accord binding force to a certain type of preliminary agreement is a question of fact to be determined, in significant part, based on industry custom").  Thus, the fourth factor weighs in favor of Deutsche Bank.

Because three of the four factors in the Type I analysis weigh in favor of Deutsche Bank's position, and because the first factor carries special weight, the Court concludes that Deutsche Bank has sufficiently alleged the existence of a binding, Type I agreement.  Because the Court has so found, it need not analyze the Confirmation Letter under the Type II factors.

### ii.    Conditions Precedent

New York law defines a condition precedent as "an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises."  *Bank of New York Mellon Trust Co., N.A. ("BNYM") v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 305 (2d Cir. 2016) (quoting *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690 (N.Y.

1995)).  Conditions precedent may be express in the parties' agreement or implied, constructive conditions that are "imposed by law to do justice."  *Oppenheimer*, 86 N.Y.2d at 690.  Although conditions precedent need not be described with any "talismanic words[,]" the law requires that they "be expressed in unmistakable language." *BNYM*, 821 F.3d at 305 (citing *Oppenheimer*, 86 N.Y.2d at 691).  Some "tell-tale signs of a condition precedent" are use of the phrases "if," "until," and "unless."  *DirectTV Latin Am., LLC v. RCTV Int'l Corp.*, 982 N.Y.S.2d 96, 97 (1st Dep't 2014).  Other "linguistic conventions" signaling a condition precedent include "on condition that," "provided that," "in the event that," and "subject to."  *BNYM*, 821 F.3d at 305.  When the language of a purported condition precedent is unclear, courts will interpret it as "a promise or constructive condition rather than an express condition."  *Id.* (citing *Oppenheimer*, 86 N.Y.2d at 691).

The Funds argue that the Customer Claims being allowed is not a condition precedent because that condition is neither expressed in clear language nor given a time frame during which it had to occur.  Doc. 24 at 12-14.  The Funds further argue that the Confirmation Letter uses clear condition precedent language with respect to the agreement being "subject to" execution of a PSA, and in the draft PSAs delineates a conditions precedent section, but never uses such language with respect to the Customer Claims being allowed.  *Id*. at 12-13.

Although the Funds are correct that the Confirmation Letter does not label the Customer Claims being allowed as a condition precedent, or otherwise offset that provision with any of the linguistic conventions the case law has described, the Confirmation Letter still conveys that the Customer Claims being allowed is a condition

precedent to completing the sale.  In the Confirmation Letter, the Funds confirm their "firm, irrevocable and binding agreement . . . to sell the Claims[.]"  Doc. 1-1 at 1.  The Claims are then defined as the "Global Claim" and the "Euro Claim," which are both comprised, in relevant part, of "all right, title and interest, whether legal, equitable or otherwise, in the Allowed claim . . .  against" BLMIS.  *Id.*  Because the Claims the Funds committed to selling were expressly defined as allowed, Deutsche Bank has sufficiently alleged that the Claims being allowed is a condition precedent to its performance.

While it is also true that the Confirmation Letter does not set a time for performance, "the law implies a reasonable time."  *Savasta v. 470 Newport Assocs.*, 82 N.Y.2d 763, 765 (N.Y. 1993).  "What constitutes a reasonable time for performance depends upon the facts and circumstances of the particular case."  *Id.* (citation omitted).  Here, the Adversary Proceeding, which arose from a longstanding and far-reaching Ponzi scheme, had to be resolved for the Customer Claims to become allowed.  The Adversary Proceeding was pending for ten years before the parties reached a settlement agreement, and Deutsche Bank and the Funds were in communication regarding this transaction for eight of those ten years.  Whether or not that period is reasonable is "a fact-dependent inquiry the Court cannot resolve at this stage."  *JM Holdings 1 LLC v. Quarters Holding GmbH*, No. 20 Civ. 3480 (JPO), 2021 WL 860516, at *4 (S.D.N.Y. Mar. 8, 2021).

The Funds also argue that, if the Confirmation Letter is a Type I agreement, Deutsche Bank breached it by failing to make a payment to the Trustee before the conclusion of the Adversary Proceeding.  Doc. 24 at 24.  This argument has no basis in the language of the Confirmation Letter Deutsche Bank seeks to enforce, and is exclusively derived from the draft PSAs that were never executed.  *See, e.g.*, Doc. 23-10

at § 3(b) (providing that Deutsche Bank fund a "portion of the Purchase Price necessary to satisfy the Funding Obligations directly to the Trustee").  The Funds reason that because the Confirmation Letter does not contain a merger clause, it is not integrated and urges the Court to consider the draft PSAs for the parties' intent.  However, "[t]he determination of whether a document is fully integrated in the absence of a merger clause is a highly fact-dependent inquiry" and is therefore not resolvable on a motion to dismiss. *Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*, 483 F. Supp. 3d 195, 208 (S.D.N.Y. 2020) (citation omitted).[7]

Accordingly, the Funds' motion to dismiss Deutsche Bank's breach of contract and declaratory judgment claims is denied.

### B.      Breach of the Covenant of Good Faith and Fair Dealing (Claim III)

Deutsche Bank alleges that the Funds breached the covenant of good faith and fair dealing by bringing the Chapter 15 Proceeding.  Doc. 1 at ¶¶ 94-99.  The Funds argue both that this claim is estopped and, in any event, insufficiently alleged.  Docs. 24 at 25; 36 at 10.  The Court addresses each argument in turn.

#### i.      Estoppel

As a preliminary matter, the Court finds that Deutsche Bank is not estopped from asserting this claim.  "The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted).  Estoppel "protect[s] the integrity of the judicial process by prohibiting parties

---

[7] To the extent the Funds argue that the draft PSAs indicate the parties intended that payment of the Trustee was a condition precedent of the transaction, the Court notes that the most recent draft provided, the August 25 PSA, does not categorize this provision as a condition precedent.  Doc. 23-10 at § 3(b).

from deliberately changing positions according to the exigencies of the moment."
*Adelphia Recovery Trust v. Goldman, Sachs & Co.*, 748 F.3d 110, 116 (2d Cir. 2014)
(quoting *New Hampshire*, 532 U.S. at 749-50).  Although application of estoppel requires
analyzing the "specific factual context[]" and is "not reducible to any general formulation
of principle[,]" courts consider whether the party's prior and current positions are
inconsistent, whether a court adopted the party's earlier position, and whether the party
would gain an unfair advantage or otherwise prejudice the opposing party if not estopped.
*New Hampshire*, 532 U.S. at 750-51.  Where the party's earlier position is not adopted by
a court, it "poses little threat to judicial integrity."  *Id.* at 751.  Courts enforce estoppel
when "the enforcement of the rights of one party would work an injustice upon the other
party due to the latter's justifiable reliance upon the former's words or conduct."
*Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001).
Whether to apply estoppel is "ultimately a question of fact."  *Id.*

Because Deutsche Bank had objected that the Funds had acted in bad faith in the
Chapter 15 Proceeding, and ultimately withdrew its objection, the Funds argue that
Deutsche Bank's breach of the implied covenant claim is estopped.  Doc. 24 at 25.  Even
assuming withdrawal of an objection is equivalent to taking an inconsistent position to
the instant matter, no prior court has adopted Deutsche Bank's argument either way.
There is, therefore, little risk that judicial integrity will be tarnished by this Court
entertaining this claim.  Moreover, the Funds have pointed to no discernible prejudice
from Deutsche Bank's actions.  In fact, Deutsche Bank alleged that their settlement
agreement preserved Deutsche Bank's right to bring this action.  Doc. 1 at ¶ 73; Chapter
15 Proceeding, Dkt. 28 at 2 ("notwithstanding anything set forth herein to the contrary,

that any stay or injunction included in or arising out of this Order . . . shall not apply to (i) any action by [Deutsche Bank] in the . . . Southern District of New York in connection with, arising from, or relating to the Confirmation Letter").

Deutsche Bank's implied covenant claim is therefore not estopped.

### ii.      Sufficiency of Deutsche Bank's Allegations

Implicit in every contract under New York law is a duty of good faith and fair dealing. *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 37 (S.D.N.Y. 2017) (citation omitted). The covenant requires that each party "not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part." *Id.* (citation omitted). In other words, the covenant mandates that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (citation omitted).

Deutsche Bank sufficiently alleges that the Funds acted in bad faith by filing the Chapter 15 Proceeding. Specifically, Deutsche Bank alleges that the Funds purposefully kept Deutsche Bank out of negotiations of the Settlement Agreement to resolve the Adversary Proceeding, did not inform Deutsche Bank that they intended to file the Chapter 15 Proceeding, and filed the Chapter 15 Proceeding to gain a tactical advantage over Deutsche Bank to keep Deutsche Bank from acquiring the Customer Claims. Doc. 1 at ¶¶ 91, 97. In support of its position, Deutsche Bank cites the Funds' verified petition in the Chapter 15 Proceeding, which alleged that Deutsche Bank "may now attempt to resurrect the [Confirmation Letter], based on the increase in value of [the Funds']

Customer Claims."[8]  Doc. 27-3 at ¶ 29.

In their motion, the Funds argue that the parties had merely reached an impasse, and they brought the Chapter 15 Proceeding to ensure the orderly administration of the estate.  Doc. 24 at 21, 25.  These are factual disputes that cannot be resolved at this stage of the litigation.  *Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 625 (S.D.N.Y. 2006) (declining to resolve a factual dispute on a motion to dismiss).

Accordingly, the Funds' motion to dismiss Deutsche Bank's implied covenant of good faith and fair dealing claim is denied.

## IV.    Conclusion

For all of these reasons, the Funds' motion to dismiss is denied.  The parties are directed to appear for a status conference on **April 21, 2021 at 10 a.m**. using the following conference call information:  (877) 411-9748; Access Code: 3029857#.

The Clerk is respectfully directed to terminate the motion, Doc. 22.


    SO ORDERED.

Dated:    March 26, 2021
          New York, New York

                                                    _____
                                                       Edgardo Ramos, U.S.D.J.

---

[8]  Although parties are not bound by prior inconsistent allegations, which are controvertible, that hardly prevents the Court from considering them.  *In re Parmalat Sec. Litig.*, 421 F. Supp. 2d 703, 713 (S.D.N.Y. 2006).