UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEUTSCHE BANK SECURITIES INC.,

                    Plaintiff,

                                              Case No. 19-cv-10823 (ER)

          v.

KINGATE GLOBAL FUND LTD. and
KINGATE EURO FUND LTD.,

                    Defendants.

## DEFENDANTS' ANSWER TO THE COMPLAINT

Defendants Kingate Global Fund Ltd. and Kingate Euro Fund Ltd. ("Funds")[1], through

their undersigned attorneys, answer the November 22, 2019 complaint ("Complaint") (Dkt.7) filed

by plaintiff Deutsche Bank Securities Inc. ("DBSI"). The Funds deny each allegation in the Com-

plaint, except for those expressly and specifically admitted below.[2]

Per Federal Rule of Civil Procedure 9(c), the Funds specifically deny that the parties' Au-

gust 25, 2011 confirmation letter ("Confirmation Letter") contained a condition precedent that the

Funds' customer claims under Chapter 11 of the United States Code ("Bankruptcy Code") against

the Madoff Estate ("Customer Claims") become Allowed before DBSI was required to perform.

The Confirmation Letter was a Type II agreement that only required the parties to negotiate in

good faith, which the Funds did. Alternatively, if the Confirmation Letter were a Type I agreement,

it required DBSI to fund the Funds' settlement with the Madoff Trustee *before* the Customer

---

[1] Unless defined herein, defined terms have the meanings ascribed to them in DBSI's Complaint.

[2] The Funds include here the headings used by DBSI in its Complaint. Because those headings are
not allegations, the Funds do not respond to them individually. To the extent a response is required,
the Funds deny any allegation in a heading.

Claims could become Allowed—it was DBSI's funding of the settlement that would permit the Customer Claims to become Allowed. DBSI's allegations that it had no obligation to perform until the Customer Claims became Allowed and that the Funds had an obligation to transfer the Customer Claims to DBSI once they became Allowed as the result of a settlement that DBSI did not fund are untrue. DBSI's failure to fund the Funds' settlement with the Madoff Trustee led to the Funds expending millions of dollars to litigate the Trustee Adversary Proceeding, delaying for years the ability of the Funds' investors to receive even partial recovery on the assets lost when the Madoff fraud finally came to light.

Each response below corresponds to the identical paragraph number in the Complaint.

## **INTRODUCTION**

1.     The Funds admit that, in 2011, they and DBSI executed the Confirmation Letter, which concerned the Funds' Customer Claims and the Funds' potential remission recoveries relating to any forfeiture fund established pursuant to 28 C.F.R. Part 9 or otherwise ("Remission Recoveries"). Otherwise denied.

2.     The Funds admit that the Confirmation Letter defines "Allowed" Customer Claims. The Funds admit that they did not possess Allowed Customer Claims at the time they executed the Confirmation Agreement. The Funds admit that the Madoff Trustee filed the Trustee Adversary Proceeding. The Funds admit that they would not possess Allowed Customer Claims (or Allowed Remission Recoveries) until the Trustee Adversary Proceeding was resolved. Otherwise denied.

3.     The Funds admit that the Trustee Adversary Proceeding was settled on June 26, 2019. The Funds admit that they did not have Allowed Customer Claims until the Settlement Agreement's closing date. The Funds admit that the Madoff Trustee filed a motion in the bankruptcy court overseeing the administration of the Madoff Estate on July 17, 2019 seeking approval of the Settlement Agreement, which was approved by that court on August 6, 2019. The Funds

admit that the BVI courts overseeing the Funds' liquidation approved the Settlement Agreement. Otherwise denied.

4.      The Funds admit that, in May 2019, their counsel stated to DBSI's counsel that the Confirmation Letter was not "binding" at that time. The Funds admit that, in May 2019, their counsel stated to DBSI's counsel that they would not transfer the Customer Claims to DBSI or negotiate a final PSA with DBSI. Otherwise denied.

5.      The Funds admit that, on the closing date of the Settlement Agreement, the Funds received a total combined "Allowed" Customer Claim of $1,659,748,094.52 against the Madoff Estate. Otherwise denied.

## PARTIES

6.      Admitted.

7.      Admitted.

8.      Admitted.

## JURISDICTION AND VENUE

9.      Admitted.

10.      The Funds deny that the Confirmation Letter was a binding contract for the sale of the Customer Claims. Otherwise admitted.

## BACKGROUND

### The Kingate Funds and the Revelation of the Madoff Fraud

11.      The Funds admit that they solicited approximately $1.6 billion in investments for deposit with BLMIS through managed investment accounts opened and operated by BLMIS on those investors' behalf. The Funds admit that, in December 2008, Bernard Madoff confessed that BLMIS was a fraud and that he operated the largest known Ponzi scheme in history. The Funds

admit that the Customer Claims arise out of the Funds' investments prior to Madoff's confession. Otherwise denied.

12.     The Funds admit that, following Madoff's confession, a SIPA proceeding was initiated in the United States Bankruptcy Court for the Southern District of New York to liquidate BLMIS. The Funds admit that the Madoff Trustee supervises the administration and liquidation of BLMIS in this SIPA proceeding. The Funds lack knowledge or information sufficient to form a belief about how the SIPA proceeding is being conducted.

13.     The Funds deny that the Madoff Trustee's allegations in the *Picard* litigation were true. Otherwise admitted.

14.     The Funds admit that they attempted to assert both a Customer Claim against the BLMIS Estate for assets recovered by the Madoff Trustee on behalf of the Madoff Estate and a claim for potential Remission Recoveries from the forfeiture fund established by the U.S. Department of Justice for Madoff's victims. The Funds admit that they would not have Allowed Customer Claims against the Madoff Estate until the Trustee Adversary Proceeding was resolved. Otherwise denied.

15.     The Funds deny that they invested almost all capital provided to them by investors with BLMIS. The Funds deny that the revelation of Madoff's fraud alone caused them to enter liquidation proceedings. Otherwise admitted.

**The Kingate Funds' Agreement to Sell the Claims to DBSI**

16.     Admitted.

17.     The Funds admit that DBSI submitted a formal bid letter to acquire the Funds' Customer Claims and Remission Recoveries relating to the Madoff Estate. The Funds admit that the bid letter included proposed terms and conditions to be incorporated in any PSA between the

Funds and DBSI, as well as any settlement agreement between the Funds and the Madoff Trustee. The Funds admit that the bid letter contained the quoted definition of "Allowed" with respect to the Customer Claim. Otherwise denied.

18.     The Funds admit they initially selected a different bidder with whom to negotiate a potential sale of the Customer Claims and Remission Recoveries and that those discussions did not result in a confirmation letter or a binding final agreement. The Funds admit that they reengaged with DBSI thereafter and ultimately executed the Confirmation Letter. Otherwise denied.

19.     The Funds admit that, on August 18, 2011, DBSI's counsel sent the Funds' counsel an initial draft of the PSA for the Funds' sale of the Customer Claims and Remission Recoveries to DBSI. The Funds admit that the draft PSA included the phrase "Allowed against the Debtor in the amounts set forth in the Settlement Agreement [with the Madoff Trustee] . . . ." The Funds admit that the draft PSA defined "Allowed" in the same way as DBSI's May 25, 2011 bid letter. The Funds lack knowledge or information sufficient to form a belief about the risks that DBSI was willing to accept. Otherwise denied.

20.     The Funds admit that, on August 23, 2011, their counsel sent DBSI's counsel a draft PSA. The Funds admit that the draft PSA contained the language quoted by DBSI. Otherwise denied.

21.     The Funds admit that, on August 24, 2011, they executed the Confirmation Letter with DBSI. The Funds admit that the Confirmation Letter contained the phrase "confirmation of our firm, irrevocable and binding agreement (the 'Transaction') to sell the Claims (defined below) at the Purchase Rate (defined below) to [DBSI] on the following terms…." The Funds admit that the Confirmation Letter defined the Global and Euro Customer Claims as, *inter alia*, Allowed. The Funds admit that Exhibit A is a true and correct copy of the Confirmation Letter. Otherwise denied.

22.     Denied.

23.     The Funds admit that the Confirmation Letter describes the Global and Euro Claims as quoted by DBSI. Otherwise denied.

24.     The Funds admit that the Confirmation Letter contained the phrase "[t]he Transaction is subject to execution of a Purchase and Sale Agreement (governed by New York law) in a form that is reasonably and mutually agreed between Seller and Buyer and which Seller and Buyer shall negotiate in good faith." Otherwise denied.

25.     The Funds lack knowledge or information sufficient to form a belief about DBSI's dealings with third parties. Otherwise denied.

26.     The Funds admit that the Confirmation Letter did not contain an express expiration date. Otherwise denied.

**2011 Negotiations of the PSA Following Execution of the Agreement**

27.     The Funds admit that, after executing the Confirmation Letter, the parties negotiated over a PSA for some period of time. The Funds lack knowledge or information sufficient to form a belief about DBSI's good faith. Otherwise denied.

28.     The Funds admit that they engaged in negotiations with the Madoff Trustee and DBSI to resolve the Trustee Adversary Proceeding against the Funds. The Funds admit that DBSI requested the ability to review and consent to the terms of the Funds' settlement with the Madoff Trustee. The Funds admit that DBSI requested that it be included in the draft settlement agreement with the Madoff Trustee as a third-party beneficiary and that the Allowance of the Remission Recoveries be a condition to settlement. The Funds admit that the Madoff Trustee was the Special Master of the Forfeiture Fund until Richard Breeden replaced him in December 2012. Otherwise denied.

29.     The Funds admit that, during the remainder of 2011, the parties' counsel partici-
pated in numerous conversations regarding DBSI's potential purchase of the Customer Claims and
any Remission Recoveries. Otherwise denied.

**The Kingate Funds' Litigation Against DBSI**

30.     The Funds admit that they filed a complaint against DBSI on December 21, 2011
in *Kingate Global Fund Ltd. v. Deutsche Bank Securities Inc.*, No. 11-cv-9364 (S.D.N.Y. 2011)
(Batts, J.). The Funds admit that their complaint sought declaratory relief that the Confirmation
Letter was "firm, irrevocable and binding." The Funds admit that they alleged the Funds "decided
to sell their claims" and that those Customer Claims and Remission Recoveries were in the process
of "being sold" to DBSI, but that DBSI was "unwilling[] to consummate the sale." The Funds
admit that they alleged the Confirmation Letter "plainly states" the contemplated transaction is a
"done deal." The Funds admit that they represented to DBSI that they were "open to settlement
discussions" and that the complaint was "not intended to cut off discussions" between the parties.
Otherwise denied.

31.     The Funds admit that, on January 11, 2012, DBSI filed an answer and counterclaim.
The Funds admit that, in its counterclaim, DBSI sought "a declaration (i) that the Confirmation
Letter, standing alone, does not bind DBSI to purchase the claims; (ii) that to the extent the Con-
firmation Letter obligated DBSI to negotiate in good faith with the Kingate Funds, DBSI has fully
complied with any such obligation; and (iii) that DBSI has no ongoing obligation under the Con-
firmation Letter to continue to negotiate the PSA with the Kingate Funds." The Funds admit that
Paragraph 5 of DBSI's counterclaim stated "Any sale of the Kingate Funds' claims is predicated
on the Funds' successful settlement of the lawsuit brought by the Madoff Trustee. Put simply, the
Kingate Funds would have no claims to sell to DBSI unless, among other things, the Kingate Funds

achieve a settlement with the Madoff Trustee, persuade the Madoff Trustee to release the BLMIS estate's separate litigation claims against the Funds, and then obtain the approval of the settlement by the United States Bankruptcy Court. In addition, because the Kingate Funds are presently the subjects of a liquidation proceeding in the British Virgin Islands ('BVI'), any settlement between the Kingate Funds and the BLMIS estate also would require the approval of the BVI Court over-seeing the Funds' liquidation. Therefore, the settlement with the Madoff Trustee is the event that will create the bundle of rights the Kingate Funds seek to sell." Otherwise denied.

32. The Funds admit that, following the exchange of pleadings they continued to nego-tiate with the Madoff Trustee to resolve the Customer Claims and Remission Recoveries. The Funds admit that, following the exchange of pleadings, they continued to negotiate with DBSI towards a final PSA as required by the Confirmation Letter. Otherwise denied.

33. The Funds admit that, on April 12, 2012, their counsel attended a status conference with DBSI's counsel. The Funds admit that, in that status conference, Judge Batts indicated that she would allow the parties to stay discovery to enable them to continue their negotiations of a potential sale of the Customer Claims and Remission Recoveries. The Funds admit that they agreed with DBSI to stay the lawsuit. Otherwise denied.

34. The Funds admit that, on May 1, 2012, DBSI's counsel sent a letter to the Funds' counsel. The Funds admit that that letter contained the phrases quoted by DBSI. Otherwise denied.

35. Admitted.

36. Admitted.

37. The Funds admit that, on July 6, 2012, their counsel sent an email to DBSI's coun-sel. The Funds admit that the email sought to discontinue the lawsuit. The Funds admit that the email contained the phrases quoted by DBSI. Otherwise denied.

38.     The Funds admit that, on July 17, 2012, DBSI's counsel sent a letter to the Funds' counsel. The Funds admit that the letter stated it would be premature to dismiss the pending litigation. The Funds admit that the letter contained the phrase quoted by DBSI. Otherwise denied.

39.     The Funds admit that, on August 21, 2012, they attended a joint meeting with representatives from DBSI and the Madoff Trustee. Otherwise denied.

40.     The Funds admit that, in late 2012 and early 2013, they exchanged with DBSI drafts of the PSA and the proposed settlement agreement with the Madoff Trustee. The Funds admit that no PSA or settlement was entered into at that time. The Funds admit that, on February 19, 2013, DBSI's counsel sent an email to the Funds' counsel that contained the phrase "We would like to move this forward as expeditiously as possible and therefore certainly want to provide the Trustee with our comments by Friday, in any case." The Funds admit that, on March 6, 2013, DBSI's counsel sent an email to the Funds' counsel that contained the phrase "we have strived to accommodate the various concerns raised by the Trustee in last week's email by keeping our comments to a minimum." Otherwise denied.

41.     The Funds admit that, on November 22, 2013, their counsel requested that DBSI's counsel enter a stipulation of dismissal. The Funds admit that their counsel conveyed their understanding of the DOJ guidelines for distributions from the Forfeiture Fund. Otherwise denied.

42.     The Funds admit that, on December 6, 2013, DBSI's counsel sent the Funds' counsel an email. The Funds admit that the email contained the phrases quoted by DSBI. Otherwise denied.

43.     Denied.

44.     The Funds admit that DBSI agreed to stipulate to the dismissal of the action with prejudice. The Funds admit that, on December 6, 2013, DBSI's counsel sent the Funds' counsel

an email. The Funds admit that the email contained the phrase quoted by DBSI. The Funds admit that they and DBSI agreed to voluntarily dismiss the action. Otherwise denied.

45.     The Funds admit that, on December 17, 2013, they met with the Madoff Trustee and DBSI. Otherwise denied.

46.     The Funds admit that, on January 2, 2014, the district court dismissed the pending action without prejudice. Otherwise denied.

**Continuing Negotiations Following Voluntary Dismissal of the Kingate Funds' Actions**

47.     The Funds admit that, from January 2014 to December 2018, the Liquidators and their counsel ("Funds' Representatives") had intermittent communications with DBSI and their counsel ("DBSI's Representatives"). The Funds admit that some of these communications referred to the status of the Trustee Adversary Proceeding. Otherwise denied.

48.     The Funds admit that, from January 2014 to December 2018, the Funds' Representatives had intermittent communications with DBSI's Representatives. The Funds admit that some of these communications referred to the status of the Trustee Adversary Proceeding. The Funds admit that they did not reach a settlement with the Madoff Trustee until June 26, 2019. Otherwise denied.

49.     Admitted.

50.     Admitted.

51.     The Funds admit that, on December 17, 2014, the bankruptcy court held a hearing on the motion to dismiss the Madoff Trustee's complaint. Otherwise denied.

52.     Admitted.

10

53.     The Funds deny that the Confirmation Letter required them to sell the Customer Claims and Remission Recoveries to DBSI. The Funds deny that the Customer Claims and Remission Recoveries being Allowed is a condition precedent. The Funds deny the Madoff Trustee's allegations that they and their former principals had actual knowledge of Madoff's fraud. Otherwise admitted.

54.     The Funds lack knowledge or information sufficient to form a belief about the truth of these allegations.

55.     The Funds admit that, on August 12, 2015, DBSI's counsel sent the Funds' counsel an email. Otherwise denied.

56.     The Funds admit that the Funds' Representatives had two telephone conversations with DBSI's Representatives in October 2015 and one in-person meeting on November 18, 2015. Otherwise denied.

57.     The Funds admit that they and the Madoff Trustee actively litigated the Trustee Adversary Proceeding, which forced the Funds to expend many millions of dollars defending the lawsuit. The Funds admit that, between December 2015 and June 2016, they and the Madoff Trustee briefed multiple discovery disputes. The Funds admit that, in June 2016, the bankruptcy court held oral argument on those disputes and, in October 2016, appointed a discovery arbitrator. The Funds admit that, on June 24, 2016, DBSI's counsel sent an email to the Funds' counsel. Otherwise denied.

58.     The Funds currently lack knowledge or information sufficient to form a belief about the timing of discussions between their counsel and DBSI's counsel in July 2016. Otherwise denied.

59.     The Funds admit that, between December 2016 and September 2018, the Funds' Representatives spoke with DBSI's Representatives. The Funds currently lack knowledge or information sufficient to form a belief about the timing of discussions between the Funds' Representatives and DBSI's Representatives. The Funds admit that, in 2017 and 2018, its litigation against the Madoff Trustee continued. Otherwise denied.

60.     The Funds lack knowledge or information sufficient to form a belief about when DBSI learned of potential mediation regarding the Trustee Adversary Proceeding. The Funds admit that, between December 2016 and September 2018, their counsel spoke with DBSI's counsel. The Funds currently lack knowledge or information sufficient to form a belief about the timing of discussions between their counsel and DBSI's counsel. Otherwise denied.

61.     Denied.

62.     Denied.

63.     Denied.

**The Kingate Funds Attempt to Walk Away from the Agreement in 2019**

64.     The Funds lack knowledge or information sufficient to form a belief about when DBSI learned that the Funds intended to enter mediation. The Funds admit that, on May 7, 2019, DBSI's counsel sent the Funds' counsel a letter that contained the phrase "We understand that Kingate is preparing to enter into mediation with BLMIS." Otherwise denied.

65.     The Funds admit that, on May 7, 2019, DBSI's counsel sent the Funds' counsel a letter that contained the phrase "DB is ready and willing to provide support to Kingate in the mediation or otherwise in an effort to facilitate the resolution of the dispute between BLMIS and Kingate, and in turn permit the transactions contemplated by the Trade Confirm to be consummated." Otherwise denied.

66.     The Funds admit that, on May 16, 2019, their counsel sent a letter to DBSI's counsel. The Funds admit that this letter stated, in part: "The August 2011 trade confirmation you reference in your letter is not, as you characterize it, 'binding.' Almost eight years have elapsed without [DBSI] making any payment or finalizing documentation." Otherwise denied.

67.     The Funds admit that, on June 4, 2019, DBSI's counsel sent a letter to the Funds' counsel. The Funds admit that the letter contained the language quoted by DBSI. The Funds deny that DBSI accurately quoted the letter, as it omits a sentence from the excerpt. Otherwise denied.

68.     Denied.

**The Kingate Funds Settle the Trustee Adversary Proceeding**

69.     The Funds admit that, after June 11, 2019, they did not communicate with DBSI about the Trustee Adversary Proceeding. Otherwise denied.

70.     Admitted.

71.     The Funds admit that, on August 6, 2019, the bankruptcy court entered an order approving the Settlement Agreement. The Funds admit that the courts in the BVI and Bermuda overseeing the liquidation of the Funds also approved the Settlement Agreement. Otherwise denied.

72.     The Funds admit that, on September 5, 2019, they filed a Verified Petition. The Funds admit that the Verified Petition seeks recognition of the BVI insolvency proceedings initiated in May 2009. Otherwise denied.

73.     The Funds admit that, on September 30, 2019, DBSI filed an objection to the Verified Petition. The Funds admit that the parties resolved DBSI's objection. The Funds admit that the parties agreed to a Recognition Order. The Funds admit that the agreed Recognition Order

allowed DBSI to litigate its rights, if any, against the Funds arising from the Confirmation Letter in the District Court for the Southern District of New York. Otherwise denied.

74.     Denied.

75.     The Funds admit that they did not disclose their intention to file the Verified Petition to DBSI before doing so. Otherwise denied.

76.     Denied.

## JURY DEMAND

77.     The Funds admit that DBSI has demanded a jury trial. Otherwise denied.

## FIRST CAUSE OF ACTION
### (Breach of Contract/Damages)

78.     The Funds repeat their responses to the preceding paragraphs.

79.     The Funds admit that the Confirmation Letter contains the phrase "firm, irrevocable and binding." Otherwise denied.

80.     The Funds admit that the Confirmation Letter refers to a "Global Claim" and a "Euro Claim." Otherwise denied.

81.     The Funds admit that the Confirmation Letter provides that the Global Claim Amount is $938,862,952 and the Euro Claim Amount is $685,885,142. Otherwise denied.

82.     The Funds admit that the Confirmation Letter provides that the Global Claim Amount is $938,862,952 and the Euro Claim Amount is $685,885,142. The Funds admit that the Confirmation Letter states that the "Purchase Rate" is "66% of the Global Claim Amount and the Euro Claim Amount." Otherwise denied.

83.     Denied.

84.     Denied.

85.     Denied.

14

## SECOND CAUSE OF ACTION
### (Breach of Contract/Damages)

86.     The Funds repeat their responses to the preceding paragraphs.

87.     The Funds admit that the Confirmation Letter contains the phrases "firm, irrevocable and binding," "negotiate in good faith," and "execution of a Purchase and Sale Agreement (governed by New York law) in a form that is reasonably and mutually agreed between." Otherwise denied.

88.     Denied.

89.     Denied.

90.     The Funds admit that the Settlement Agreement between the Madoff Trustee and the Kingate Funds was approved by the bankruptcy court on August 6, 2019. Otherwise denied.

91.     The Funds admit that, in 2011, they sought a declaration regarding the Confirmation Letter. The Funds admit that, in 2019, they were on the cusp of resolving the Trustee Adversary Proceeding. The Funds lack knowledge or information sufficient to form a belief about DBSI's hypothetical actions. Otherwise denied.

92.     Denied.

93.     Denied.

## THIRD CAUSE OF ACTION
### (Breach of Implied Covenant/Damages)

94.     The Funds repeat their responses to the preceding paragraphs.

95.     Admitted.

96.     Denied.

97.     Denied.

98.     Denied.

99.     Denied.

## FOURTH CAUSE OF ACTION
### (Declaratory Judgment)

100.    The Funds repeat their responses to the preceding paragraphs.

101.    Admitted.

102.    The Funds admit that, on August 24, 2011, the parties executed the Confirmation Letter. The Funds admit that the Confirmation Letter does not include an express expiration date. Otherwise denied.

103.    The Funds admit that they had intermittent communications with DBSI's counsel from August 2011 until their settlement with the Trustee. Otherwise denied.

104.    The Funds admit that, in May 2019, their counsel asserted that the Confirmation Letter was not binding at that time. The Funds admit that, in May 2019, they declined to negotiate a PSA with DBSI. Otherwise denied.

105.    Denied.

## DEFENDANTS' AFFIRMATIVE DEFENSES

The Funds assert the following Affirmative Defenses. The Funds do not admit that they bear the burden of proof on any issue. The Funds reserve the right to assert any additional defenses revealed through discovery or further investigation.

## FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

1.      The Funds incorporate their Answer to DBSI's Complaint.

2.      DBSI's claims all fail because the Confirmation Letter is a Type II preliminary agreement and the Funds fulfilled their obligations under that agreement.

3.      As a Type II preliminary agreement, the Confirmation Letter committed the parties merely to negotiate in good faith towards a binding contract. When the parties executed the Confirmation Letter, there were numerous material open issues. The Confirmation Letter did not commit the parties to additional obligations.

4.      The Confirmation Letter had an implied expiration date, beyond which the parties had no further obligation to negotiate, and which passed before the Customer Claims became Allowed under the Funds' settlement with the Madoff Trustee in July 2019.

5.      In the alternative, the Funds' obligation to negotiate ended when the parties reached impasse on negotiating a final contract, which occurred before the Customer Claims became Allowed under the Funds' settlement with the Madoff Trustee in July 2019.

6.      In the alternative, the Funds' obligation to negotiate ended when they reached and funded a settlement with the Madoff Trustee without DBSI's funding, making impossible a final contract under which DBSI would fund a settlement, which was a key condition of any proposed agreement.

7.     The Funds complied with their obligation under the Confirmation Letter to negotiate in good faith. DBSI cannot show that the Funds breached that obligation. DBSI also cannot show that the Funds deprived DBSI of the fruits of the Confirmation Letter or otherwise breached the implied covenant of good faith and fair dealing.

**SECOND AFFIRMATIVE DEFENSE**
**(Failure to State a Claim)**

8.     The Funds incorporate the prior paragraphs.

9.     DBSI's claims all fail to the extent they seek "actual, economic, consequential, and out-of-pocket damages," as such damages are not available to it as a matter of law.

10.     The Confirmation Letter is governed under New York law. Under New York law, only reliance damages are available for failure to negotiate in good faith under a Type II agreement.

11.     DBSI has thus failed to state a claim to the extent it seeks any damages greater than or different from reliance damages.

**THIRD AFFIRMATIVE DEFENSE**
**(11 U.S.C. § 363)**

12.     The Funds incorporate the prior paragraphs.

13.     DBSI's claims all fail because Section 363 of title 11 of the Bankruptcy Code—made applicable in Chapter 15 cases pursuant to section 1520(a)(2) of the Bankruptcy Code upon recognition of a foreign main proceeding and any attempted use, transfer, or sale of property located in the United States—requires bankruptcy court approval before the Customer Claims may be transferred to DBSI.

14.     For the bankruptcy court overseeing the Funds' Chapter 15 case to approve the sale of the Customer Claims in a rising asset market, the bankruptcy court must make the determination that the sale is in the best interests of the Debtors' estates. The bankruptcy court would not find

that the sale of the Customer Claims to DBSI at a price of 66 cents on the dollar (when the current value of the Allowed Customer Claims is significantly higher) is in the best interests of the Debtors' bankruptcy estates.

15.     The Court thus may not order the specific performance of directing the parties to negotiate a new PSA, or damages in lieu of specific performance, as such relief would be contrary to Section 363 and futile.

## FOURTH AFFIRMATIVE DEFENSE
### (Excuse of the Funds' Performance)

16.     The Funds incorporate the prior paragraphs.

17.     DBSI's claims all fail because the Funds' performance was excused by DBSI's material breach of its duty to negotiate a final PSA in good faith.

18.     Under New York law, parties to a Type II agreement such as the Confirmation Letter are required to negotiate in good faith towards a binding contract, and a duty of good faith and fair dealing inheres in all Type II agreements.

19.     DBSI breached its duty under the Confirmation Letter to negotiate in good faith a final contract for its purchase of the Customer Claims and Remission Recoveries. DBSI demanded that the Funds' settlement agreement with the Madoff Trustee guarantee DBSI's entitlement to recovery under the Forfeiture Fund, even though eligibility under the Forfeiture Fund was not up to the Madoff Trustee, and even though the parties had never previously discussed such a term. DBSI made these demands as the market price of the Customer Claims and Remission Recoveries was falling dramatically, by December 2011 reaching 60% (or lower) of their face value—a loss equivalent to roughly $90 million. On information and belief, DBSI insisted on its new terms in order to scuttle a proposed transaction that it no longer considered economically viable, thus breaching its obligation to negotiate in good faith.

20.     DBSI's breach of the Confirmation Letter was material. The Madoff Trustee would not release the Customer Claims until it received a settlement payment. DBSI's failure to negotiate in good faith a final PSA that provided for DBSI to fund the Funds' settlement with the Madoff Trustee prevented the Funds from timely resolving their litigation with the Madoff Trustee, subverting the entire purpose of the transaction contemplated by the Confirmation Letter and resulting in the Funds spending millions of dollars to continue litigating against the Madoff Trustee.

21.     Because DBSI materially breached the Confirmation Letter, the Funds' performance under that contract was excused.

### FIFTH AFFIRMATIVE DEFENSE
**(Statute of Limitations)**

22.     The Funds incorporate the prior paragraphs.

23.     DBSI's claims all fail to the extent that they assert that the Funds breached their obligation to negotiate in good faith under the Confirmation Letter before November 20, 2013, as such claims are barred by the statute of limitations.

24.     The Confirmation Letter is governed by New York law. Under New York law, the statute of limitations for a breach of contract is six years. CPLR 213(2).

25.     DBSI's claims asserting that the Funds breached the Confirmation Letter by failing to negotiate in good faith before November 20, 2013 accrued more than six years before DBSI asserted them on November 21, 2019 and are therefore untimely.

### SIXTH AFFIRMATIVE DEFENSE
**(Recission by Abandonment)**

26.     The Funds incorporate the prior paragraphs.

27.     In the alternative, DBSI's claims all fail because the parties mutually agreed to abandon the Confirmation Letter.

28.     The Confirmation Letter is governed by New York law. Under New York law, a contract duly executed and thereafter abandoned or ignored by the parties is unenforceable.

29.     The parties' intent to abandon a contract may be expressly manifested or inferred from the relevant facts and circumstances, including the parties' conduct.

30.     As a Type II preliminary agreement, the Confirmation Letter required the parties to negotiate in good faith a final contract for sale of the Customer Claims and Remission Recoveries. The parties reached impasse over the terms of any final proposed contract and ceased exchanging drafts of proposed final contracts as early as July 2013 and many years before the Customer Claims became Allowed under the Funds' settlement with the Madoff Trustee in July 2019. The parties' conduct demonstrates their intent to abandon the Confirmation Letter and they acted consistently with that understanding, thus disavowing any intent to be bound.

31.     Because the parties abandoned the Confirmation Letter, the Confirmation Letter was rescinded and is now unenforceable.

## SEVENTH AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

32.     The Funds incorporate the prior paragraphs.

33.     In the alternative, if the Confirmation Letter were a Type I binding agreement, then DBSI's claims all fail because the Funds complied with their contractual obligations.

34.     The Confirmation Letter required DBSI to fund the Funds' settlement with the Madoff Trustee before the Funds transferred the Customer Claims and Remission Recoveries to DBSI. The Funds had no obligation to transfer the Customer Claims and Remission Recoveries to DBSI unless and until DBSI funded that settlement. Because DBSI never funded the settlement, the Funds were never obligated to transfer the Customer Claims and Remission Recoveries to

DBSI, and thus did not breach the Confirmation Letter by refusing to transfer the Customer Claims and Remission Recoveries to DBSI.

35.     The Funds deny that the Confirmation Letter contained a condition precedent that the Customer Claims and Remission Recoveries become Allowed before DBSI was required to perform. The Confirmation Letter required DBSI to fund the Funds' settlement with the Madoff Trustee before the Customer Claims could become Allowed—DBSI's funding of the settlement would permit the Customer Claims to become Allowed. DBSI's allegations that it had no obligation to perform until the Customer Claims and Remission Recoveries became Allowed and that the Funds had an obligation to transfer the Customer Claims and Remission Recoveries to DBSI once they became Allowed as the result of a settlement that DBSI did not fund are untrue.

36.     In addition, the Confirmation Letter had an implied expiration date, beyond which the parties had no further obligations, and which passed before the Customer Claims became Allowed under the Funds' settlement with the Madoff Trustee in July 2019.

37.     The Funds complied with their obligations under the Confirmation Letter. DBSI cannot show that the Funds breached those obligations. DBSI also cannot show that the Funds deprived DBSI of the fruits of the Confirmation Letter or otherwise breached the implied covenant of good faith and fair dealing.

### EIGHTH AFFIRMATIVE DEFENSE
**(11 U.S.C. § 363)**

38.     The Funds incorporate the prior paragraphs.

39.     In the alternative, DBSI's claims all fail because Section 363 of title 11 of the Bankruptcy Code—made applicable in Chapter 15 cases pursuant to section 1520(a)(2) of the Bankruptcy Code upon recognition of a foreign main proceeding and any attempted use, transfer, or

sale of property located in the United States—requires bankruptcy court approval before the Customer Claims may be transferred to DBSI.

40.     For the bankruptcy court overseeing the Funds' Chapter 15 case to approve the sale of the Customer Claims in a rising asset market, the bankruptcy court must make the determination that the sale is in the best interests of the Debtors' estates. The bankruptcy court would not find that the sale of the Customer Claims to DBSI at a price of 66 cents on the dollar (when the current value of the Allowed Customer Claims is significantly higher) is in the best interests of the Debtors' bankruptcy estates.

41.     The Court thus may not order the specific performance of directing the Funds to transfer the Customer Claims, or damages in lieu of specific performance, as such relief would be contrary to Section 363 and futile.

## NINTH AFFIRMATIVE DEFENSE
### (Repudiation)

42.     The Funds incorporate the prior paragraphs.

43.     In the alternative, if the Confirmation Letter were a Type I binding agreement, then DBSI's claims fail because DBSI repudiated that contract.

44.     Under New York law, a party repudiates a contract where, before the time of its performance arrives, it makes a statement to its counterparty that it will commit a breach that would give the counterparty a claim for damages. A repudiation discharges the non-repudiating party's obligation to perform.

45.     The Confirmation Letter required DBSI to fund the Funds' settlement with the Madoff Trustee before the Customer Claims would become Allowed and the Funds were required to transfer them to DBSI. Before the Funds could perform by transferring Allowed Customer

Claims, DBSI declared its intention to not fulfill its obligation to fund the Funds' settlement with the Madoff Trustee. DBSI never funded the Funds' settlement with the Madoff Trustee.

46.     DBSI's repudiation discharged the Funds' obligation to perform under the Confirmation Letter.

### TENTH AFFIRMATIVE DEFENSE
**(Excuse of the Funds' Performance)**

47.     The Funds incorporate the prior paragraphs.

48.     In the alternative, if the Confirmation Letter were a Type I binding agreement, then DBSI's claims all fail because the Funds' performance under the Confirmation Letter was excused by DBSI's material breach of that contract.

49.     New York law excuses a party's performance under a contract where the other party has substantially failed to perform its side of the bargain or committed a material breach.

50.     The Confirmation Letter required DBSI to fund the Funds' settlement with the Madoff Trustee before the Funds transferred the Customer Claims and Remission Recoveries to DBSI. DBSI's obligation to fund the settlement was a material term of the contract because it was the premise of the contemplated transaction.

51.     DBSI breached the Confirmation Letter by failing to fund the Funds' settlement with the Madoff Trustee.

52.     DBSI's breach of the Confirmation Letter was material. The Madoff Trustee would not (at that time) release the Customer Claims—thus permitting the Customer Claims to become Allowed—until it received a settlement payment. The Funds lacked funds to make a sufficient settlement payment to the Madoff Trustee. The Funds bargained for DBSI to fund the settlement, as that funding would have enabled the Madoff Trustee to release the Customer Claims, permitting

those Customer Claims to become Allowed, so the Funds could then transfer them to DBSI. Because DBSI failed to fund the Funds' settlement with the Madoff Trustee, the Funds could not at that time enter a settlement, receive Allowed Customer Claims, or transfer Allowed Customer Claims to DBSI.

53.    Because DBSI materially breached the Confirmation Letter, the Funds' performance under that contract was excused.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Recission by Abandonment)

54.    The Funds incorporate the prior paragraphs.

55.    In the alternative, if the Confirmation Letter were a Type I binding agreement, then DBSI claims all fail, because the parties mutually agreed to abandon that agreement.

56.    The Confirmation Letter is governed by New York law. Under New York law, a contract duly executed and thereafter abandoned or ignored by the parties is unenforceable.

57.    The parties' intent to abandon a contract may be expressly manifested or inferred from the relevant facts and circumstances, including the parties' conduct.

58.    DBSI made no attempt to pay the Madoff Trustee to settle its litigation against the Funds—which was a key provision of any binding contract—at any time before June 2019, when the Customer Claims became Allowed under the Funds' settlement with the Madoff Trustee. The parties' conduct demonstrates their intent to abandon the Confirmation Letter and they acted consistently with that understanding, thus disavowing any intent to be bound.

59.    The parties thus abandoned the Confirmation Letter, inconsistent with the intent to be bound thereby, and DBSI cannot now maintain an action to enforce its terms.

## TWELFTH AFFIRMATIVE DEFENSE
### (Recission or Reformation Due to Unilateral Mistake)

60.    The Funds incorporate the prior paragraphs.

61.     In the alternative, if the Confirmation Letter were a Type I binding agreement, and if it did not contain DBSI's obligation to fund the Funds' settlement with the Madoff Trustee, then the Funds' omission of that condition was a unilateral mistake.

62.     The Confirmation Letter is governed by New York law. Under New York law, a party's unilateral mistake can be grounds to rescind or reform a contract where it is induced by the other party's inequitable conduct or where enforcement of the contract would be unconscionable or result in unjust enrichment.

63.     DBSI obtained the Funds' agreement to the Confirmation Letter by inequitable conduct. On information and belief, DBSI knew that the Funds wished to enter an agreement under which DBSI would fund the Funds' settlement with the Madoff Trustee before they transferred the Customer Claims and Remission Recoveries to DBSI. That was the whole point of the parties' agreement. (For example, this condition was reflected in the draft PSAs that the parties exchanged before they executed the Confirmation Letter.) On information and belief, DBSI further knew that the Funds would not enter into an agreement with DBSI that did not contain this provision. To the extent that the Confirmation Letter does not include this funding condition, DBSI misrepresented its understanding of that fact to the Funds, assuring them that DBSI's funding of the settlement was a part of the deal, and so inequitably induced them to enter a contract that lacked that condition.

64.     Enforcing the Confirmation Letter as a Type I agreement without this funding condition would be unconscionable and unjustly enrich DBSI. It would give DBSI an exclusive, perpetual, risk-free right to purchase the Customer Claims and Remission Recoveries at the precise moment they became valuable—even though DBSI paid not one cent to fund the settlement with the Madoff Trustee. It would also prejudice the Funds by requiring them to transfer Customer

Claims and Remission Recoveries to DBSI at a vastly below-market price, after it spent seven years and millions of dollars litigating with the Madoff Trustee. It thus would reward DBSI's inequitable behavior with a substantial windfall at the Funds' expense.

65.    The Court should rescind the Confirmation Letter or reform it to include the funding condition. If the Court reforms the Confirmation Letter, it should excuse the Funds' performance because DBSI failed to comply with the funding condition, which was a material breach.

**THIRTEENTH AFFIRMATIVE DEFENSE**
**(Equitable Estoppel)**

66.    The Funds incorporate the prior paragraphs.

67.    In the alternative, if the Confirmation Letter were a Type I binding agreement, and the Court determines that the Confirmation Letter omitted DBSI's obligation to fund the Funds' settlement with the Madoff Trustee, then DBSI is equitably estopped from disclaiming this funding condition.

68.    The Confirmation Letter is governed by New York law. Under New York law, equitable estoppel applies where an adverse party (1) with knowledge of the real facts (2) engages in conduct which amounts to a false representation or concealment of material facts and (3) intends that such conduct will be acted upon by the other party, whereas the other party (1) lacks knowledge of the true facts, (2) relies upon the conduct of the adverse party, and (3) prejudicially changes in their position.

69.    On information and belief, at the time the parties signed the Confirmation Letter, DBSI knew that it did not intend to fund the Funds' settlement with the Madoff Trustee but falsely represented to the Funds that they would do so. DBSI intended for the Funds to rely upon its material omission and misrepresentation to execute the Confirmation Letter. The Funds did not know of DBSI's material omission and misrepresentation.

70.     DBSI is therefore equitably estopped from claiming the Confirmation Letter omitted the funding condition.

### FOURTEENTH AFFIRMATIVE DEFENSE
**(Failure to State a Claim)**

71.     The Funds incorporate the prior paragraphs.

72.     DBSI's claim for breach of the implied covenant of good faith and fair dealing fails because DBSI cannot show that the Funds acted in bad faith by lawfully deciding to seek domestic recognition of a foreign liquidation contemplated under Chapter 15 of the Bankruptcy Code.

### FIFTEENTH AFFIRMATIVE DEFENSE
**(Estoppel)**

73.     The Funds incorporate the prior paragraphs.

74.     DBSI is estopped from asserting its claim for breach of the implied covenant of good faith and fair dealing.

75.     A party is estopped from asserting a position in litigation where it has asserted a clearly inconsistent position in a prior litigation, it succeeded in persuading a court to accept that earlier position, and it would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

76.     DBSI asserted a clearly inconsistent position in a prior litigation. When the Funds filed their Chapter 15 petition in *In re Kingate Global Fund, Ltd.*, No. 19-12853 (Bankr. S.D.N.Y.), DBSI filed an objection that the Funds filed their petition in bad faith. DBSI withdrew that objection in a proposed order that the parties submitted to the bankruptcy court, recognizing that the Funds' petition complied with all statutory requirements and agreeing that the bankruptcy court should recognize the foreign proceeding. DBSI's statements in the proposed order are clearly inconsistent with its current assertions that the Funds filed their petition in bad faith.

77.     DBSI succeeded in persuading a court to accept its prior inconsistent position. The bankruptcy court entered the order proposed jointly by DBSI and the Funds and adopted the parties' language on October 18, 2019. Accepting DBSI's current position would mean that it knowingly asked the bankruptcy court to accept a petition to recognize a foreign proceeding that DBSI believed to have been submitted in bad faith—which would tarnish the judicial integrity of the bankruptcy court.

78.     DBSI would derive an unfair advantage and impose an unfair detriment on the Funds if not estopped. In exchange for DBSI's representations to the bankruptcy court that their Chapter 15 petition was proper, the Funds agreed to lift the automatic bankruptcy stay, allowing DBSI to litigate claims arising from the Confirmation Letter. Allowing DBSI to assert in this litigation that the Funds filed their Chapter 15 petition in bad faith would undo the parties' bargain— the Funds would have agreed to lift the stay while DBSI is able to reassert that the Funds filed their Chapter 15 petition in bad faith.

<u>**SIXTEENTH AFFIRMATIVE DEFENSE**</u>
**(Waiver & Ratification)**

79.     The Funds incorporate the prior paragraphs.

80.     DBSI waived its claim for breach of the implied covenant of good faith and fair dealing.

81.     Under New York law, a party may waive a contractual right if it knowingly, voluntarily, and intentionally abandons that right. A party may ratify a breach of contract by knowingly giving sanction to or affirming an act which would otherwise be unauthorized and not binding.

82.     By submitting the proposed joint order asking the bankruptcy court to grant Funds' Chapter 15 petition, DBSI knowingly, voluntarily, and intentionally abandoned any claim for breach of the implied covenant of good faith and fair dealing based on an allegation that the Funds

29

filed that petition in bad faith, it and ratified the Funds' decision to seek Chapter 15 bankruptcy protection. DBSI cannot now walk back its knowing waiver and ratification.

Dated: May 7, 2021
     New York, NY

Respectfully submitted,

SELENDY & GAY, PLLC

By:   */s/ Philippe Z. Selendy*
     Philippe Z. Selendy
     Caitlin Halligan
     Andrew R. Dunlap
     Lena Konanova
     Oscar Shine
     SELENDY & GAY, PLLC
     1290 Avenue of the Americas
     New York, NY 10104
     Telephone: 212-390-9000
     Email: pselendy@selendygay.com
     challigan@selendygay.com
     adunlap@selendygay.com
     lkonanova@selendygay.com
     oshine@selendygay.com

     *Attorneys for Defendants Kingate Global*
     *Fund Ltd. and Kingate Euro Fund Ltd.*