Selendy & Gay PLLC
1290 Avenue of the Americas
New York NY 10104
212 390 9000

Andrew R. Dunlap
212 390 9005
adunlap@selendygay.com



October 8, 2021

<u>Via ECF</u>

The Honorable Edgardo Ramos
United States District Judge
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

**Re:** *Deutsche Bank Securities Inc. v. Kingate Global Fund Ltd., et al.*,
No. 19-cv-10823-ER (S.D.N.Y.)

Dear Judge Ramos,

Per Your Honor's Individual Practices and Local Civil Rule 37.2, we write on behalf of Defendants Kingate Global Fund Ltd. and Kingate Euro Fund Ltd. (the "<u>Funds</u>") to request a pre-motion discovery conference to address Plaintiff Deutsche Bank Securities Inc.'s ("<u>DBSI</u>") refusal to produce important categories of relevant, non-privileged documents in response to the Funds' First Set of Requests for Production of Documents ("<u>RFPs</u>"), *see* Ex. 1.[1]

In this breach of contract action, DBSI alleges that, in 2011, the parties entered an agreement (the "<u>Confirmation Letter</u>") for the Funds to sell DBSI claims they held against the Madoff Estate (the "<u>Claims</u>").[2] *See* Compl., ECF No. 7, ¶ 1. The Funds assert various defenses, including that any agreement with DBSI required DBSI to fund a settlement between the Funds and the Madoff Estate, which DBSI refused to do. Answer, Aff. Defenses, ECF No. 45, ¶ 45. The Funds now seek documents concerning (1) DBSI's communications with nonparty investors to which DBSI marketed and sold its potential interests in the Claims; (2) DBSI's documentation of and practices relating to similar transactions; and (3) DBSI's employees' financial interest in DBSI's transaction with the Funds. DBSI has no valid reason to withhold these documents.

---

[1] The parties have exchanged letters, *see* Exs. 3-6, and met and conferred three times in good faith, but have been unsuccessful in resolving their disputes.

[2] In the Funds' RFPs, "<u>Madoff Estate</u>" refers to the estate of Bernard L. Madoff Securities, "<u>Customer Claims</u>" to the Funds' customer claims for net equity against the Madoff Estate, and "<u>Remission Recoveries</u>" to the Funds' potential recoveries from any forfeiture fund established pursuant to 28 C.F.R. Part 9 or otherwise against the Madoff Estate.

The Honorable Edgardo Ramos
October 8, 2021

### I. Communications Between DBSI and Its Investors

The Funds seek DBSI's communications with a syndicate of third-party investors (the "Investors") to which DBSI marketed and sold its potential interests in the Funds' Claims, and documents reflecting those communications. Ex. 1 at 8–9, RFP Nos. 15-16. These communications likely reflect DBSI's contemporaneous description and understanding of the Confirmation Letter—likely including that DBSI was required to fund the Funds' settlement with the Madoff Trustee in 2011—and so are centrally relevant to the Funds' affirmative defenses that DBSI's admitted failure to fund a settlement in 2011 amounts to repudiation, excuse, and rescission by abandonment. Answer, Aff. Defenses, ECF No. 45, ¶¶ 42-59.

DBSI concedes these communications are relevant but maintains that many are protected by the common interest privilege. *See* Ex. 2 at 16.[3] Not so. DBSI "bears the burden of establishing that [the privilege] applies." *ACE Securities Corp. v. DB Structured Products, Inc.*, 40 N.Y.S.3d 723, 734 (N.Y. Sup. Ct. 2016) (citing *Ambac Assur. Corp.*, 27 N.Y.3d at 623–24 (N.Y. 2016)). Because "privilege assertions … are at odds with the general policy of [New York] favoring liberal discovery," DBSI's privilege claim "must be narrowly construed." *Id.*; *see also Cohen v. Cohen*, No. 09 Civ. 10230, 2015 WL 745712, at *2 (S.D.N.Y. Jan. 30, 2015) ("New York courts take a conservative approach to privilege because it constitutes an obstacle to the truth-finding process") (cleaned up).

DBSI fails to identify any common *legal* interest with its Investors. New York recognizes common interest privilege only for communications among "parties who share a common *legal* (as opposed to business or commercial) interest" in pending litigation. *Ambac*, 27 N.Y.3d 616 at 622 (emphasis added).[4] The Investors are not signatories to or third-party beneficiaries of the Confirmation Letter; DBSI has never asserted that it assigned its rights under the Confirmation Letter to them; and DBSI has not identified a written common interest agreement with them.[5] At most, the Investors' "ultimate interest" in this case—to purchase from DBSI the Claims that DBSI

---

[3] DBSI also objects that these communications would be in the possession of third parties not within DBSI's possession, custody, or control. *See id.* The Funds do not ask DBSI to produce materials outside of their control. The Funds have served third-party discovery requests on the Investors, many of whom are represented by the same law firm representing DBSI and also invoke the common interest privilege. *See* Ex 7 at 2–3.

[4] Because the Confirmation Letter is governed by New York law, *see* Compl. Ex. A at 3, ECF No. 7-1, New York law governs privilege regarding the claims and defenses in this action, *see* Fed. R. Evid. 501.

[5] The cases that DBSI cited to the Funds thus are inapposite. *See GMA Accessories, Inc. v. HMY Jewelry, Inc.*, 2021 WL 1885260, at *2 (S.D.N.Y. May 11, 2021) (common interest privilege applied to communications between the third-party's in-house counsel and named defendant made for the purpose of formulating the parties' legal strategy in response to a demand letter threatening litigation against both the defendant and the third parties); *HSH Nordbank AG N.Y. Branch v. Swerdlow*, 259 F.R.D. 64, 72 (S.D.N.Y. 2009) (common interest privilege applied to communications between third-party lenders with legal rights memorialized in loan documents at issue in litigation); *Vacco v. Harrah's Operating Co.*, 2008 WL 4793719, at *8–*9 (N.D.N.Y. Oct. 29, 2008) (common interest privilege applied to communications between plaintiff-trustee and third parties with legal rights assigned to plaintiff-trustee); *In re Rivastigmine Patent Litig.*, 2005 WL 2319005, at *3 (S.D.N.Y. Sept. 22, 2005) (observing that common interest privilege has often applied to communications between patent owners and their exclusive licensees); *Subramanian v. Lupin, Inc.*, 2019 WL 1771556, at *1 (S.D.N.Y. Apr. 23, 2019) (common interest privilege not precluded over communications between parties with formal joint defense agreement).

seeks to obtain from the Funds—is "merely a desire to ensure that … [their] own agreements" with DBSI materialize. *Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*, 215 F.R.D. 466, 472 (S.D.N.Y. 2003). This "concern… is commercial in nature and does not qualify for protection under the common interest rule." *Id.* at 472–73 ("A concern shared by parties regarding litigation does not establish by itself that the parties held a common legal interest."); *see also Cohen*, 2015 WL 745712, at *3 ("Although the two may have a common financial interest in the outcome of this litigation, that relationship does not fall into the narrow category primarily reserved for co-litigants pursuing a shared legal strategy."); *Fox Paine & Co., LLC v. Houston Cas. Co.*, 2016 WL 1602747, at *20 (N.Y. Sup. Ct. 2016) (quoting *Cohen*, 2015 WL 745712, at *3).

DBSI suggested that the parties defer any dispute over its common interest assertions until they exchange privilege logs, but that is a recipe for inefficiency and delay. Whether DBSI can invoke the common interest privilege is a threshold question of law the Court should resolve now. If DBSI cannot assert the privilege at all, then DBSI should produce all the relevant documents and need not log them. If the parties wait until the exchange of privilege logs to even raise this issue, and DBSI cannot assert the privilege, the discovery schedule could be delayed as DBSI goes back to re-review and produce then documents that it should produce now.

## II. DBSI's Customary Practices For Purchasing Bankruptcy Claims

The Funds seek documents demonstrating DBSI's regular practices, procedures, and policies in purchasing bankruptcy claims, including its preliminary and final agreements for the purchase of other bankruptcy claims and documents sufficient to show the volume of DBSI's trading in Madoff claims in particular. Ex. 1 at 10-11, RFP Nos. 23-30.

Contrary to DBSI's assertions, Ex. 6 at 5, these materials are relevant to the open question of whether the Confirmation Letter is a Type I binding agreement or a Type II agreement to negotiate. One factor relevant to that question is the "customary form of such transactions" and whether that custom "necessit[ates] putting the agreement in final form." *See Brown v. Cara*, 420 F.3d 148, 157 (2d Cir. 2005). In its ruling on the Funds' motion to dismiss, the Court noted that "it is nearly impossible to determine at the motion to dismiss stage whether a more formal contract would normally be expected under prevailing industry conditions." ECF No. 40 at 19. Because DBSI is a regular participant in the market for distressed bankruptcy claims, its participation in other, similar transactions is probative of industry custom. *See FCOF UB Sec. LLC v. MorEquity, Inc.*, 663 F. Supp. 2d 224, 231 (S.D.N.Y. 2009) ("[T]he question of whether it is customary to accord binding force to a certain type of preliminary agreement is a question of fact to be determined, in significant part, based on industry custom.").

DBSI's policies and procedures for finalizing similar transactions are also relevant to determining whether the entire "context of the negotiations demonstrates an intent of the parties to be bound," which goes directly to whether the Confirmation Letter is a Type I or Type II agreement. *Bear Sterns Inv. Products, Inc. v. Hitachi Automotive Products, Inc.*, 401 B.R. 598, 627 (S.D.N.Y. 2009). In 2011, DBSI was negotiating with the Funds as well as many other parties with claims against the Madoff Estate. In this litigation, DBSI claims that it believed the Confirmation Letter, standing alone, was a firm and binding commitment. *See* Compl., ECF No. 7, ¶¶ 1, 4, 21, 79, 87. If DBSI's representatives had a practice of signing multiple contracts or detailed PSAs before finalizing other, comparable deals, there would be no reason for DBSI's

traders to have believed that the Confirmation Letter was sufficient to bind the parties. DBSI's other transactions are thus relevant and must be produced.

### III. Documents Reflecting DBSI's Employees' Financial Incentives for Closing or Delaying DBSI's Transaction with the Funds

The Funds seek documents "regarding any actual or potential compensation for any DBSI employee related to DBSI's potential purchase or sale of any interest in the Funds' Customer Claims, Remission Recoveries, or Allowed Claims." Ex. 1 at 9, RFP No. 18.

Contrary to DBSI's objections, Ex. 2 at 17, this information is relevant to the Funds' defense that, after the Confirmation Letter was signed, DBSI acted in bad faith to delay execution of a PSA because the market price of the Claims had declined. Answer, Aff. Defenses, ECF No. 45, ¶ 19. DBSI's interest in the deal returned only after the Claims' market price recovered. The Funds may show that DBSI is estopped from resurrecting a deal it chose to repudiate, and that individual DBSI traders had a financial motive to scuttle (and then revive) the transaction.

DBSI stated that "no DBSI employee's compensation depended on the execution of any transactions relevant to this case," Ex. 4 at 3, but this qualified representation obscures more than it reveals. First, that an employee's compensation did not "depend on" the transaction does not mean the transaction was irrelevant to that compensation—if an employee's compensation depended in part on his or her division's total profits, this transaction could contribute to those profits and thus influence the compensation. Second, that compensation decisions did not turn on the "execution" of the transaction does not mean that the transaction was irrelevant—the Funds allege that DBSI had a motive in 2011 to *avoid* executing a final transaction that would have been a bad financial deal at that point. Third, and relatedly, DBSI has not clarified what "transactions relevant to this case" means—relevant transactions include not only any deal between DBSI and the Funds but also DBSI's deal to sell its interest in the Claims to the Investors. Finally, the Funds have alleged, in support of a unilateral mistake defense, that DBSI induced them to agree to the Confirmation Letter by assuring the Funds that DBSI would provide prompt funding for any settlement with the Trustee. Answer, Aff. Defenses, ECF No. 45, ¶ 63. Any financial benefit related to the contemplated transaction would demonstrate that DBSI's employees were motivated to push the deal forward at any cost, including through deception. *See United States v. Int'l Bus. Machines Corp.*, 84 F.R.D. 651, 652 (S.D.N.Y. 1979) ("Inquiry into a witness' financial interest in the outcome of a case, and the extent of that interest, is essential if bias is to be uncovered."). The information the Funds seek thus is relevant and DBSI may not withhold it.

The Funds respectfully request that the Court schedule a pre-motion conference to hear and resolve these issues, and that DBSI be ordered to produce the requested discovery.

Respectfully submitted,

*Andrew Riggs Dunlap*

Andrew R. Dunlap

cc:   Counsel of Record (via ECF)