UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEUTSCHE BANK SECURITIES INC.,

　　　　　　　Plaintiff,

　　　v.

KINGATE GLOBAL FUND LTD. and
KINGATE EURO FUND LTD.,

　　　　　　　Defendants.

Case No. 19-cv-10823

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD UNDER THE COMMON INTEREST DOCTRINE

Date:  April 27, 2022

Andrew R. Dunlap
Amy K. Nemetz
Ronald J. Krock
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, NY  10104
Tel: 212-390-9000
adunlap@selendygay.com
anemetz@selendygay.com
rkrock@selendygay.com

Hugh M. McDonald
PILLSBURY WINTHROP SHAW
PITTMAN LLP
31 West 52nd Street
New York, NY 10019
Tel: 212-858-1000
hugh.mcdonald@pillsburylaw.com

*Attorneys for Defendants Kingate Global
Fund Ltd. and Kingate Euro Fund Ltd.*

## TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT ....................................................................................................1

BACKGROUND .........................................................................................................................4

LEGAL STANDARD...................................................................................................................8

ARGUMENT ..............................................................................................................................9

I.      UNDER CONTROLLING NEW YORK LAW, THE COMMON INTEREST
        DOCTRINE IS A VERY NARROW EXCEPTION TO WAIVER OF
        ATTORNEY-CLIENT PRIVILEGE......................................................................................9

II.     DBSI AND THE INVESTORS DO NOT SHARE A COMMON LEGAL
        INTEREST IN THE CONFIRMATION LETTER, ONLY A FINANCIAL
        INTEREST IN SEPARATE DOWNSTREAM CONTRACTS.......................................12

CONCLUSION........................................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*,
    27 N.Y.3d 616 (2016) .......................................................................................9, 10, 11, 15, 16

*City of Almaty, Kazakhstan v. Ablyazov*,
    2019 WL 2865102 (S.D.N.Y. July 3, 2019) ..............................................................9

*Cohen v. Cohen*,
    2015 WL 745712 (S.D.N.Y. Jan. 30, 2015) ........................................................11, 12

*Delta Fin. Corp. v. Morrison*,
    2007 WL 2993663 (N.Y. Sup. Ct. Oct. 11, 2007) ......................................................9

*Empire Bank v. Dumond*,
    2014 WL 12910485 (N.D. Okla. May 14, 2014) ......................................................16

*GMA Accessories, Inc. v. HMY Jewelry, Inc.*,
    2021 WL 1885260 (S.D.N.Y. May 11, 2021) ..........................................................14

*Gulf Islands Leasing, Inc. v. Bombardier Cap., Inc.*,
    215 F.R.D. 466 (S.D.N.Y. 2003) ..........................................................11, 12, 13, 14

*HSH Nordbank AG N.Y. Branch v. Swerdlow*,
    259 F.R.D. 64 (S.D.N.Y. 2009) ............................................................................10

*Hyatt v. State of Cal. Franchise Tax Bd.*,
    105 A.D.3d 186 (2d Dep't 2013) ...........................................................................11

*Lego v. Stratos Lightwave, Inc.*,
    224 F.R.D. 576 (S.D.N.Y. 2004) .........................................................................8, 15

*Schaeffler v. United States*,
    806 F.3d 34 (2d Cir. 2015)...............................................................................10, 16

*Spectrum Sys. Int'l Corp. v. Chem. Bank*,
    78 N.Y.2d 371 (1991) ............................................................................................9

*Strougo v. BEA Assocs.*,
    199 F.R.D. 515 (S.D.N.Y. 2001) .....................................................................10, 11, 15

*Vacco v. Harrah's Operating Co.*,
    2008 WL 4793719 (N.D.N.Y. Oct. 29, 2008) .......................................................10, 15

**Statutes and Rules**

Fed. R. Evid. 501 .........................................................................................................................8, 15

## PRELIMINARY STATEMENT

This case hinges on what Plaintiff DBSI and the Defendant Kingate Funds understood their August 2011 Confirmation Letter to mean. DBSI asserts that this two-page document bound the Funds in perpetuity to sell it $1.6 billion in bankruptcy claims against the estate of Bernard L. Madoff Investment Securities ("BLMIS"), whenever those claims might become allowed by the Bankruptcy Court. The Funds believe that the Confirmation Letter was either an agreement to agree or that DBSI repudiated its own obligations under the allegedly binding Confirmation Letter when it refused to provide the money for the Funds to settle their litigation with the Madoff Trustee back in 2011—which would have enabled their claims against the Madoff Estate to become allowed at that time. In bringing this litigation, DBSI has done an about-face: While it refused to close this transaction in late 2011, when the Funds' claims were worth significantly less than they are today, now that the price of the claims has skyrocketed, DBSI alleges that the parties always understood that the Confirmation Letter alone bound the Funds to sell their claims to DBSI.

DBSI is withholding critical evidence of its understanding of the Confirmation Letter—documents that it shared with the hedge funds to whom it intends to resell interests in the Funds' claims against BLMIS, should it acquire them from the Funds (DBSI's "Investors").[1] The Investors withhold such documents as well. While DBSI alleged in its 2019 Complaint (at ¶ 22) that the parties bound themselves to a $1.6 billion transaction in the Confirmation Letter, DBSI took a very

---

[1] The Investors at issue in this Motion are Centerbridge Partners LP ("Centerbridge"), Farallon Capital Management LLC ("Farallon"), and Solus Alternative Asset Management LP ("Solus"). In their request for a pre-motion conference, ECF No. 105, the Funds also sought relief regarding the common interest doctrine against three other Investors: Glendon Capital Management LP ("Glendon"), Stone Lion Capital Partners LP ("Stone Lion"), and Third Point LLC ("Third Point"). On April 27, 2022—the day this Motion was due—the Investors' counsel informed the Funds for the first time that Glendon, Stone Lion, and Third Point do not currently withhold any documents under the common interest doctrine. Ex. 1 at 1 (Apr. 27, 2022 email from Investors' counsel).

different position shortly after signing the Confirmation Letter in 2011. As the market value of the claims referenced by the Confirmation Letter dropped in late 2011, DBSI's economic incentive to close the transaction (and in turn, the investors' incentive for DBSI to close) shifted, and DBSI refused to finalize the Purchase and Sale Agreement required by the Confirmation Letter to complete the deal. DBSI's and the Investors' privilege logs show that they communicated about DBSI's position toward the Funds. These documents are essential to discovering DBSI's view about the parties' obligations under the Confirmation Letter—the core of this case.

DBSI and the Investors withhold these highly relevant documents based solely on the common interest doctrine but have no basis to do so. The Investors have no legal interests in litigation concerning the Confirmation Letter because they possess no legal rights under that document. They are not parties to or beneficiaries of the Confirmation Letter. They are not assignees or purchasers of DBSI's rights under the Confirmation Letter. They could not sue the Funds for breach of the Confirmation Letter, nor could the Funds sue the Investors if DBSI breached the Confirmation Letter. The Investors did not purchase DBSI's interests in the Funds' claims that are the subject of the Confirmation Letter. The Investors thus lack common legal rights of the sort that New York would require that they hold in common with DBSI to invoke the common interest doctrine and prevent a waiver of privilege.

DBSI points to participation agreements executed with the Investors that, it claims, give the Investors a legal interest in a "bundle of rights" that amount to all right, title, and interest in the Funds' claims. Not so. The plain language of those participation agreements expressly conditions any future transfer of DBSI's ownership interest in the claims to the Investors on negotiating and executing two additional, separate contracts: *first*, an upstream Purchase and Sale Agreement ("PSA") between the Funds and DBSI; and *second*, a downstream Participation of Claim

Agreement between DBSI and each Investor to transfer DBSI's interests in the upstream PSA. Neither the upstream PSA nor any downstream Participation of Claim Agreement was ever signed. No document provides the Investors with a current legal interest in the Confirmation Letter at issue in this case or in the Funds' claims against BLMIS—only interests in Participation Agreements that are not at issue in any litigation. The Investors thus at best have a contingent future ability to purchase interests in the Funds' claims via a separate, non-existent series of contracts. Such a contingent right to pay or receive payment may be an economic interest, but it is not a legal one under New York law. Even were it a legal right, moreover, it would not be "common" to DBSI and the Investors, who would be counterparties on opposite sides of the downstream transaction.

It is DBSI's and the Investors' burden to justify their privilege assertions, but they have not offered any binding authority for the proposition that legal advice can be shared with economically-interested third parties without waiver. Any doubt should be resolved in favor of disclosure: The New York Court of Appeals requires the common interest doctrine to be construed narrowly because it is in tension with New York's policy of liberal discovery. That Court has stressed that New York law disfavors cloaking commercial discussions in attorney-client privilege. No case decided under New York law demonstrates that DBSI and the Investors' interests in their downstream participation agreements create a legal interest for the Investors in DBSI's upstream Confirmation Letter with the Funds—at most, the Investors have a *financial* interest in DBSI winning this case, but that does not create a common *legal* interest under New York law. If that were so, then the common interest exception would swallow the rule that disclosing privileged advice to third parties waives the privilege.

The Court should compel DBSI and the Investors to produce the documents they withhold based on the common interest privilege.

3

## BACKGROUND

In December 2008, the Funds, on their shareholders' behalf, held approximately $1.6 billion in managed investment accounts operated by BLMIS. When Bernard Madoff confessed that BLMIS was a fraud, the value of those investments plunged. Having no other significant assets, the Funds in 2009 entered liquidation overseen by the Eastern Caribbean Supreme Court in the British Virgin Islands (the "BVI Court"), where the Funds are incorporated. The BVI Court appointed the Joint Liquidators to recover whatever they could from the Madoff Estate and to distribute those recoveries to the Funds' stakeholders.

The Joint Liquidators had a problem: The Funds could not recover on their claims against the Madoff Estate ("Customer Claims") until the court overseeing the Madoff bankruptcy (the "Bankruptcy Court") "allowed" those claims. But the Bankruptcy Court would not allow the Funds' Customer Claims until separate claims that the Madoff Estate (the "Madoff Trustee") brought against the Funds, seeking to claw back money the Funds withdrew from BLMIS, were resolved. Lacking sufficient cash to settle the Madoff Trustee's claims, the Joint Liquidators auctioned the Funds' Customer Claims and their rights to receive distributions, if any, from the U.S. Department of Justice's Madoff Victim Fund (together with the Customer Claims, the "Claims"), planning to use the proceeds to pay for a settlement with the Madoff Trustee and small distributions to stakeholders.

On August 24, 2011, in the two-page contract at issue in this case (the "Confirmation Letter"), Deutsche Bank Securities Inc. ("DBSI") said that it would buy the Funds' Claims at 66% of the Claims' value. Ex. 2 (Aug. 24, 2011 Confirmation Letter).[2] The Confirmation Letter provided

---

[2] References to "Exhibits" or "Ex." pertain to the exhibits to the accompanying Declaration of Andrew R. Dunlap filed in support of this motion to compel ("Motion").

that the transaction was "subject to" DBSI and the Funds negotiating "in good faith" a PSA "that is reasonably and mutually agreed" to close the transaction. *Id.*

DBSI did not seek these Claims for itself; it acted as a broker for its Investors, a group of downstream hedge funds to whom it planned to resell its interest in the Claims, earning a commission. *See* MacInnis Decl. ¶ 4, ECF No. 117-1. On the same date that it signed the Confirmation Letter, DBSI executed agreements with its Investors ("Participation Agreements"), confirming a "transaction" for DBSI to sell to the Investors "participation interest[s]" in the PSA that the Confirmation Letter called for DBSI to execute with the Funds. *See, e.g.*, Ex. 3 at -257 (Barclays Participation Agreement). The Funds and DBSI never executed that upstream PSA.

In these Participation Agreements, *DBSI did not transfer any of its rights under the Confirmation Letter to the Investors*. The Participation Agreements rather provided that the "Form of Transfer" from DBSI to the Investors would be separate contracts—Participation of Claim Agreements—to be executed on the same day in the future that DBSI executed its PSA with the Funds. *Id.* at -257 ("Form of Transfer: Participation of Claim Agreement… Seller and Buyer agree that they shall execute the Participation of Claim on the same day… that Seller and Kingate executes [*sic*] the Global Upstream Agreement and the Euro Upstream Agreement."). The Participation Agreements provided that the transaction between DBSI and its Investors was "subject to" DBSI successfully completing its purchase of the Claims from the Funds. *Id.* at -258.

Three months later, the market price for the Claims dropped below the 66% rate DBSI had agreed to pay to the Funds, ████████████████████████████████ ███████████████████████, and DBSI refused to finalize its PSA with the Funds unless the PSA included additional terms not stated in the Confirmation Letter. Ex. 5 (Nov. 11, 2011 email from Funds' counsel memorializing call with DBSI's counsel). On December 21, 2011, the

Funds sued in the Southern District of New York to compel DBSI to complete the transaction and execute a final PSA (the "2011 Litigation"). Compl., *Kingate Global Funds Ltd. v. Deutsche Bank Secs. Inc.*, No. 11-cv-09364-DAB (S.D.N.Y. Dec. 21, 2011), ECF No. 1. DBSI counterclaimed for a judgment declaring that the Confirmation Letter was not a final enforceable agreement. Answer & Countercl., *Kingate*, No. 11-cv-09364-DAB (S.D.N.Y. Jan. 11, 2012), ECF No. 9.

In December 2012, DBSI and the Investors executed commitment letters that reaffirmed their obligations under the Participation Agreements and bound the Investors "to reimburse [DBSI], to the extent of [each Investor]'s Share, for all of [DBSI's] legal expenses incurred and to be incurred after [August 24, 2011] in connection with, or in relation to, the pending litigation between [DBSI] and Kingate." Ex. 3 at -261 (Barclays Commitment Letter). ████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████ In January 2014, the parties agreed to dismiss the 2011 Litigation with prejudice, leaving the Funds to defend against the Madoff Trustee's claims without sufficient cash on hand to settle them.

In June 2019, after eight years of litigation, the Madoff Trustee agreed to settle its claims against the Funds without an upfront cash payment. By then the Madoff Trustee had recovered approximately 75% of creditors' losses to BLMIS,[3] and the value of the Funds' Customer Claims skyrocketed. DBSI then demanded that the Funds sell it the Customer Claims under the Confirmation Letter (that it had previously argued was unenforceable) at a price well below current market value, Ex. 7 (May 7, 2019 letter from DBSI's counsel), a transaction that would bring the Investors a huge windfall.

---

[3] T. Varadarajan, "The Amazing Madoff Clawback," The Wall Street Journal (Nov. 30, 2018), *available at* https://webreprints.djreprints.com/4743180552220.html (accessed Apr. 27, 2022).

In September 2019, the Funds filed a petition for recognition of their BVI liquidation pro-

ceedings under Chapter 15 of the Bankruptcy Code to protect their assets located in the United

States, specifically their Customer Claims against the Madoff Estate. DBSI objected that the Bank-

ruptcy Code's automatic stay would preclude DBSI from suing the Funds to enforce the Confir-

mation Letter. DBSI Limited Objection, *In re: Kingate Global Fund, Ltd., et al.*, No. 19-br-12853

(Bankr. S.D.N.Y. Sept. 30, 2019), ECF No. 21. DBSI's objection did not mention the Investors,

and the Investors filed no objections of their own. The Funds and DBSI resolved DBSI's objection

by allowing DBSI to bring its claims against the Funds in this Court, and the Bankruptcy Court

granted Chapter 15 recognition.

DBSI filed this suit in November 2019, with the Investors paying its litigation expenses.

*See* MacInnis Decl. ¶ 19 (stating that DBSI and certain Investors entered a "Common Interest,

Reimbursement, and Indemnification Agreement" in 2019); ████████████████████████

████████████████████████████████████████████████████████████████████

████ ; Ex. 9 at 27:14–15 (April 20, 2022 pre-motion discovery conference transcript) (DBSI's

counsel acknowledging the Investors are "funding the litigation").

In discovery, the Funds asked DBSI and the Investors to produce their communications

with each other concerning issues relevant to this case, including the history of litigation between

the Funds and DBSI. *See* Ex. 10 at 8–9 (Funds' Requests for Production Nos. 12, 15–16); Ex. 11

at 9–10 (Funds' Subpoena to Solus, Requests for Production Nos. 1(a), 3–6). These documents are

crucial, as they may well show DBSI's candid assessments of the meaning of the Confirmation

Letter—which the Funds believe are contrary to DBSI's position in this litigation. DBSI represents

that its search for relevant documents is complete and that it withholds 84 documents that it shared

with the Investors under the common interest privilege.[4] To date, the Investors collectively have located at least 64 relevant documents that they are withholding or redacting on common interest grounds. Ex. 1 at 1 (stating that the numbers of documents withheld or redacted under common interest privilege are "Centerbridge: 54; Solus: 4; [and] Farallon: 6"). The Funds believe that the Investors likely possess additional relevant documents exchanged with DBSI that have not yet been collected. *See id.* (noting that certain Investors are still undertaking searches for responsive documents).

Following a pre-motion conference, the Court directed the Funds to file this motion to compel DBSI and the Investors to produce those documents. Ex. 9 at 32:23–33:3.

## LEGAL STANDARD

In a civil action, "state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501. State law governs privilege issues in diversity cases, "except where the proof is directed to an issue that is governed by federal law." *Lego v. Stratos Lightwave, Inc.*, 224 F.R.D. 576, 578 (S.D.N.Y. 2004) (cleaned up) (applying state privilege law to discovery dispute in diversity case). New York privilege law thus governs here.

New York law strongly "favor[s] liberal discovery," *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 27 N.Y.3d 616, 624 (2016), so "the burden of establishing any right to protection is on the party asserting it; the protection claimed must be narrowly construed; and its

---

[4] In Category 7 of its log of its own documents ("DBSI Log") and a separate log of its counsel Milbank LLP's documents ("Milbank Log"), DBSI withholds 62 and 76 documents, respectively, "concerning or leading up to" this litigation or the Funds' Chapter 15 petition in *In re: Kingate Global Fund, Ltd.*, No. 19-12853 (Bankr. S.D.N.Y.) (the "Chapter 15 Case"), *see* Ex. 12 at 6–7 (Mar. 11, 2022 Fourth Updated Categorical Privilege Log); Ex. 13 at 4–5 (Mar. 11, 2022 Second Updated Categorical Privilege Log Regarding Documents Collected from Milbank LLP). DBSI withholds 21 and 63 documents, respectively—84 total—under only the common interest and attorney-client privileges. *See* Ex. 14 at 1–2 (Feb. 28, 2022 email from DBSI's counsel); Ex. 15 at 2 (Mar. 11, 2022 letter from DBSI's counsel).

application must be consistent with the purposes underlying the immunity." *Spectrum Sys. Int'l Corp. v. Chem. Bank*, 78 N.Y.2d 371, 377 (1991). The proponent's burden "cannot be satisfied by counsel's conclusory assertions of privilege; rather the proponent of the privilege must set forth with competent evidence establishing the elements of the privilege." *Delta Fin. Corp. v. Morrison*, 2007 WL 2993663, at *2 (N.Y. Sup. Ct. Oct. 11, 2007); *accord City of Almaty, Kazakhstan v. Ablyazov*, 2019 WL 2865102, at *8 (S.D.N.Y. July 3, 2019) ("unsworn motion papers authored by attorneys" are insufficient to satisfy burden of establishing privilege (quotation marks and citation omitted)).

## **ARGUMENT**

## I.     **UNDER CONTROLLING NEW YORK LAW, THE COMMON INTEREST DOCTRINE IS A VERY NARROW EXCEPTION TO WAIVER OF ATTORNEY-CLIENT PRIVILEGE**

In the seminal *Ambac* case, the New York Court of Appeals explained that the common interest doctrine "is not an independent privilege but an exception to the general rule that communications shared with third parties are not privileged." 27 N.Y.3d at 625 n.1. The doctrine applies only where (1) withheld documents contain attorney-client communications; (2) those communications were shared among persons with "a common legal interest in pending or reasonably anticipated litigation"; and (3) this disclosure was "in furtherance of" the common legal interest in litigation. *See id.* at 628.

The Court of Appeals has cautioned that this doctrine "must be narrowly construed" because the attorney-client privilege "shields from disclosure pertinent information and therefore constitutes an obstacle to the truth-finding process," putting it "in obvious tension with the policy of this State favoring liberal discovery." *Id.* at 624 (cleaned up). "[A]s a matter of fairness," a party generally should not be allowed to withhold communications from its adversary under the attorney-client privilege when it has disclosed them to a third party; New York thus adheres to a

"formulation of the common interest doctrine [that] is limited to situations where the benefit and the necessity of shared communications are at their highest, and the potential for misuse is minimal." *Id.* at 624, 628.

The doctrine typically applies where "codefendants, coplaintiffs or persons who reasonably anticipate that they will become colitigants" share legal advice relevant to their legal strategies. *Id.* at 628; *see also id.* at 625 (explaining that "[t]he doctrine has its roots in criminal law" to permit "attorneys of criminal co-defendants to share confidential information about defense strategies without waiving the privilege as against third parties" (cleaned up)). It can also apply to communications between assignors and assignees of legal rights at issue in a litigation, *see Vacco v. Harrah's Operating Co.*, 2008 WL 4793719, at *2, *8–9 (N.D.N.Y. Oct. 29, 2008); between a litigant and third parties who have contractually authorized that litigant to represent them in enforcing their legal rights, *see HSH Nordbank AG N.Y. Branch v. Swerdlow*, 259 F.R.D. 64, 73 (S.D.N.Y. 2009); or between persons who face a common risk of liability arising directly from the litigation, *see Strougo v. BEA Assocs.*, 199 F.R.D. 515, 525 (S.D.N.Y. 2001).

To invoke the doctrine, the communicating entities must share an interest that is "*legal* (as opposed to business or commercial)" in nature, the interest must relate to "pending or reasonably anticipated *litigation*" (not transactional matters), and the interest must be *common* to the entities. *See Ambac*, 27 N.Y.3d at 622, 630, 632 (emphases added).

*First*, the interest must be legal, not commercial, in nature. While legal interests "may coincide or overlap with" commercial interests, *HSH Nordbank*, 259 F.R.D. at 73; *see also Schaeffler v. United States*, 806 F.3d 34, 42 (2d Cir. 2015) (applying federal law), a financial interest in litigation does not suffice, and commercial interests cannot create legal interests where there are none to begin with. *Gulf Islands Leasing, Inc. v. Bombardier Cap., Inc.*, 215 F.R.D. 466, 473

(S.D.N.Y. 2003) ("[T]he existence even of such a coordinated legal strategy is insufficient where there is only a common commercial interest and no identity of legal interests."). The communicating parties' subjective beliefs that they share a common legal interest or that their communications should be protected does not matter. *See Ambac*, 27 N.Y.3d at 621, 632 (holding that Bank of America and Countrywide lacked a common legal interest in communications about a commercial matter that they believed would be confidential); *id.* at 638 (Rivera, J., dissenting) (noting that the *Ambac* majority did not uphold the communicating parties' expectation of confidentiality). This is true even if the parties entered a common interest agreement to maintain confidentiality. *Cohen v. Cohen*, 2015 WL 745712, at *4 (S.D.N.Y. Jan. 30, 2015) (holding that a written agreement between communicating parties could not "change the substance of their relationship, which [was] inherently financial and in no way within the mold of a common legal interest").

*Second*, the shared legal interest must be in a pending or reasonably anticipated litigation. *Ambac*, 27 N.Y.3d at 628. The New York Court of Appeals expressly declined to extend the doctrine to commercial matters or other common problems, in part because "[t]he difficulty of defining 'common legal interests' outside the context of litigation could result in the loss of evidence of a wide range of communications between parties who assert common legal interests but who really have only nonlegal or exclusively business interests to protect." *Id.* at 629.

*Third*, "[t]he legal interest that [the communicating] parties have in common must be identical (or nearly identical), as opposed to merely similar." *Hyatt v. State of Cal. Franchise Tax Bd.*, 105 A.D.3d 186, 205 (2d Dep't 2013); *see also Strougo*, 199 F.R.D. at 520 (common legal interest must "be identical, not similar" (quotation marks and citation omitted)). That is, the communicating entities must share legal claims or defenses that they could assert in pending or anticipated litigation. *See Cohen*, 2015 WL 745712, at *4 (under New York law, nonparty could not "possibly

11

share any legal interest with Plaintiff sufficient to invoke the common interest doctrine" where there was "no suggestion that she ha[d] any legal claim against Defendants whatsoever").

Under this doctrine, downstream purchasers do not have common legal interests in their counterparties' upstream contracts. That is, if A agrees to sell an asset to B, and B agrees to sell that asset to C, B's agreement with C does not give C a legal interest in A's contract with B. *Gulf Islands*, 215 F.R.D. at 470–74 (concluding, under New York law, that "even if there were some common interests" between parties to upstream contract and parties to downstream contract, "these interests were not 'identical'"). At best, C has a financial interest that B acquire the asset from A. *Id.*

## II. DBSI AND THE INVESTORS DO NOT SHARE A COMMON LEGAL INTEREST IN THE CONFIRMATION LETTER, ONLY A FINANCIAL INTEREST IN SEPARATE DOWNSTREAM CONTRACTS

DBSI and the Investors cannot meet their burden of showing a common legal interest in litigation over the Confirmation Letter. The Investors are not parties to the Confirmation Letter, are not third-party beneficiaries of it, and have not been assigned DBSI's rights under it; the Investors are not mentioned in the Confirmation Letter at all. Ex. 2 (Aug. 24, 2011 Confirmation Letter). The Investors' downstream Participation Agreements with DBSI do not give them any legal rights in the upstream Confirmation Letter between DBSI and the Funds; they address only participation interests in a PSA that DBSI and the Funds never signed. Ex. 3 at -257 (Barclays Participation Agreement); *see also id.* at -258 (making DBSI's sale of its participation interests to the Investors "subject to" DBSI acquiring the Claims from the Funds).

Even if the Confirmation Letter were a binding, valid contract for the Funds to sell their Claims to DBSI (it is not), DBSI did not transfer its interests in those claims to the Investors in the downstream Participation Agreements. At best, DBSI agreed to transfer those interests *in the future* (when DBSI and the Funds sign the PSAs) *via a different contract* (a Participation of Claim

Agreement) that DBSI and the Investors would sign *if and when* DBSI signed a PSA with the Funds. *Id.* A contingent agreement to transfer assets later under a separate contract does not give the Investors a legal interest in those assets now.

This case is materially similar to *Gulf Islands*, where the district court rejected a downstream lender's attempt to withhold communications with an upstream manufacturer. 215 F.R.D. at 472. There, nonparty Bombardier Aerospace Corp. ("Aerospace") sold an interest in an airplane to Gulf Islands Leasing, Inc. ("Gulf"), which then pledged its interest in the airplane to Bombardier Capital, Inc. ("Capital") as security for a loan. *Gulf Islands*, 215 F.R.D. at 467–68. Capital and Aerospace were subsidiaries of the same parent corporation. *Id.* at 473. When Gulf and Aerospace sued each other for breach of contract, Capital wanted the case resolved without Gulf defaulting on its upstream purchase agreement with Aerospace, so that Gulf would keep paying Capital under its downstream loan agreement. *Id.* at 468, 472. Applying New York law, the court held that Aerospace and Capital lacked a common legal interest in that litigation because Capital's "ultimate interest in the dispute was merely a desire to ensure that the sums owed by Gulf to [Capital] under its own [separate] agreements were paid." *Id.* at 472. "A concern to ensure the payment of money is commercial in nature and does not qualify for protection under the common interest rule," even if payment is contingent on the outcome of a litigation. *Id.* at 472–73 (finding that "even if there were some common interests" between Aerospace, as party to upstream contract, and Capital, as party to downstream contract, "these interests were not 'identical'").

Here, similarly, there is an upstream agreement between the Funds and DBSI—the Confirmation Letter—and downstream agreements between DBSI and its Investors—the Participation Agreements. DBSI has sued to enforce the Confirmation Letter against the Funds, and the Investors want DBSI to win its suit so it can acquire the Customer Claims and then sell them to the

Investors for a commission, in which case the Investors reap a huge windfall. The Investors do not have a legal interest—a desire to obtain interests in the Claims under the Participation Agreements is a purely commercial interest that, even if contingent on the outcome of this case, does not qualify for the common interest doctrine. While DBSI and the Investors assert that the Investors' downstream interests are "derivative" of the Confirmation Letter, Ex. 9 at 19:12–16, 20:1–3, that is not enough under New York law. *Gulf Islands*, 215 F.R.D. at 471 ("The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial" (quoting *N. River Ins. Co. v. Columbia Cas. Co.*, 1995 WL 5792, at *3 (S.D.N.Y. Jan. 5, 1995))).

Because DBSI and the Investors cannot show a common legal interest in the Confirmation Letter, they cannot show a common legal interest in the 2011 Litigation or in this case, both of which center on the meaning and enforceability of the Confirmation Letter. Even if they could, they still could not show a common legal interest in the Funds' Chapter 15 petition: The Investors are not Fund creditors or claimants of the Funds' estates, they did not object to the petition, and DBSI's objections do not mention the Investors.

DBSI and the Investors' arguments to the contrary find no support in the caselaw they cite. They cite *GMA Accessories, Inc. v. HMY Jewelry, Inc.* (Ex. 16 at 1 (Sept. 9, 2021 letter from Investors' counsel)), in which nonparty customers shared a common interest with defendant where plaintiff "threatened litigation against all [the] entities" for copyright infringement and defendant "agreed to indemnify the [c]ustomers against potential legal claims." 2021 WL 1885260, at *2 (S.D.N.Y. May 11, 2021)—but DBSI and the Investors are not co-parties in actual or anticipated litigation involving the Funds. They cite *Strougo* (ECF No. 117 at 3), in which nonparty directors had "a common interest with the defendant BEA directors in responding to plaintiff's allegations that the [nonparty] directors were not independent," 199 F.R.D. at 525—but the Investors face no

risk of liability in this or any other litigation between DBSI and the Funds, nor any finding of fact that could harm their other legal interests. They cite *Vacco* (Ex. 16 at 2), in which a Native American tribe was found to share a common legal interest with the litigation trust to which the tribe had assigned the ability to enforce its legal rights, 2008 WL 4793719, at *8–9— but DBSI did not bring this litigation as assignee of the Investors' rights; the Investors do not have any legal rights against the Funds; and DBSI does not purport to sue the Funds on the Investors' behalf, *cf.* ECF No. 117 at 2 (citing *HSH Nordbank*, 259 F.R.D. at 68, 72–73 (plaintiff lender and nonparty co-lenders shared common legal interest in enforcing loan where "terms of the Loan itself" identified plaintiff "as the only party capable of enforcing or exercising any of the rights or remedies of or under any of the Loan Documents" (cleaned up)); *Homeward Residential, Inc. v. Sand Canyon Corp.*, 2017 WL 4676806, at *10 (S.D.N.Y. Oct. 17, 2017) (trust's loan servicer shared common legal interest with trust's certificateholders where trust contracts required servicer to "enforce re-purchase obligations for the benefit of certificateholders"); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 2003 WL 21983801, at *1 (S.D.N.Y. Aug. 20, 2003) (baseball clubs shared common legal interest with entity that they created and contractually empowered to enforce their intellectual property rights)).

Nor can DBSI and the Investors support their privilege claims with cases based on federal privilege law. New York law governs here. *See* Fed. R. Evid. 501; *Lego*, 224 F.R.D. at 578. In *Ambac*, the New York Court of Appeals specifically rejected invitations to extend New York's common interest doctrine to match the broader federal version. *See Ambac*, 27 N.Y.3d at 631–32 (declining to follow federal courts of appeal that have extended the doctrine to "communications in furtherance of any common legal interest" and instead "maintain[ing] the narrow construction that New York courts have traditionally applied"). It thus does DBSI no good to cite cases like

*Schaeffler v. United States* or *Empire Bank v. Dumond*, decided under a federal law doctrine that requires simply a "common interest," *Empire Bank*, 2014 WL 12910485, at *2–4 (N.D. Okla. May 14, 2014), or "a 'common legal enterprise,'" *Schaeffler*, 806 F.3d at 40, "whether or not litigation is ongoing," *id.* at 42.[5] The relevant New York standard requires a common legal interest in actual or anticipated litigation, and DBSI and the Investors have none.

DBSI and the Investors' attempt to invoke the common interest doctrine is also squarely contrary to the policies underlying that doctrine. In *Ambac*, the New York Court of Appeals stressed that the doctrine applies only "to situations where the benefit and the necessity of shared communications are at their highest, and the potential for misuse is minimal." 27 N.Y.3d at 628. It warned against expanding the doctrine at the cost of the "loss of evidence of a wide range of communications between parties who assert common legal interests but who really have only non-legal or exclusively business interests to protect." *Id.* at 629. DBSI did not need to share its privileged legal advice with the Investors to litigate the meaning of the Confirmation Letter with the Funds in the 2011 Litigation or now, or to file its objections to the Funds' Chapter 15 petition. This Court should not impede the Funds' discovery of vital evidence to protect DBSI's commercial interests in reselling the Claims to its Investors.

---

[5] These cases are also readily distinguishable on their facts. In *Schaeffler*, the appellant contractually gave a consortium of banks a right of refusal over his dealings with the IRS, including litigation; this was part of an "ongoing common enterprise" that created a common legal interest in his litigation with the IRS. 806 F.3d at 42. Here, the Investors have no legal rights to control DBSI's litigation with the Funds. *See* Ex. 3. In *Empire Bank*, a plaintiff bank had a common interest with other banks to which it had already transferred interests in the loan contract at issue in the litigation. 2014 WL 12910485, at *1 (plaintiff's predecessor "s[old] each bank an interest in the … loan"). Here, DBSI has not transferred any interests to the Investors; at best, it has contracted to do so at some point in the future in a different contract. *See* Ex. 3.

## <u>CONCLUSION</u>

Defendants respectfully request the Court compel DBSI and the Investors to produce all

documents that they withhold solely on the basis of the common interest doctrine.


Dated:   New York, NY                          Respectfully submitted,
         April 27, 2022
                                               SELENDY GAY ELSBERG PLLC


                              By:      /s/   *Andrew R. Dunlap*
                                       Andrew R. Dunlap
                                       Amy K. Nemetz
                                       Ronald J. Krock
                                       SELENDY GAY ELSBERG PLLC
                                       1290 Avenue of the Americas
                                       New York, NY  10104
                                       Tel: 212-390-9000
                                       adunlap@selendygay.com
                                       anemetz@selendygay.com
                                       rkrock@selendygay.com


                                        /s/   *Hugh M. McDonald*
                                       Hugh M. McDonald
                                       PILLSBURY WINTHROP SHAW PITTMAN LLP
                                       31 West 52nd Street
                                       New York, NY 10019
                                       Tel: 212-858-1000
                                       hugh.mcdonald@pillsburylaw.com