UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEUTSCHE BANK SECURITIES INC.,

                                    Plaintiff,

                 - against -

KINGATE GLOBAL FUND LTD. and KINGATE
EURO FUND LTD.,

                                    Defendants.

**OPINION AND ORDER**
19 Civ. 10823 (ER)

Ramos, D.J.:

        Deutsche Bank Securities Inc. ("DBSI") brings this action against Kingate Global Fund

Ltd. and Kingate Euro Fund Ltd. (the "Funds") to recover damages resulting from the Funds'

purported breach of contract to sell DBSI claims against the estate of Bernard L. Madoff

Investment Securities LLC ("BLMIS" or the "Madoff Estate").  Pending before the Court are

two motions:  (1) DBSI's motion to compel the Funds to produce an itemized log of the relevant

filings they made in their liquidation proceedings before the Commercial Division of the Eastern

Caribbean Supreme Court in the High Court of Justice, Virgin Islands (the "BVI Court"); and (2)

the Funds' motion to compel DBSI, and downstream investors in the relevant claims, to produce

documents withheld under the common interest privilege.  For the reasons set out below, DBSI's

motion is GRANTED in part and DENIED in part, and the Funds' motion is GRANTED.

## I.    Factual Background and Procedural History[1]

### a)  General Background

---

[1] Unless otherwise noted, citations to "¶ _" refer to the Complaint, Doc. 7.

In the years leading up to December 2008, when Bernard Madoff first publicly confessed that BLMIS was a massive Ponzi scheme, the Funds invested nearly all their investors' capital into BLMIS accounts (approximately $1.6 billion).  ¶¶ 11, 15.  After Madoff's confession, BLMIS entered into a liquidation proceeding in the U.S. Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (the "Bankruptcy Case"), and the Funds entered into liquidation proceedings in the BVI Court.  ¶ 15; *see Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC v. Kingate Global Fund, Ltd. et al.*, Adv. Pro. No. 09-1161 (BRL) (Bankr. S.D.N.Y.).  The BVI Court appointed joint liquidators to administer the Funds' assets (the "Joint Liquidators").  *See* Doc. 78-1; Doc. 78-2; Doc. 76 at 4. The Joint Liquidators are officers of the court whose principal duties are to:  (1) "take possession of, protect and realise the assets of the company;" (2) "distribute the assets or the proceeds of realisation in accordance with [Section 184(a) of the Insolvency Act 2003;]" and (3) distribute surplus assets that may remain.  *See* Doc. 54-1 at 5.

On April 17, 2009, the trustee for BLMIS liquidation (the "Madoff Trustee") commenced an adversary proceeding (the "Trustee Adversary Proceeding") in the Bankruptcy Court against the Funds, alleging that the Funds' former principals received millions of dollars in fees while aware of BLMIS's fraudulent activities.  ¶ 13.  Also in the Trustee Adversary Proceeding, the Funds each brought two sets of counterclaims against BLMIS:  (1) customer claims against assets recovered by the Madoff Trustee; and (2) remission claims against any forfeiture fund, including the U.S. Department of Justice's Madoff Victim Fund (together, the "Claims").  ¶ 14.

In or about April 2011, the Funds, allegedly lacking cash to settle the Madoff Trustee dispute, *see* Doc. 123 at 4, solicited bids to purchase the Claims.  *See* ¶ 16.  DBSI participated in the bidding, and its May 25, 2011 bid letter specified "that as a condition precedent to any

transaction, any settlement agreement with the Madoff Trustee would need to provide that the Claims would be treated for all purposes as Allowed." ¶ 17.[2]  The Funds ultimately selected DBSI's bid, and on August 24, 2011, the parties executed a final agreement (the "Confirmation Letter"), which obliged the Funds to sell DBSI its Claims at a purchase rate of 66% of the value of the Claims once the Claims became allowed, and subject to the parties' "negotiat[ing] in good faith" and executing a "reasonably and mutually agreed [upon]" Purchase and Sale Agreement ("PSA").  Doc. 7-1; *see* ¶¶ 17–27.  At the same time that it signed the Confirmation Letter, DBSI entered into agreements with downstream investors (the "Participants"), promising to sell them "participation interest[s]" in the PSA (the "Participation Agreements").  *See, e.g.*, Doc. 125-3 (Barclays Participation Agreement); *see also* Doc. 116-1 ¶ 4.  These Participation Agreements did not transfer DBSI's rights under the Confirmation Letter to the Participants.  Doc. 123 at 5.  Rather, the agreements were subject to DBSI's successful purchase of the Claims.  *Id.*

On December 21, 2011, the Funds brought an action in this District to compel DBSI to complete the transaction and execute a final PSA (the "2011 Action").  *See Kingate Global Funds Ltd. v. Deutsche Bank Secs. Inc.*, No. 11 Civ. 9364 (DAB) (S.D.N.Y. Dec. 21, 2011).  DBSI counterclaimed for declaratory judgment that the Confirmation Letter "standing alone, does not bind DBSI to purchase the claims."  *See* 2011 Litigation Doc. 9 ¶ 17.  Ultimately, the parties agreed to dismiss the 2011 Litigation without prejudice in January 2014, and the PSA was not executed.  *See* 2011 Litigation Doc. 18.

---

[2] The bid letter and subsequent Agreement both define "allowed" as: a "valid, enforceable, liquidated, non-contingent, undisputed, unavoidable, and unsubordinated claim that is not subject to any actual or potential avoidance, reduction, set-off, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise, and whether pursuant to Section 510(c) of the United States Bankruptcy Code or otherwise), counterclaim, cross-claim, defenses, disallowance (whether under sections 502(b), (d), or (e) of the United States Bankruptcy Code or otherwise), impairment, objection, or any other challenges under any applicable law, whether foreign or domestic." ¶¶ 17, 20, 21.

Approximately 5½ years later, the Funds entered into a settlement agreement with the Madoff Trustee, and the Claims became allowed (the "Settlement Agreement"). ¶ 70. On August 6, 2019, the Bankruptcy Court approved the Settlement Agreement; the BVI Court subsequently approved it, as well. ¶ 71. The Funds then argued that the Confirmation Letter with DBSI was non-binding and rejected DBSI's offer to participate in mediation. ¶ 76. DBSI filed the instant action to enforce the Confirmation Letter on November 21, 2019, asserting breach of contract, breach of the implied covenant of good faith and fair dealing, and seeking declaratory judgement that the Confirmation Letter is binding. ¶¶ 78–105. Certain of the participants who purchased interests in the PSA are paying for DBSI's legal fees. *See* Doc. 116-1 ¶ 19 ("DBSI also negotiated and entered into a Common Interest, Reimbursement, and Indemnification Agreement with the five remaining Participants in 2019."). The parties are now engaging in discovery.

### b)  The First Discovery Dispute:  the BVI Filings

On June 4, 2021, DBSI served its first document request on the Funds. Doc. 71-1. DBSI's fourth request ("Request No. 4") sought "[a]ll filings the Kingate Funds have made with the BVI Court regarding the Claims" (together, the "BVI Filings"). *Id.* at 12.[3] On July 14, 2021, the Funds responded, refusing to produce any of the documents called for by Request No. 4 because they "were submitted to the BVI Court under seal, are privileged, or are attorney work-product." Doc. 71-2 at 7. On July 30, 2021, DBSI responded that the Funds cannot withhold the

---

[3] More specifically, Request No. 4 encompasses:  "(a) All filings relating to the Claims; (b) All filings relating to the Kingate Funds' decision to sell the Claims; (c) All filings relating to the [Confirmation Letter]; (d) All filings relating to the commencement of the 2011 Action; (e) All filings relating to the dismissal of the 2011 Action; (f) All filings relating to the Kingate Funds' efforts to enter into a final settlement agreement with the [Madoff] Trustee that was dependent only on funding from DBSI; (g) All filings relating to the Chapter 15 Petition; (h) All Documents and Communications reflecting the amounts of any distributions received by the Kingate Funds from BLMIS on account of the Claims; and (i) All Documents and Communications reflecting amounts expected to be recovered on account of the Claims."  *Id.* at 12–13.

BVI Filings without first identifying them in an itemized privilege log with a date and description of each document.  Doc. 71-3 at 2–3.  DBSI also asked that the Funds explain the legal basis for the BVI Court's sealing orders (the "Sealing Orders") and why such orders would override their domestic discovery obligations.  *Id.* at 3.

On September 7, 2021, the Funds again objected to DBSI's request because:  (1) "[FRCP 34] only requires a party to produce documents that exist at the time of the request," and "[t]here is no existing summary of all [the d]ocuments in response" to DBSI's request; (2) it would be unduly burdensome to review and summarize the approximately 200 filings; and (3) the filings "would not be discoverable . . . in U.S. litigation" because the "BVI Court issued multiple sealing orders forbidding the Joint Liquidators from disclosing any materials filed under seal."  Doc. 71-4 at 2–3.  In a subsequent letter dated October 19, 2021, the Funds further explained that the BVI Filings generally consist of three categories of documents:  "(1) documents in applications by liquidators for directions; (2) documents in administrative applications (e.g., for appointment or removal of liquidators, or approval of fees); and (3) reports to the court, either in the context of such applications or otherwise."  Doc. 71-6 at 2.  "Many of those filings are irrelevant," the Funds alleged "as they do not discuss the subjects of this litigation, and those that do *likely* are privileged."  *Id* (emphasis added).  The Funds further stated that they would have already produced copies of "any relevant, non-privileged documents that existed before they were attached to filings with the BVI Court . . . in the normal course of responding to DBSI's other document requests."  *Id.* at 2 n.2.  The Funds also noted that the BVI Court's Sealing Orders are themselves sealed and cannot be disclosed.  *Id.* at 2.

On October 29, 2021, DBSI requested a pre-motion conference on its anticipated motion to compel the Funds to produce an itemized privilege log of the BVI Filings responsive to

Request No. 4.  *See generally* Doc. 53.  As indicated in its letter, DBSI intended Request No. 4 to encompass any relevant non-privileged documents and communications in the possession of Mourant Ozannes ("Mourant"), the Funds' law firm in the BVI liquidation proceedings (the "Mourant Communications").  *Id.* at 3 ("The parties have agreed to collect and review documents and communications from the parties' other outside counsel … [and t]here is no justification for excluding Mourant from that agreement.  Indeed, Mourant is an obvious source of the information sought [in Request No. 4.]").  The Funds opposed DBSI's request on November 3, 2021, contending that the "the relevant material in the filings is overwhelmingly likely to be privileged" and again referencing the sealed Sealing Orders.  *See* Doc. 54 at 1–3. The Funds also noted that "DBSI has no basis to request documents from Mourant" for three reasons:  (1) Mourant was not involved in negotiating the Funds' decision to enter the Confirmation Letter; (2) Mourant always copies the Liquidators on such communications, and the Funds are producing such communications from their own files; and (3) the parties agreed to produce documents from other outside counsel—but only from firms likely to have unique, relevant, non-privileged material, which Mourant does not have.  Doc. 54 at 3.

At the November 5, 2021 pre-motion conference, DBSI argued that the Funds must produce an itemized privilege log of the relevant BVI filings pursuant to Federal Rule of Civil Procedure 26(b)(5), *see* Doc. 62, Transcript of Pre-motion Conference, at 26:5–22, so that DBSI could "assess what privilege [the Funds] assert[] with respect to [the] documents," *id.* at 27:17–19.[4]  The Funds asserted that DBSI's motion, if granted, would unduly burden the Funds with "having to choose between defying an order from [this Court] . . . and defying an existing order

---

[4] During the conference, DBSI specifically stated:  "[W]e've been asking to understand what was filed with the BVI Court, and we would submit that we would want more than a categorical log here." Doc. 62 at 27:20–22.

from the B.V.I. court." *Id.* at 28:4–14.[5]  To avoid that scenario, the Funds proposed that DBSI

should, itself, petition the BVI Court to unseal the BVI Filings.  *Id.* at 31:12–19.[6,7]  The Funds

also explained that in the BVI Court, two types of information are categorically privileged:  (1)

information submitted to the court in a sealed proceeding "that reflects existing attorney-client or

work-product privileges or the BVI equivalence thereof" ("Litigation Privilege"); and (2) reports

from a liquidator to the BVI Court "about the substance of a litigation that [the liquidator] is

pursuing or defending on behalf of the estate," "the BVI equivalent of attorney work product"

("Legal Advice Privilege"), *id.* at 29:14–30:3.[8]  Ultimately, the Court granted DBSI leave to file

its motion to compel.  *Id.* at 34:2–5.

On December 17, 2021, the Funds provided DBSI a categorical log of privileged BVI

Filings (the "Log").  The Log includes a "category description" (the "Category Description") of

67 documents, a date range of December 15, 2011 through November 20, 2019, the bases for

privilege (i.e. Litigation Privilege and/or Legal Advice Privilege), and the names of the 18

---

[5] At the conference, DBSI again indicated that its request to produce non-privileged documents and a log of privileged external communications possessed by Mourant falls within the contours of Request No. 4.  *See* Doc. 62 at 34:10–12. (The Mourant request "is subsumed within the request for information concerning the filings with the B.V.I. court[.]").

[6] The Funds indicated, however, that they would *oppose* such an application.  *See id.* at 31:24–32:14 ("[T]he funds act through the liquidators or liquidators act on behalf of the funds.  So I believe the [F]unds would oppose [DBSI asking the BVI Court to unseal the documents in the interests of justice.]")

[7] In the opinion of one of the Funds' BVI experts, David Chivers QC, "[a] sealing order of the BVI court recognises the confidentiality of the documents placed under seal.  It is not open to the liquidator to waive that confidentiality by disclosing the documents to third parties.  Instead, the liquidator requires the court's prior permission authorising disclosure.  Otherwise, the liquidator risks placing himself in civil and criminal contempt of the BVI court."  Doc. 54-1 ¶ 9.  The BVI Court employs an exacting "interests of justice" standard in deciding whether to unsealed filings. See Doc. 62 at 31:6–8; *see also* Doc. 54-1 ¶ 69.

[8] *See* Doc. 76 at 9 (quoting Doc. 54-1 ¶ 32) (Litigation Privilege "protects confidential communications between a party or their counsel with third parties made 'for the purpose of obtaining information or advice in connection with' litigation, including communications between liquidators and the BVI Court"); *see also id.* (citing Doc. 54-1 ¶¶ 54–61) (Legal Advice privilege protects "privileged attorney-client communications or work product submitted to the BVI Court under seal.").

participants in the communications, distinguishing between attorneys (11) and non-attorneys (7). *See* Doc. 80-2.  The Category Description for each of the 67 documents reads:  "Filings with the BVI Court, including applications for direction, administrative applications, and applications for sanction, concerning the Funds' Customer Claims, their decision to sell the Customer Claims, the Confirmation Letter, their conduct of the 2011 Litigation, their settlement of the Trustee Adversary Proceeding, and their Chapter 15 Petition."  *Id*.

In their opposition to DBSI's motion to compel, the Funds supplemented the Log with additional details, including that five documents are "related to applications for direction," 40 are "related to administrative applications," and 22 are related to "applications for direction."[9]  *See* Doc. 76 at 8.  The Funds moreover advised that "[a]pplications for direction generally concern third-party adversary proceedings; administrative applications generally concern the appointment or removal of liquidators or approval of professional fees; reports generally concern administrative applications or applications for direction, or provide information about the liquidation or estate."  *Id*.  The Funds' opposition also noted that each filing could include a "notice of application, skeleton arguments, case summaries, witness statements, exhibits, and a proposed order."  *Id*.[10]  The Funds further provided greater detail regarding the participants in the filings, such as that "[t]he Funds and their counsel are the primary authors of the filings, . . . the BVI Court is the recipient," and that the "Joint Liquidators generally author witness statements with the assistance of outside counsel, explaining the basis for their applications[.]"  *Id*. at 8.

---

[9] The Funds do not explain the difference between the 5 documents "related to applications for direction" and 22 documents "related to applications for direction."  *Id*.

[10] According to the Opposition, the "skeleton arguments and case summaries are [documents] drafted by counsel and submitted before any hearing . . . [that] set out what the application relates to, the order being sought, and how the facts relevant to the application apply to any legal test or analysis that the BVI Court ought to consider."  *Id*. at 8 n.4.

Nonetheless, DBSI maintains that it requires a more specific itemized privilege log so that it

may:

> (1) understand what each BVI Court filing is (*i.e.*, an application for directions, an administrative application, or a report to the court), what relevance each filing has to this litigation (*e.g.*, does it relate to the sale of the claims, the 2011 litigation, the settlement with the Madoff trustee, or the Chapter 15 petition), and what documents have been submitted to support the request for relief; (2) appropriately tailor a motion to compel certain documents that DBSI does not believe are validly subject to the seal and/or are privileged; and (3) understand what questions to ask the liquidators about the applications made to the BVI Court in depositions and at trial.

Doc. 86 at 6–7.

### c)   The Second Discovery Dispute:  The Common Interest Documents

On April 27, 2022, the Funds asked DBSI and the Participants to produce

communications with each other concerning issues relevant to the instant case and to past

litigation between the Funds and DBSI.  *See* Doc. 125-10 at Nos. 12, 15–16; 125-11 at Nos. 9–

10.  The Funds believe that such documents could contain crucial insight into how DBSI

interpreted the Confirmation Letter.  *See* Doc. 123 at 7.  To date, the Participants[11] have

collected—but have withheld or redacted on common interest grounds—at least 64 relevant

documents.  *See* Doc. 123 at 8; *see also* Doc. 125-1 ("Centerbridge: 54; Solus: 4; [and] Farallon:

6").  Since some of the Participants have not yet completed their searches for relevant materials,

the Funds believe that additional relevant documents likely exist.  *See* Doc. 123 at 8.

---

[11] The relevant Participants here are Centerbridge Partners LP ("Centerbridge"), Farallon Capital Management LLC ("Farallon"), and Solus Alternative Asset Management LP ("Solus").  *See* Doc. 123 at 1 n.1.  In their request for a pre-motion conference, *see* Doc. 105, the Funds also sought relief regarding the common interest doctrine against three other Investors:  Glendon Capital Management LP ("Glendon"), Stone Lion Capital Partners LP ("Stone Lion"), and Third Point LLC ("Third Point").  But according to the Participants' April 27, 2022 letter to the Funds, Glendon, Stone Lion, and Third Point are not currently withholding any documents under the common interest doctrine.  *See* Doc. 125-1.

Additionally, DBSI is withholding 84 documents that it shared with the Participants under common interest privilege.  *Id.* at 7–8, n.4; *see also* Doc. 125-14, Feb. 28, 2022 email from DBSI's counsel, at 1–2; Doc. 125-15, Mar. 11, 2022 letter from DBSI's counsel, at 2.

## II.   DISCUSSION

### a.   The BVI Filings

With respect to the withheld BVI Filings, the Court must address three questions:  (1) whether the Categorical Log satisfies the Funds' discovery obligations under FRCP 26(b)(5) with respect to the privileged BVI Filings; (2) whether the Funds must produce a list of the non-privileged BVI Filings; and (3) whether the Funds must produce the Mourant Communications.

#### i.   The Legal Standard

Federal Rule of Civil Procedure ("FRCP") 26 provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ."  Fed. R. Civ. P. 26(b)(1).  Discoverability is determined by the broad standard of relevance.  *See Gucci Am., Inc. v. Guess ?, Inc.*, 790 F. Supp. 2d 136, 140 (S.D.N.Y. 2011).  The relevance standard "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).  The scope of FRCP 26(b), however, is not unlimited; FRCP 26 has been amended to strike "the proper balance between the need for evidence, and the avoidance of undue burden and expense."  *Kaye v. New York City Health & Hosps. Corp.*, No. 18 Civ. 12137 (JPC) (JLC), 2020 WL 7237901, at *4 (S.D.N.Y. Dec. 9, 2020) (internal citation and quotation marks omitted).

"The party seeking discovery bears the burden of initially showing relevance, and as such, he or she must make a *prima facie* showing that the discovery sought is more than merely a

fishing expedition." *Id.* at *4 (internal citations and quotation marks omitted). "The party

resisting discovery bears the burden of showing why discovery should be denied." *Cole v.*

*Towers Perrin Forster & Crosby*, 256 F.R.D. 79, 80 (D. Conn. 2009) (citation omitted).

"General and conclusory objections as to relevance, overbreadth, or burden are insufficient to

exclude discovery of requested information." *Melendez v. Greiner*, No. 01 Civ. 7888 (SAS)

(DF), 2003 WL 22434101, at *1 (S.D.N.Y. Oct. 23, 2003). Instead, the resisting party must

show "specifically how, despite the broad and liberal construction afforded the

federal discovery rules, each interrogatory is not relevant or how each question is overly broad,

burdensome or oppressive[.]" *Fort Worth Employees' Retirement Fund v. JP. Morgan Chase &*

*Co.*, 297 F.R.D. 99, 102–03 (S.D.N.Y. 2013) (internal citation and quotation marks omitted).

Federal district courts have broad discretion in deciding motions to compel. *See Grand Cent.*

*P'ship, Inc. v. Cuomo*, 166 F.3d 473, 488 (2d Cir. 1999).

### ii.  The Categorical Privilege Log

FRCP 26(b)(5) provides that "[w]hen a party withholds information otherwise

discoverable by claiming that the information is privileged . . . the party must:  (i) expressly

make the claim; and (ii) describe the nature of the documents, communications, or tangible

things not produced or disclosed—and do so in a manner that, without revealing information

itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P.

26(b)(5)(A). "This language requires the party asserting a privilege, at a minimum, to claim the

privilege and briefly describe the information withheld." Moore's Federal Practice – Civil §

26.90. "[T]he purpose of a privilege log is to enable the opposing party and the Court to test the

asserted privilege." *Davis v. City of New York*, No. 10 Civ. 0699 (SAS), 2011 WL 1742748, at

*4 (S.D.N.Y. May 5, 2011). A privilege log is thus an "essential tool which allows the parties

and the court to make an intelligent decision as to whether a privilege or immunity exists."

*Breon v. Coca-Cola Bottling Co.*, 232 F.R.D. 49, 55 (D. Conn. 2005); *see also JDS*

*Therapeutics, LLC v. CVS Pharmacy, Inc.*, No. 15 Civ. 4365 (JSR), 2015 WL 6459092, at *2

(S.D.N.Y. Oct. 22, 2015) (describing the FRCP 26(b)(5) as "in no way optional.").

> Relevant here, Local Rule 26.2(c) (the "Local Rule") provides:
>
> Efficient means of providing information regarding claims of privilege are
> encouraged, and parties are encouraged to agree upon measures that further this
> end.  For example, when asserting privilege on the same basis with respect to
> multiple documents, it is presumptively proper to provide the information
> required by this rule by group or category.

This Local Rule therefore "permits the parties to agree . . . to exchange categorical privilege logs,

which group like documents into categories, instead of listing each document individually.").[12]

*U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, 18 Civ. 4044 (BCM), 2021 WL 1968325, at

*4 (S.D.N.Y. Mar. 31, 2021).  However, "[F.R.C.P.] Rule 26 applies with the same force to a

categorical log as it does to a traditional log that lists each document individually," *Auto Club of*

*N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, 297 F.R.D. 55, 59 (S.D.N.Y. 2013), and "the party

asserting attorney-client privilege or work product protection [still] bears the burden of

establishing the privilege's essential elements," *Aviles v. S&P Global, Inc.*, No. 17 Civ. 2987

(JPO) (KHP), 2022 WL 336951, at *2 (S.D.N.Y. Feb. 4, 2022) (internal quotation marks

---

[12] Courts in this district have not squarely resolved the question of whether Local Rule 26.2 *requires* parties to agree
to use categorical logs.  With respect to the BVI Filings, the parties have not agreed.  On its face, Rule 26.2 does not
require consent; it simply "*encourage[s]*" parties to agree to discovery terms that would promote efficiency.  Local
Rule Civ. R. 26.2(c) (emphasis added).  Consistently, the Local Rule also stipulates that "a party receiving a
privilege log that groups documents or otherwise departs from a document-by-document or communication-by-
communication listing may not object solely on that basis, but may object if the substantive information required by
this rule has not been provided in a comprehensible form."  Local Civ. R. 26.2(c).  The Rule thereby allows for the
possibility that a requesting party may receive a categorical log without first knowing that the withholding party
intended to depart from the standard document-by-document format.  *Accord S.E.C. v. Thrasher*, No. 92 Civ. 6987
(JFK), 1996 WL 125661, at *1 (S.D.N.Y. Mar. 20, 1996) (Even where parties have not consented to use of a
categorical log, "courts retain some discretion to permit less detailed disclosure [than a document-by-document
privilege log] in appropriate cases.").

omitted).  The essential elements include the privilege bases for withholding a category of

documents, as well as document:  (1) type; (2) general subject matter; (3) date; (4) author; and

(5) address.  Local Civ. R. 26.2(a)(2)(A).  Courts in this district have deemed categorical

privilege logs adequate if they contain the essential elements and "provide[] information about

the nature of the withheld documents sufficient to enable the receiving party to make an

intelligent determination about the validity of the assertion of the privilege."  *See In re Aenergy,*

*S.A.*, 451 F. Supp. 3d 319, 325–26 (S.D.N.Y. 2020) (quoting *Auto Club of N.Y., Inc.*, 297 F.R.D.

at 59).

 Courts have also held that the requesting party must articulate the need for *why* it

requires a document-by-document log in lieu of a categorical log.  *See GenOn Mid-Atlantic, LLC*

*v. Stone & Webster, Inc.*, No. 11 Civ. 1299 (HB) (FM), 2011 WL 5439046, at *11 (S.D.N.Y.

Nov. 10, 2011) (denying request for an itemized log where "it [was] not apparent what material

benefit [the movant] would derive if [the withholding party] were required to identify each

document"); *see also S.E.C. v. Thrasher*, No. 92 Civ. 6987 (JFK), 1996 WL 125661, at *2

(S.D.N.Y. Mar 20, 1996) (holding that compelling production of a document-by-document

privilege log is not justified "in the absence of any articulated showing of need").

 Lastly, courts should consider whether a categorical log is appropriate in the case before

the court.  *Auto Club of N.Y.*, 297 F.R.D. at 60.  Although Rule 26 "arguably permits categorical

logs in any cases, the rule should be read in light of its purpose, which is to reduce the burden of

individually identifying a large volume of documents."  *Id.*; *see also Assured Guar. Mun. Corp.*

*v. UBS Real Estate Sec. Inc.*, No. 12 Civ. 1579 (HB) (JCF), 2013 WL 1195545, at *9 (S.D.N.Y.

Mar. 25, 2013) ("[C]ourts in this district have endorsed a categorical approach in providing a

privilege log to reduce [burden and expense.]"); *see also* Committee Note to Local Civil Rule

26.2 ("With the advent of electronic discovery and the proliferation of e-mails and e-mail chains, traditional document-by-document privilege logs may be extremely expensive to prepare, and not really informative to opposing counsel and the Court.").  Courts should therefore consider proportionality.

To determine whether the Funds' Log meets the standards imposed by F.R.C.P. 26, the Local Rule, and caselaw applying them, the Court must assess:  (1) whether the Log provides DBSI with sufficient information to challenge the Funds' privilege claims, (2) whether the Funds articulate need for an itemized log; and (3) whether use of a categorical log is appropriate in light of Local Rule 26.2(c)'s underlying policy.

### A) Sufficiency of the Information

The parties dispute whether the Funds have provided DBSI enough information "to make an intelligent determination about the validity of the assertion of the privilege."  *Rekor Sys., Inc. v. Suzanne Loughlin*, No. 19 Civ. 07767 (LJL), 2021 WL 5450366, at *1 (S.D.N.Y. Nov. 22, 2021).  DBSI asserts that it has "no insight into what the Funds filed and can only guess at the subject matter of each filing," Doc. 86 at 3, and that courts "have ordered itemized privilege logs where categorical logs[, like the one here,] contain 'vague' and 'generic' descriptions that do 'little or nothing to assist the reader in determining whether the underlying documents are … privileged."  *Id.* at 4 (citing *Triaxx*, 2021 WL 1968325, at * 4–5).  In response, the Funds argue that the information provided "exceeds what a typical categorical log would provide, and easily satisfy[ies] the requirement of information sufficient to enable DBSI to assess the Funds' privilege claim."  *See* Doc. 76 at 9.  As explained below, the Court concludes that the Funds have not provided DBSI adequate information about the BVI Filings.

The Funds mistakenly analogize the instant dispute to the one in *Rekor Sys., Inc. v. Suzanne Loughlin*, 1:19-CV-07767, (S.D.N.Y. Nov. 22, 2021), wherein the court denied a motion to compel an itemized privilege log because the categorical log already provided the movant enough information to determine the validity of the non-movant's privilege claims. *See id*. at \*1. The categorical log in *Rekor* contained 30 categories of documents, and each category contained documents spanning time frames of up to four years. *See generally Rekor Sys.* Doc. 180-1. Each of the 30 categories had a general subject matter description. *Id.* And each category included anywhere between 1 and 427 documents (approximately 89 documents per category on average).[13]  *Id.* The court, moreover, held that the log "appear[ed] to identify third parties in] sufficient detail in order for Defendants to make a privilege challenge." *Rekor Sys.*, 2021 WL 5450366, at \*2.

There are material differences between the *Rekor* log and the Funds' log. The document groupings and category descriptions in the *Rekor* log, for example, were generally more specific than those in the Funds' log.  A sample category description in the *Rekor* log reads:  "[282 d]ocuments regarding Rekor's or Firestorms counsel's efforts to review, analyze, evaluate comment upon, edit, and/or draft materials facilitating Rekor's January 2017 acquisition of Firestorm, as well as legal advice related thereto."  Whereas that description referenced communications relating to a specific transaction, the Funds' Category Description refers to documents relating to *multiple* legal proceedings and underlying transactions.  Additionally, the category with the broadest timeframe in the *Rekor* log spanned 4 years while the BVI Filings span 9 years.

---

[13] The log encompassed 2,678 documents in total.  *Id.*

Beyond those material differences, the court in *Rekor* did not reach any determination with respect to the sufficiency of the information provided in any one category.  Indeed, the court expressly noted that its decision was without prejudice to defendants' asserting that with respect to any *specific* category of documents, that the category is defined too broadly or provides insufficient information to permit an intelligent determination as to the validity of the claim of privilege.  *Id.*  Because the *Rekor* court did not examine whether the defendants provided adequate information about any particular category, this case does not instruct this Court's assessment of sufficiency.

The Funds also cite *in re Currency Conversion Antitrust Litigation*, No. 05 Civ. 7116(WHP) (THK), 2010 WL 4365548, at *2–3 (S.D.N.Y. Nov. 3, 2010) to show that they have provided enough information about the BVI Filings.  There, the court denied a request for an itemized log for approximately 123 documents, but only after conducting *in camera* review of a random sample of documents to conclude that the logs provided the necessary information required by the Local Rule.  Critically, the Funds also draw no parallels between the logs in *Currency Conversion* and their own log.  They simply conclude that the Local Rule's requirements are met here, just as they were met there.  Doc. 76 at 11.  But that is not so.

Essentially, the Funds have provided the following information:  that over the course of 9 years, 11 lawyers and 7 non-lawyers participated in 67 communications, each of which concerns one or more of the (numerous) topics encompassed by this litigation and falls within one of three broad categories, two of which are the same.  Courts in this district have routinely found that broad category descriptions of that kind are insufficient.  In *Aenergy*, 784 F.Supp. 3d at 329, for instance, the court deemed impermissibly vague categorical logs that characterized materials as "confidential internal documents between [] employees and in-house counsel seeking or

conveying legal advice [about one or more subjects, including:] … the on-sale contracts, the Credit Facility Agreement, or the contracts." (Internal quotation marks omitted). The court, lacking "confidence that [the withholding party would] provide sufficient information regarding withheld documents to inform [its counterparty] of the basis for its privilege calls," compelled a production of a document-by-document list. *Id.* at 328. Like the descriptions in *Aenergy*, the Funds' Category Description also broadly encompasses a variety of subjects and, thus, offers too little detail. *See also Triaxx*, 2021 WL 1968325, at *3 (deeming a categorical log impermissibly vague that described the withheld communications as "reflect[ing] request for or receipt of legal advice from . . . counsel and/or . . . documents prepared in anticipation for litigation or for trial.").

The information provided by the Funds comes up short in other respects. As DBSI points out, the documents span a nine-year timeframe. This court has previously held that categorical logs with periods longer than six *months* are too long to "provide sufficient substantive information." *Aviles*, 2022 WL 336951, at *2 ("The Court finds that a date range of more than six months is generally too broad."). *Aviles* also expressly held that a categorical log should identify the corporate titles or roles of non-attorney participants since such information is not privileged. *Id.* (citing *Jessore Mmt. SA v. Brit Syndicate 2987*, 20 Civ 5849 (AT) (KNF), 2021 WL 4037849, at *14 (S.D.N.Y. Sept. 3, 2021) (finding defendants' categorical log deficient for failing to sufficiently identify individuals whose communications were protected by attorney-client privilege)). The Categorical Log omits the titles or roles of non-lawyers.

### B) Articulable Need

The Funds, moreover, argue that the Court should deny DBSI's motion because it fails to show "what material benefit [it] would derive" from an itemized log. *See* Doc. 76 at 10. Again,

the Court disagrees.  The two cases on which the Funds chiefly rely are distinguishable.  In *GenOn Mid-Atlantic, LLC*, the court found that the movant—who had previously received a categorical log—would not receive any material benefit from an itemized log because each of the documents "were redacted in the same way in each instance [and] were all created for the same purpose[.]"  2011 WL 5439046, at *11 (internal quotation marks and citation omitted).  Thus, the Court concluded that "it would be a useless . . . exercise to require [the non-movant] to include specific entries in its privilege log each time the same redacted document appear[ed] in another document."  *Id.*  Such an exercise would not be "useless" here; the Funds do not purport that the BVI Filings are anywhere near so redundant.  *Thrasher* involved similar facts, but there the movant "ma[de] *no effort* to explain what benefit it [would] gain from a detailed document-by-document log.  Indeed, it offer[ed] *no suggestion* as to why it might need the requested details[.]"  1996 WL 125661, at *1–2 (emphasis added).  Meanwhile, DBSI *has* articulated why it needs an itemized log, namely to:

> (1) understand what each BVI Court filing is (*i.e.*, an application for directions, an administrative application, or a report to the court), what relevance each filing has to this litigation (*e.g.*, does it relate to the sale of the claims, the 2011 litigation, the settlement with the Madoff trustee, or the Chapter 15 petition), and what documents have been submitted to support the request for relief; (2) appropriately tailor a motion to compel certain documents that DBSI does not believe are validly subject to the seal and/or are privileged; and (3) understand what questions to ask the liquidators about the applications made to the BVI Court in depositions and at trial.

Doc. 86 at 6–7.  DBSI also notes that an itemized log could be useful in establishing at trial that the Funds made certain submissions to the BVI Court.  *Id.* at 7 n.4.  In light of these clear statements of need, the Funds' second argument fails.

### C)  Appropriateness of a Categorical Log

Lastly, the Court must consider whether a categorical log is appropriate in light of Rule 26.2(c)'s underlying policy: "to reduce the burden of individually identifying a large volume of documents." *Auto Club of N.Y.*, 297 F.R.D. at 60. The documents that are the subject of this dispute number only 67.[14] DBSI points to a case where this Court has considered 1,359 documents too few to warrant use of a categorical log. *See Triaxx*, 2021 WL 1968325, at *3 (compelling production of itemized log of 1,359); *see also Aenergy*, 784 F. Supp. 3d at 328 (holding that preparing a document-by-document log of 1,300 documents is "[not] particularly burdensome"). While "there is a strong justification for a categorical log when thousands of documents have been withheld, there is some threshold below which the marginal utility of a categorical log is immaterial." *Auto Club of N.Y.*, 297 F.R.D. at 60. Based purely on the numbers, the burden of logging 67 documents falls comfortably below that threshold.

The Funds, however, argue that because the BVI Court's Sealing Orders prohibit them from producing an itemized log, their use of a categorical log is justified. Compelling a document-by-document log, they say, would offend international comity—an outcome that this Court should avoid. *See* Doc. 76 at 15–16 (citing *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. Of Iowa*, 482 U.S. 522, 546 (1987)). "International comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction." *In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1049 (2d Cir. 1996) (citation omitted). Arguably, such a conflict would exist between the BVI Court's sealing orders and this Court's order for the Funds to produce an itemized privilege log, *see* Doc. 76 at 16. When a conflict exists, the Second Circuit considers various factors to determine which law to apply. The factors include:

---

[14] In *Rekor*, the Court approved a categorical log for over 2,500 documents. 2021 WL 5450366, at *2.

(1) the importance to the investigation or litigation of the documents or other
information requested; (2) the degree of specificity of the request; (3) whether the
information originated in the United States; (4) the availability of alternative
means of securing the information; (5) the extent to which noncompliance with
the request would undermine important interests of the United States, or
compliance with the request would undermine the important interests of the state
where the information is located; (6) the hardship of compliance on the party or
witness from whom discovery is sought; and (7) the good faith of the party
resisting discovery.

*In re Commodity Exch, Inc., Gold Futures & Oions Trading Litig.*, No. 14-MD-2548 (VEC),

2019 WL 1988525, at *2 (S.D.N.Y. May 6, 2019) (citation omitted).  Considering those factors,

each party sets forth a variety of arguments for why the scale should tip in their respective

favor.[15]

Of particular note, here, the Funds set forth reasonable arguments for why factors 5 and 6

weigh against compelling production of an itemized log.  Violating the Sealing Orders, the Funds

say, "could subject the Joint Liquidators to criminal or civil contempt of the BVI Court, exposing

them to imprisonment, fine, and revocation of their license."  Doc. 76 at 19 (citing Doc. 54-1 ¶¶

9(1), 79; Doc. 79 ¶ 23; Doc. 78 ¶¶ 30–32).  As "an officer and representative of the BVI Court . .

. [the Joint Liquidators] cannot blatantly violate its longstanding order without penalty."  *Id.*

(citing Doc. 54-1 ¶¶ 21–23; Doc. 79 ¶ 5) (internal quotation marks omitted).  Moreover, "the

Joint Liquidators would face several other professional harms as well, including risking their

license and the devastation of their relationship of candor and trust with the BVI Court."  *Id.*

(citing Doc. 78 ¶¶ 29, 32).  The Funds ask that these potential burdens not be overlooked.

Furthermore, with respect to factor 5, the Funds assert that "[c]ompelling the Joint Liquidators to

violate those orders without input from the BVI Court could upend the BVI Court's oversight of

---

[15] For purposes of this opinion, the Court need not—and does not—decide whether the Second Circuit's balancing test weighs in favor of the Sealing Orders over granting DBSI's motion to compel.

this liquidation and future liquidations, as neither the BVI Court nor its liquidators could be sure that such proceedings would remain confidential." *Id.* at 17 (citing Doc. 78 ¶ 36).[16]

In summary, the Court on one hand recognizes:  (1) that DBSI is entitled to information about the withheld filings sufficient to allow it to evaluate the Funds' privilege assertions, and (2) that the policy underlying the Rule 26.2(c) is to make discovery easier for litigants engaged voluminous discovery.  On the other hand, the Court also acknowledges:  (1) that categorical logs are an accepted method of cataloguing withheld documents, and (2) that using categorical logs may be warranted for reasons other than to expedite document cataloguing in discovery-heavy cases (e.g. to avoid violating a foreign court's order).  To maximize the information available to DBSI, while also respecting the express purpose of Rule 26.2(c), and minimize the burden on the Funds, while also respecting international comity to the greatest possible extent, the Court directs the Funds to instruct the Joint Liquidators to apply to the BVI Court on the Funds' behalf to seek leave to produce a document-by-document index of the 67 privileged BVI Filings.[17]  The Joint Liquidators are to explain that the purpose of the log is to enable DBSI to challenge the Fund's privilege assertions.  The Funds will also direct the Joint Liquidators to request that the BVI Court's order be made available to DBSI and the Court.  As requested by the Funds, *see* Doc. 76 at 23–24, any itemized log that may be produced will be available only to

---

[16] At least for now, the Court does not consider DBSI's arguments for why the factors weigh in favor of granting this motion, as well as its argument for why the factors should not govern at all.  *See* Doc. 86 at 6–9.

[17] The Funds, in their Opposition, volunteer to direct the Joint Liquidators to make this application.  *See* Doc. 76 at 23–24.  DBSI regards this alternate form of relief "too little, too late," *see* Doc. 86 at 2, since it would come "after the parties have [already] (1) exchanged multiple letters on the issue, (2) filed letter briefing with the Court … (3) participated in one hearing before the Court on this issue . . . , and (4) forced DBSI to expend significant time and expense moving to compel a log," *see id.* at 9 n.8.  The Court is unconvinced by DBSI's reasoning for why this result is unacceptable.  Indeed, in its initial memorandum to the Court, DBSI explicitly indicated that "the Funds could move to lift the seal to provide a list identifying the filings."  Doc. 69 at 13.

this Court and DBSI's U.S. counsel in this action.  Should the BVI Court deny the Joint

Liquidators' application, DBSI may request that the Court revisit this question.

### iii.  The Non-privileged, Responsive BVI Court Filings

DBSI argues that "to the extent there are responsive BVI Court Filings that are not

privileged, DBSI should be entitled to know what these documents are so that it can assess

whether there would be a basis to compel their production."  Doc. 69 at 10.  The Funds, in reply,

contend that such a log is "unwarranted" because they are already "producing the original

versions of these documents—identical to the filed copies except for the BVI Court's stamp[.]"[18]

Doc. 76 at 24.  DBSI, however, maintains that regardless of whether the Funds will be providing

the original versions of the documents, "it would nonetheless be relevant to know whether they

submitted [them] to the BVI Court for review."  Doc. 86 at 5.

The parties' respective BVI experts, moreover, appear to disagree as to whether

producing a list of non-privileged but responsive documents would violate the Sealing Orders.

DBSI's expert, Mark Phillips QC, explains:

> With respect to "[f]iled documents that pre-existed the liquidation or are available
> other than through the court file ('category 1')," "sealing the Court file does not
> prevent disclosure.  Producing a list of such documents, even if they are now on
> the liquidation file in the BVI cannot be disclosure of confidential material, nor
> can it constitute a breach of the sealing order.  The Liquidators would not be in
> contempt of the BVI court by producing a list of documents in category 1.  Such
> document[s] either pre-existed the liquidation or are available other than through
> the court file.  Sealing the file in the liquidation does not prevent the disclosure of
> or providing information regarding the subject matter of category 1 documents."

Document 86-3 ¶¶ 5–6, Second Affidavit of Mark Phillips.  David Chivers QC, the Funds'

expert, appears to reach the opposite conclusion:  The Sealing Orders prohibit the Funds from

producing a list of sealed, non-privileged documents:

> However, as explained in my First Report, a liquidator could not comply with a
> request for copies of (non-privileged) documents on the sealed court file without

---

[18] The Court understands this representation to mean that there are original versions of *all* of the sealed, relevant, non-privileged filings.

> breaching the sealing order.  Equally, I do not consider that a liquidator could
> comply with a request for disclosure by way of list identifying each document on
> the sealed court file without breaching the sealing order.  First, some or all of the
> documents, including the fact that they exist, are likely to be confidential.  The
> description of those documents in a list of documents may breach that
> confidentiality.  Second, the mere fact that the documents were filed (even if the
> documents or their existence are not confidential) may be confidential and the
> sealing order designed to protect that confidentiality.

Doc. 79 ¶ 17, Second Affidavit of David Chivers QC.[19]  Given the ostensibly conflicting

opinions of the experts, and to avoid the possibility of compelling the Funds to violate the

Sealing Orders, the Court directs the Funds to instruct the Joint Liquidators to petition the BVI

Court on the Funds' behalf to produce a list of *all* non-privileged but responsive BVI Court

Filings.  As previously ordered, the Funds will also direct the Joint Liquidators to request that the

BVI Court's order on this issue be made available to the Court and DBSI.  And any list that may

be produced will be available only to this Court and DBSI's U.S. counsel in this action.  Should

the BVI Court deny the Joint Liquidators' petition, DBSI may request that the Court revisit this

question.

### iv. The Mourant Documents

DBSI also requests that the Funds' BVI counsel, Mourant, produce relevant non-

privileged documents and communications and log any external communications that are

purportedly subject to privilege.  Doc. 69 at 3.[20]  The Funds allege that because Mourant "was

not involved in negotiating" the Confirmation Letter—the instrument purportedly obliging the

---

[19] DBSI argues that "the Funds' own BVI Court expert[, Chivers,] concedes that non-privileged documents filed
with the BVI Court that exist outside of the court can be disclosed, obviating any objection based on the undisclosed
Sealing Orders."  Doc. 86 at 5–6.  Yet this excerpt clearly evidences Chivers' belief that that is not the case.

[20] The Funds argue that DBSI waived its request for the relevant Mourant communications during the November 5,
2021 conference.  That argument is without merit.  The record shows that DBSI said that it could "dispense with
[the Mourant request]" only because it considered that request to be "subsumed within the request for information
concerning the filings with the BVI court, largely," which at that point had already been discussed.  Doc. 66 at
34:10–15.

Funds to sell DBSI the Claims once they became allowed—they need not produce those documents.  Doc. 54.  But even if that were the case, DBSI has shown that Funds have conceded that Mourant was "involved in the [their] decision to commence Chapter 15 proceedings and [their] negotiations with the Madoff Trustee regarding the settlement of the adversary proceeding, which are also issues relevant to this dispute."  *See* Doc. 71-8  at 5 (Hammond declaration identifying Mourant counsel Nicolas Fox and Eleanor Morgan in response to interrogatory Nos. 6 and 7).

The Funds, accordingly, do not contest the fact that Mourant possesses relevant information.  Instead, they assert that "[t]here simply is no reason to grant DBSI's request," since "it was Mourant's general practice not to take any relevant action or otherwise communicate with third parties on behalf of the Funds without a representative of the Funds or member of [the Funds' other counsel] being present or copied on their communications[.]"  Doc. 76 at 25.  The Funds contest that they have "produced relevant external communications from their and [the Funds' other counsel's] files" and that DBSI does not identify any other non-privileged "unique, relevant, and noncumulative evidence" it expects in Mourant's possession.  *Coventry Cap. US LLC v. EEA Life Settlements, Inc.*, No. 17 Civ. 7417 (VM), 2021 WL 961750, at * 1–2 (S.D.N.Y. Mar. 15, 2021).  The Court rejects the Funds' argument, as DBSI has no way of knowing what additional materials may have come in Mourant's possession during the firm's representation of the Funds in the BVI Liquidation.  Mourant's purported "general practice," does not permit the Funds to escape their discovery obligations.  The Funds are therefore directed to produce communications in Mourant's possession responsive to Request No. 4.  To the extent that Mourant claims that the communications are sealed or privileged, the documents are to be logged.

### b.  The Documents Withheld Under Common Interest Privilege

### i.    The Legal Standard

Federal Rule of Evidence 501 stipulates that "state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."  Fed. R. Evid. 501.  "In a diversity case, this rule requires the application of the state law of privileges, except where the proof is directed to an issue that is governed by federal law."  *Lego v. Stratos Lightwave, Inc.*, 224 F.R.D. 576, 578 (S.D.N.Y. 2004) (internal quotation marks and citation omitted).  New York privilege law therefore controls here.

Because New York law strongly "favor[s] liberal discovery," *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 57 N.E.3d 30 (N.Y. 2016), "the burden of establishing any right to protection is on the party asserting it; the protection claimed must be narrowly construed; and its application must be consistent with the purposes underlying the immunity[.]"  *Spectrum Sys. Int'l Corp. v. Chem. Bank*, 581 N.E.2d 1055 (N.Y. 1991) (internal citations omitted).  The proponent's burden "cannot be satisfied by counsel's conclusory assertions of privilege; rather the proponent of the privilege must set forth with competent evidence establishing the elements of the privilege."  *Delta Fin. Corp. v. Morrison*, No. 011118/2013, 2007 WL 2993663, at *2 (N.Y. Sup. Ct. Oct. 11, 2007).

### ii.   The Common Interest Privilege

The common interest privilege, an "exception to the general rule that the presence of a third party destroys any claim of privilege," applies "where two or more clients *separately* retain counsel to advise them on matters of common legal interest."  *Ambac*, 57 N.E.3d 30.  The doctrine "is limited to situations where the benefit and the necessity of shared communications are at their highest, and the potential from misuse is minimal."  *Id*.  Specifically, it applies in

"instances wherein codefendants, coplantiffs or persons who reasonably anticipate that they will become colitigants," must communicate between one another to "mount a common claim or defense, at a time when [the] parties are likely to expect discovery requests and their legal interests are sufficiently aligned that 'the counsel of each [i]s in effect the counsel of all[.]'" *Id.* (quoting *Chahoon v. Commonwealth,* 62 Va. (21 Gratt.) 822, 839–40 (1871)).  To invoke the doctrine, the communicating entities must share "common legal interests" that relate to "pending or reasonably anticipated litigation" common to the entities.  *Id.*  Here, DBSI and the Participants lack a common legal interest.  For that reason, the common legal privilege does not shield the 84 documents that DBSI shared with the Participants or the 64 documents withheld or redacted by the Participants.  *See* Doc. 123 at 7–8.

There is common legal interest where the entity:  (1) is an actual or anticipated co-litigant, *see, e.g.*, *330 Acquisition Co., LLC v. Regency Savings Bank, F.S.B.*, No. 109283/98, 2003 WL 25516150, at *2–3 (N.Y. Sup. Ct. Jul. 11, 2003); (2) has received authorization to enforce a litigant's rights, *see, e.g.*, *ACE Secs. Corp. v. DB Structured Prods., Inc.*, 40 N.Y.S.3d 723 (N.Y. Sup. Ct. 2016) (where trustee was authorized to act on behalf of trust's certificate holders); or (3) has some rights or liabilities at issue in the litigation, even if it is not itself a litigant, *see, e.g.*, *San Diego Gas & Elec. Co. v. Morgan Stanley Senior Funding, Inc.*, 136 A.D.3d 547, 548 (N.Y. App. Div. 2016) (finding that a third party who had rights under a contract against plaintiff shared common legal interest with defendant).  *See* Doc. 139 at 4–5.  None of these circumstances are present here.  First, "DBSI and the [Participants] are not co-parties in actual or anticipated litigation involving the Funds" and the Participants face "no risk of liability in this [litigation] or any other litigation between DBSI and the Funds[.]"  Doc. 123 at 14–15.  Second, DBSI has not transferred or assigned—or authorized any other party to

exercise—any of its rights under the Confirmation Letter.  *See id.* at 14–15.[21]  Critically, the

Participants have no rights or obligations in the Confirmation Letter.  They are neither parties to,

nor beneficiaries of, the letter, and they could not sue the Funds for breaching it.  As the Funds

explained during the April 20, 2022 conference:

> The investors' only legal interest is in their downstream contract with [DBSI], but
> that's different from [DBSI's] legal interest in its upstream contract with the
> [F]unds.  There's no litigation about the downstream contracts, and those
> contracts aren't at issue in the 2011 litigation, the chapter 15 petition, or in this
> case.

Doc. 128 at 16:25–17:5.  The wholly separate nature of the Participation Agreements from the

Confirmation Letter leaves the Participants without any common legal interest with DBSI in the

instant action, along with the 2011 Litigation and the Bankruptcy Case.

DBSI does not argue that common legal interest exists under any of the three

aforementioned circumstances but maintains that such interest *also* exists where, as here:  (1) the

parties share an interest in a court interpreting and enforcing an agreement in a particular way

and have undertaken a common legal strategy, *see* Doc. 133 at 12; or (2) the parties share

common interest in the "fruits of" an agreement, *id.* at 14.  To support its first point, DBSI relies

on *Schaeffler v. United States*, 806 F.3d 34 (2d Cir. 2015).

There, the Second Circuit found the common legal privilege properly invoked when a

company involved in a "legal encounter" with the IRS provided confidential documents to a non-

party consortium of banks in furtherance of a coordinated litigation strategy to avoid unfavorable

tax treatment for the company that would also adversely affect the consortium.  *See* Doc. 133 at

11–12 (citing *Schaeffler*, 806 F.3d at 37–41) (internal quotation marks omitted).  Relevant here,

---

[21] Unlike in *Vacco v. Harrah's Operating Co.*, No. 07 Civ. 663, 2008 WL 4793719 (N.D.N.Y. Oct. 29, 2008)—
where the court found common legal interest between a Native American tribe and the litigation trust to which the
tribe assigned the ability to enforce its legal rights—no such assignment or analogous sale here took place.

the Second Circuit explained that it was the consortium's "interest in avoiding [] losses that established a common legal interest" and that "[a] financial interest of a party, no matter how large, does not preclude the court from finding a legal interest shared with another party where the legal aspects materially affect the financial interests." *Schaeffler*, 806 F.3d at 42.  Put differently, where a dispute involves legal questions that will materially affect a common financial interest of a party to the litigation and a non-party, courts *can* find common legal interest to exist.  According to DBSI, the Participants' position is analogous to that of the bank consortium; the Participants are aligned with DBSI "on the litigation outcomes . . ., have undertaken mutual obligations to achieve that outcome, and have engaged in confidential communications to achieve their common goal."  Doc. 133 at 12.

Though *Schaeffler* may lend support to DBSI's position, the case is not controlling.  As the Funds rightly note, *Schaeffler* applies *federal* law.  Here, state law controls.  Cases applying federal law may guide courts on state privilege questions, *see generally HSH Nordbank AG N.Y. Branch v. Swerdlow*, 259 F.R.D. 67 (S.D.N.Y. 2009), but ultimately, the Court must administer *state* law.[22]  While DBSI cites other cases that apply state law, none conclude that privilege survives where communications are shared with entities that are *not* parties to the contract at issue and are *not* parties to the litigation to enforce the contract.  In *HSH Nordbank*, 259 F.R.D. at 73 (cited in Doc. 133 at 10), for example, "the plaintiff and third-party lenders each had independent legal rights in the guaranties at issue in the litigation," Doc. 139 at 9, whereas here, the investors have no rights under the Confirmation Letter.  Additionally, in *Homeward*

---

[22] Beyond this substantive distinction between federal and state law, there are also several differences of fact between the *Schaeffler* and the instant case.  The bank consortium in *Schaeffler*, for example, held a right of refusal over the company's legal strategy.  The Participants have no such right of refusal.  Additionally, in *Schaeffler* "cooperat[io]n" on legal strategy was necessary to avoid a "mutual financial disaster."  806 F.3d at 41.  DBSI does not allege that any such disaster would here result should the Court not find the common interest privilege to apply.

*Residential, Inc.*, No. 12 Civ. 5067 (JFK) (JLC), 2017 WL 4676806, at *10, the "trust's servicer

was contractually empowered to sue to enforce the rights of the trust's certificateholders," Doc.

139 at 9, whereas here, the Confirmation letter does not confer the Participants any such right;

and nor does DBSI sue on their behalf.  *See* Doc. 133 at 10–11.

      *Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*, 215 F.R.D. 466 (S.D.N.Y. 2003)

is most instructive.  In that case, Bombardier Aerospace Corp. ("Aerospace") sold an interest in

an airplane to Gulf Islands Leasing, Inc. ("Gulf").  Bombardier Capital, Inc. ("Capital"), an

affiliate of Aerospace, then agreed to provide financing to Gulf for the sale.  When Aerospace

and Gulf sued each other for breach of contract, Capital invoked the common legal privilege with

Aerospace, reasoning that both parties shared an interest in resolving the case without Gulf

defaulting.  *See id.* at 467–73.  Applying New York law, the court rejected Capital's argument:

> "Capital's ultimate interest in the dispute was merely a desire to ensure that the
> sums owed by Gulf to [ ] Capital under its own agreements were paid.  A concern
> to ensure the payment of money is commercial in nature and does not qualify for
> protection under the common interest rule.  Accordingly, these interests were
> commercial and do not qualify for protection under the common interest rule.
> Moreover, to the extent that the asserted interest could be construed to encompass
> a desire for [ ] Aerospace to reach a favorable outcome in the litigation with Gulf,
> it is also insufficient to invoke the common interest rule.  A concern shared by
> parties regarding litigation does not establish by itself that the parties held a
> common legal interest.

*Id.* at 472–73 (internal quotation marks omitted).  Even though Capital had a financial interest in

having the case resolved without Gulf defaulting, the court held that Capital lacked common

legal interest in that litigation with Aerospace, thereby highlighting the distinction between

common legal interest and common interest in the outcome of litigation.  Like the parties in *Gulf

Islands*, DBSI and the Participants share a transactional interest in the outcome of litigation.  But

New York law requires more than that.  "A concern to ensure the payment of money is

commercial in nature and does not qualify for protection under the common interest rule," even

if payment is contingent on the outcome of a litigation. *Id.* at 472–73; *see also Shamis v. Ambassador Factors Corp.*, 34 F. Supp. 2d 879, 893 (S.D.N.Y. 1999) (parties did not share a common legal interest who "would both benefit from a judgment in favor of the plaintiff").[23] For this reason, the Court finds that DBSI and the Participants do not share a common legal interest, though they may share an interest in the outcome of the litigation.

DBSI alternatively argues that parties share a common legal interest where they have common interest in the "fruits of" an agreement. *See* Doc. 133 at 3 ("The Participants' rights under the Participation Agreements depend upon DBSI obtaining the fruits of the Agreement and thus they indisputably have a common interest in the outcome of this litigation."). But DBSI points to no authorities construing New York law to hold that entities share a common legal interest in a litigation whose outcome *might* implicate a non-party's *future* rights under a downstream contract. Meanwhile, the Funds point to caselaw that shows the opposite is true: that common legal interest must *currently* exist. *See* Doc. 139 at 6. In *Microsoft Corp. v. Acacia Res. Corp.*, No. 13 Civ. 8275 (PAC), 2014 WL 6450254, at *2 (S.D.N.Y. Nov. 17, 2014), for example, another court in this district, applying New York law, found no common legal interest to exist between a litigant and third party entitled to royalty payments from anticipated litigation. *See also Fox Paine & Co. LLC v. Houston Cas. Co.*, 51 Misc. 3d 1212(A), at *19–22 (Sup. Ct. Apr. 21, 2016) (finding no shared legal interest between an insured litigant and a third-party insurer who was contractually obligated to indemnify the plaintiff for the liability at issue in the

---

[23] Additionally, "[t]he existence of … a coordinated legal strategy is insufficient where there is only a common commercial interest and no identity of legal interests." *Gulf Islands Leasing*, 215 F.R.D. at 473. Neither is a belief in sharing a common legal interest or that parties' intended communications to remain private. *See Ambac*, 57 N.E.3d 30 (holding that parties did not share a legal interest in communications about a commercial matter that they intended to be confidential).

litigation); *Gulf Islands Leasing*, 215 F.R.D. at 468, 473–74.[24]  A contingent stake in a downstream contract does not provide safe harbor under the common interest privilege.

Because DBSI has failed to meet its burden of proving that a common legal interest exists —which both parties accept as a prerequisite to invoke common interest privilege—the common interest privilege does not shield the withheld communications.

## III.    CONCLUSION

For the reasons set forth above, DBSI's motion to compel is DENIED in part and GRANTED in part.  Additionally, the Funds' motion to compel is GRANTED.  The Clerk of the Court is respectfully directed to terminate the motion, Doc. 43, as well as the parties' letter motions for oral argument, Docs. 87 and 140.

It is SO ORDERED.

Dated:    August 24, 2022
          New York, New York

_____
Edgardo Ramos, U.S.D.J.

---

[24] Separate from the question of common legal interest, the Funds additionally note that to invoke the common interest privilege it must be necessary for parties to freely converse; but DBSI fails to explain why free communications meet the high standard of necessity in the instant action.  *See generally* Doc. 123; *see also* Doc. 139 at 5 n.6; *Ambac*, 57 N.E.3d 30 n.1 (The common interest privilege "is limited to situations where the benefit and the necessity of shared communications are at their highest[.]").